# EXHIBIT A

CONFIDENTIAL

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

- - - - - - - - - - - - - - - - x

RITLABS, S.R.L.,                     :

       Plaintiff,              :

vs.                                  :Case No.1:12-cv-00215

RITLABS, INC., ET AL.,               :

       Defendants.             :

- - - - - - - - - - - - - - - - x

June 6, 2012

Alexandria, VA

DEPOSITION OF:

SERGHEI DEMCENKO

called for examination by counsel for the Plaintiff,

pursuant to notice, taken at the offices of I.S. Law

Firm, PLLC, 1199 North Fairfax Street, Suite 702,

Alexandria, Virginia, commencing at 9:55 a.m., before

Misty Klapper, a Notary Public in and for the

Commonwealth of Virginia, when were present on behalf

of the respective parties:

CONFIDENTIAL

1          Q.    Mr. Demcenko, are you in possession of

2    documents evidencing your payment of capital to IBIS,

3    SRL at the formation of the company?

4          A.    At the present moment I do not have

5    documents which can prove my share to the company.

6          Q.    Mr. Demcenko, why did you not retain

7    documents that would prove your contribution of

8    initial capital to IBIS, SRL?

9          A.    I am not saying that I did not save them.

10   I said that I do not have them right now.

11         Q.    If you do not have them right now, are

12   you able to obtain them?

13         A.    If there are certain things that need to

14   be done in order to obtain them, yes, I can obtain

15   them and have them.

16         Q.    Mr. Demcenko, are you familiar with ALEX,

17   SRL?

18         A.    Yes, I'm familiar with the company ALEX,

19   SRL.

20         Q.    What products or services did ALEX, SRL

21   sell?

22         A.    I don't know what kinds of services or

CONFIDENTIAL

1   **products sell ALEX, SRL.**

2           **Q.    Mr. Demcenko, is it accurate that both**

3   **IBIS, SRL and ALEX, SRL owned 50 percent of RitLabs --**

4   **excuse me -- of RIT, SRL?**

5                   MR. GARDEN:  Objection, lack of

6   foundation.

7                   THE WITNESS:  ALEX, SRL and IBIS, SRL own

8   50 percent of -- own each 50 percent of RitLabs --

9   RIT, SRL.

10                  BY MR. DI GIACOMO:

11          **Q.    Mr. Demcenko, for clarity of the record**

12  **you are familiar -- are you familiar with RIT, SRL?**

13          **A.    I am familiar with RIT, SRL.**

14          **Q.    Mr. Demcenko, have you ever in your**

15  **individual capacity owned shares in RIT, SRL?**

16          **A.    I personally never owned shares of RIT,**

17  **SRL.**

18          **Q.    Mr. Demcenko, what products and services**

19  **did RIT, SRL provide or sell?**

20          **A.    RIT, SRL developed hardware and software.**

21                  MR. DUBOGRAEV:  Objection to the

22  translation.

CONFIDENTIAL

1          MR. GARDEN:  Can we go off the record?

2          MR. DI GIACOMO:  Off the record.

3          (Thereupon, a discussion was had off the

4          record.)

5          THE WITNESS:  Development of intellectual

6    phones, personal computers and different electronic

7    devices.

8          MR. DI GIACOMO:  To clarify for the

9    record, Mr. Demcenko had stated that RIT, SRL provided

10   both software and firmware.

11         BY MR. DI GIACOMO:

12    **Q.    Mr. Demcenko, do you know the specific**

13   **names of the products that RIT, SRL sold?**

14    **A.    Yes, DOS Navigator.**

15    **Q.    Was DOS Navigator the only product that**

16   **RIT, SRL sold?**

17    **A.    No.**

18    **Q.    What other products or software services**

19   **did RIT, SRL sell?**

20    **A.    The Bat!**

21    **Q.    Mr. Demcenko, were there any other**

22   **products or services that RIT sold?**

CONFIDENTIAL

1          A.     Yes, there were.

2          Q.     What were those products?

3          A.     We did specialized versions based on our

4    products.  For example, our mail.  It's specialized

5    version for mail clients for our providers, internet

6    providers.

7          Q.     And, Mr. Demcenko, were these specialized

8    versions based on the code of either DOS Navigator or

9    The Bat!

10          A.     DOS and The Bat!  There were specialized

11    versions of the DOS Navigator and The Bat!

12          Q.     Did you write any of the code of DOS

13    Navigator?

14          A.     I did not write any code in DOS

15    Navigator.

16          Q.     Did you write any of the code of The Bat!

17    at the time that RIT, SRL sold The Bat!

18          A.     No, I did not write code when RIT sold

19    Bat -- was selling Bat.

20          Q.     Mr. Demcenko, do you know any programming

21    languages?

22          A.     I know program languages.

CONFIDENTIAL

1          Q.    Which programming languages, in your

2     personal opinion, do you feel that you are fluent in?

3          A.    Fluent I don't know any languages.

4          Q.    Mr. Demcenko, why did RIT, SRL stop

5     functioning?

6          A.    RIT, SRL stopped functioning due to

7     inability of renewal of the registration of the

8     company.

9          Q.    Why was RIT, SRL, in your lay opinion,

10    unable to renew its registration as a company?

11         A.    Because the founders of ALEX did not

12    fulfill registration of ALEX.

13         Q.    Do you know why they did not fulfill

14    their registration -- let me strike that.

15               Do you know why the founders of ALEX did

16    not fulfill their registration requirements for ALEX?

17         A.    No, I do not know why the founders of

18    ALEX did not fulfill their registration

19    responsibilities for ALEX.

20         Q.    Mr. Demcenko, did you resign from RIT,

21    SRL?

22         A.    Yes, I resigned from RIT, SRL.

CONFIDENTIAL

1   That clarification has not been provided.

2           BY MR. DI GIACOMO:

3       **Q.    Mr. Demcenko, I cannot provide you with a**

4   **definition of Moldovan law related to property.  What**

5   **I'm asking you for is your personal lay opinion as to**

6   **the definition of property, which your attorney has**

7   **now clarified for you that you are capable of**

8   **answering without a legal objection.**

9           **So I'd ask that you provide me with**

10  **your -- your personal opinion on whether or not RIT,**

11  **SRL owned any property.**

12      **A.    I answered the previous question.**

13          MR. GARDEN:  Can we go off the record?

14          MR. DI GIACOMO:  Sure.

15          (Thereupon, a discussion was had off the

16          record.)

17          (Thereupon, a brief recess was taken.)

18          BY MR. DI GIACOMO:

19      **Q.    To re-ask the question prior to break,**

20  **Mr. Demcenko, are you -- in your personal opinion, are**

21  **you aware of RIT, SRL's ownership of any property?**

22      **A.    Yes, of course.  Yes, of course.  RIT,**

CONFIDENTIAL

1    SRL used to own all products that it sold.  For

2    example, The Bat!, DOS Navigator.

3         Q.    Mr. Demcenko, are you familiar with

4    RitLabs, SRL?

5         A.    Yes, I am familiar with RitLabs, SRL.

6         Q.    Who formed RitLabs, SRL?

7         A.    Serghei Demcenko, Maxim Masiutin, Stefan

8    Tanurkov.

9         Q.    In your personal knowledge, when was

10   RitLabs, SRL formed?

11        A.    My opinion?  Formal or informal?  As

12   group or as a company?

13        Q.    As the physical -- as the business

14   entity.

15        A.    After all participants fulfilled its

16   obligations.

17        Q.    Could you provide me with the year in

18   which you believe RitLabs, SRL was formed?

19        A.    I don't have this information right now

20   because as of right now I cannot establish when is the

21   founding capital was established.

22        Q.    Mr. Demcenko, did you consult with your

CONFIDENTIAL

1      Q.    Would it be within your job duties as the

2  director of the company to have a conversation

3  concerning the statutory capital with them at that

4  time?

5      A.    Not of course.  Not of course.  No, until

6  the company was established we were all equal

7  partners.

8      Q.    Did you have any conversations with

9  Mr. Masiutin or Mr. Tanurkov concerning the

10  contribution of statutory capital after the formation

11  of the company and prior to December 2011?

12      A.    I can't recall.

13      Q.    Mr. Demcenko, what goods or services does

14  RitLabs, SRL -- did RitLabs, SRL sell during your time

15  period with the company?

16      A.    RitLabs, SRL was selling program product

17  The Bat!

18      Q.    Could you please list the other products

19  that RitLabs, SRL sold?

20      A.    BatPost!  Yes, of course.  BatPost!, The

21  Bat! Security, Courier Electronic.

22      Q.    Sorry, Career?

CONFIDENTIAL

Page 50

1          A.     Of course I do.

2          Q.     And what's his position with RitLabs,

3     SRL?

4          A.     He was the chief accountant.

5          Q.     And did you ever direct Mr. Talmatski to

6     destroy documents?

7          A.     Never.

8                 (Thereupon, DEM Deposition Exhibit Number

9                 4 was marked for identification.)

10                BY MR. DI GIACOMO:

11         Q.     Mr. Demcenko, I am handing you a document

12     that is marked Exhibit DEM4, which purports to be a

13     trademark application or, excuse me, the U.S. Patent

14     and Trademark Office data base's content related to an

15     application for registration of the trademark

16     MailVoyager.  This document shows that MailVoyager was

17     first used in commerce September 27, 2011 and it lists

18     as owner of this trademark RitLabs, Inc.

19                Can you confirm that this is accurate?

20     Excuse me, the record should reflect that it lists the

21     applicant and not the owner as RitLabs, Inc.

22                Mr. Demcenko, are you familiar with this

CONFIDENTIAL

1  **trademark filing?**

2      **A.    Yes.**

3      **Q.    Mr. Demcenko, when did RitLabs, Inc.**

4  **begin using MailVoyager as a trademark?**

5      **A.    From the date stated here.**

6      **Q.    Mr. Demcenko, did any other organizations**

7  **use MailVoyager as a trademark prior to the date**

8  **reflected in that application?**

9          MR. GARDEN:  Objection, calls for

10  speculation.

11          MR. DI GIACOMO:  Let me rephrase the

12  question.  Do you want to reflect the translation

13  prior to me rephrasing?

14          THE WITNESS:  Can you ask the question

15  again?

16          BY MR. DI GIACOMO:

17      **Q.    Absolutely.  Mr. Demcenko, did RitLabs,**

18  **SRL use MailVoyager prior to RitLabs, Inc.?**

19      **A.    RitLabs, SRL never used name MailVoyager**

20  **as a trademark.**

21          (Thereupon, DEM Deposition Exhibit Number

22          5 was marked for identification.)

CONFIDENTIAL

Page 53

1   printout of the waybackmachine, is dated August 4,

2   2011, which is prior to the date listed in that

3   application.

4              Do you still maintain that the

5   MailVoyager mark was first used by RitLabs, Inc. and

6   that it was first used on September 27, 2011?

7              MR. GARDEN:  Objection, the question

8   calls for a legal term regarding the term -- a legal

9   conclusion, rather, regarding the term use.

10             BY MR. DI GIACOMO:

11        Q.   Mr. Demcenko, I'm simply asking for your

12   lay opinion with regard to the use of this term.

13        A.   We used the name MailVoyager before we

14   did the first sale and we filed our first trademark

15   after our first sale.

16        Q.   Mr. Demcenko, how did RitLabs, SRL get

17   the authority to use that term on its website at that

18   time?

19        A.   It was just placed there.

20        Q.   And is it accurate to state that there is

21   a buy now button attached to the side bar on that

22   page?

CONFIDENTIAL

Page 54

1      A.    Yes, it's a commercial -- it's a

2  commercial for advertisement of the products.

3      Q.    And, Mr. Demcenko, you stated in your

4  testimony that if a user was to click on this link --

5  and I don't want to mischaracterize your testimony, so

6  make sure you tell me whether I'm accurate -- that

7  they would be sent to the RitLabs, Inc. website to

8  purchase that product; is that correct?

9      A.    No, they were to be sent to the Amazon

10  store to buy this product.

11      Q.    So if a user arrived at ritlabs.com and

12  clicked on this link on this date, they would be sent

13  to an Amazon Marketplace store or some Amazon store

14  selling the product; is that correct?

15      A.    I cannot say for sure because I -- I

16  don't know which link was there then.  But most

17  likely, yes.  And if there is an archive version of

18  this site, we can see.  It could probably go on Amazon

19  or RitLabs, Incorporated with the advertisement and

20  offering of our products of RitLabs.

21      Q.    RitLabs, SRL or INC.?

22      A.    RitLabs, SRL.

CONFIDENTIAL

Page 55

1          Q.    Mr. Demcenko, why did RitLabs, SRL place

2     this button on the ritlabs.com domain name, or, excuse

3     me, this advertisement would probably be a more

4     accurate characterization?

5          A.    We didn't have any kind of agreement.  We

6     just placed it there and that's it.  It was done by a

7     webmaster of the company.

8          Q.    Was this --

9          A.    Probably because I direct -- I instructed

10    him so.

11         Q.    Mr. Demcenko, did you direct your

12    attorney to file this application for the registration

13    of MailVoyager?  And I'm not asking you for any

14    conversations that you had with your attorney, just

15    whether you approved the application for filing.

16              MR. GARDEN:  I'm going to object to the

17    question to the extent it calls for an attorney/client

18    communication; however, provided you agree that his

19    response does not waive any attorney/client privilege,

20    I can agree that he can answer that question.

21              MR. DI GIACOMO:  Absolutely, I agree.

22              THE WITNESS:  Can you repeat the

CONFIDENTIAL

1   my wife, Olga, and the company RitLabs, SRL.

2            BY MR. DI GIACOMO:

3        Q.    Mr. Demcenko, what is your percentage of

4   ownership of RitLabs, Inc.?

5        A.    I cannot say the exact percent, but I own

6   the majority.  It's more than 80 percent.

7        Q.    Do you know how many shares you own,

8   Mr. Demcenko?

9        A.    No.

10       Q.    Prior to the formation of RitLabs, Inc.

11  did you seek the vote of the members of the general

12  assembly of RitLabs, SRL for approval of your creation

13  of that company?

14            MR. DUBOGRAEV:  Objection on translation.

15            MR. GARDEN:  Off the record.

16            (Thereupon, a discussion was had off the

17            record.)

18            MR. DI GIACOMO:  There was some confusion

19  on the translation of the last question.  For the

20  record, the question was prior to the formation of

21  RitLabs, Inc. did you seek the vote of the members of

22  the general assembly of RitLabs, SRL for approval of

1    the creation of RitLabs, Inc.

2             The translator reflected that the

3    term was choice by mistake and we are now asking

4    her to confirm that it is approval.

5             THE INTERPRETER:  Yes, that is correct.

6    I mean --

7             BY MR. DI GIACOMO:

8        Q.    Can you re-ask the question for

9    Mr. Demcenko?

10       A.    Before I formed the company RitLabs, I

11   did not seek the word from -- from the members of

12   general assembly of RitLabs, SRL because there is no

13   necessity for that.

14       Q.    Why was there no necessity to seek the

15   approval of the members of RitLabs, SRL prior to

16   creating RitLabs, Inc.?

17       A.    Because I was creating RitLabs, Inc.

18   personally as Serghei Demcenko.

19       Q.    Do you, in your personal opinion, feel

20   that there might have been a conflict of interest

21   creating a company with the same name within the

22   United States without the participation of your

CONFIDENTIAL

1          A.    Yes, it is my signature.

2          Q.    Mr. Demcenko, why did you sign this

3     agreement on behalf of RitLabs, SRL and not on behalf

4     of RitLabs, Inc.?

5          A.    Because I signed it on behalf of RitLabs,

6     SRL because I am a director of RitLabs, SRL.

7          Q.    But you are also the director or CEO of

8     RitLabs, Inc.; is that correct?

9          A.    Yes.

10         Q.    So why did you not sign this agreement on

11     behalf of RitLabs, Inc. as well?

12         A.    I figured that that would be better.

13         Q.    Why would that be better?

14         A.    Two sides signed, two companies, they

15     are.

16         Q.    I'm sorry, could you please rephrase that

17     answer?  I'm not sure I understood.

18              THE INTERPRETER:  Two sides, two

19     companies they are.

20              BY MR. DI GIACOMO:

21         Q.    Mr. Demcenko, I'm not understanding your

22     answer.  Could you explain why you did not sign on

Page 80

1    **behalf of RitLabs, Inc. as you signed on behalf of**

2    **RitLabs, SRL?**

3                    MR. GARDEN:  Objection, asked and

4    answered.

5                    THE WITNESS:  I answered.

6                    BY MR. DI GIACOMO:

7        Q.    **Mr. Demcenko, your answer was two sides**

8    **signed, two companies, they are.  I do not understand**

9    **that answer.  Could you please repeat that in a form**

10   **that's comprehensible, please?**

11                   MR. GARDEN:  Objection.  It's

12   comprehensible.  Please don't argue with the witness.

13                   MR. DI GIACOMO:  Kevin, can we go off the

14   record?

15                   (Thereupon, a discussion was had off the

16                   record.)

17                   BY MR. DI GIACOMO:

18       Q.    **Mr. Demcenko, were you concerned that**

19   **there may have been a conflict of interest if you**

20   **signed on both behalf of RitLabs, SRL and RitLabs,**

21   **Inc.?**

22       A.    No, I was not concerned because,

CONFIDENTIAL

1    **according to Moldova law, it is not a problem if there**

2    **are two companies sign where there's just one person**

3    **signing for both companies.**

4                    MR. DUBOGRAEV:  Somewhat of an objection

5    regarding the translation.

6                    (Thereupon, a discussion was had off the

7                    record.)

8                    THE WITNESS:  That both companies have

9    the same package of actions and the owner is one

10   person.

11                   MR. GARDEN:  Off the record.

12                   (Thereupon, a discussion was had off the

13                   record.)

14                   THE INTERPRETER:  Correction, that both

15   companies have the same package of shares.

16                   BY MR. DI GIACOMO:

17        **Q.    Mr. Demcenko, just to restate your**

18   **testimony, you stated that you were not concerned**

19   **because, according to Moldova law, it is not a problem**

20   **if there are two companies signing when there's just**

21   **one person signing for both companies.**

22                   **By that testimony do you mean to say that**

1    there is no problem of an interested or -- transaction

2    or conflict of interest with your nonlegal

3    understanding of those terms when an individual signs

4    on behalf of both companies, when the same individual

5    signs on behalf of both companies -- let me -- strike

6    that.  Let me rephrase the question.

7               Mr. Demcenko, to restate your testimony,

8    you stated that you were not concerned about signing

9    both as a director of RitLabs, SRL and as a CEO of

10   RitLabs, Inc. because under Moldova law there's not a

11   problem when the same person signs on behalf of both

12   companies.

13              Based on your lay opinion, do you mean to

14   say by this answer that there is no problem in an

15   interested transaction or conflict of interest when an

16   individual signs on behalf of both companies?

17        A.    First of all, I didn't say that when one

18   person signs on behalf of both companies.  I was

19   talking about making an agreement between two

20   companies where the owner is one person.  Based on

21   what I just said, I ask to rephrase the second part of

22   the question.

CONFIDENTIAL

1        Q.    Mr. Demcenko, your answer was no, I was

2   not concerned because, according to Moldova law, it is

3   not a problem if there are two companies sign where

4   there is just one person signing for both companies.

5   I take that to mean that you stated that there is not

6   a problem under Moldovan law where one person signs

7   for both companies.

8              Is that incorrect?

9        A.    This is not the correct translation.

10  This is incorrect.  I was not saying -- this is not

11  correct translation or maybe I did not understand

12  interpreter in a correct way.

13             I said and I affirm in accordance with

14  Moldova law, there are not -- there are no limits in

15  making an agreement between two companies SRL-type,

16  one owner owns both companies or has control of both

17  companies.

18       Q.    Just to clarify, Mr. Demcenko, are you

19  stating that you own 100 percent of RitLabs, SRL and

20  that you did own 100 percent of RitLabs, SRL at the

21  time of this license agreement?

22       A.    At this point I think that I own 100

CONFIDENTIAL

Page 84

1   **percent of SRL from information that I have.**

2                   MR. DI GIACOMO:  Before you continue with

3   the translation, if he has addressed any

4   attorney/client privilege I want to make sure that

5   it's clear to Mr. Demcenko that he doesn't waive his

6   right.

7                   MR. GARDEN:  Mr. Demcenko, I would just

8   remind you that any of the communications that you had

9   between your attorneys is subject to the

10  attorney/client privilege.

11                  THE WITNESS:  You interrupted me in a

12  question and answer.  I don't know.  So what?

13                  MR. DI GIACOMO:  I believe that he's

14  answered the question with what he stated thus far.

15                  THE WITNESS:  Can I finish my answer?

16                  BY MR. DI GIACOMO:

17      **Q.    Sure, please.**

18      **A.    I repeat that at the present time,**

19  **according to my information, I suppose that I own 100**

20  **percent shares of the company RitLabs, SRL.**

21      **Q.    Okay.**

22      **A.    At the moment of this agreement -- at the**

CONFIDENTIAL

1   moment of the conclusion of this agreement, I did not

2   have such information.

3               MR. DI GIACOMO:  I think we're going to

4   take a quick break.

5               (Thereupon, a brief recess was taken.)

6               (Thereupon, DEM Deposition Exhibit Number

7               8 was marked for identification.)

8               BY MR. DI GIACOMO:

9       Q.    Mr. Demcenko, I'm handing you what's been

10  marked as Exhibit DEM8, which purports to be an E-mail

11  that you sent to Mr. Kruglov on September 19th 2011.

12              Can you confirm that you've seen this

13  E-mail before?

14      A.    Yes, of course.

15      Q.    In this E-mail, Mr. Demcenko, you state

16  concerning your visa that they sent you a second

17  round, demanded a bunch of additional paperwork and

18  employees and that you cannot leave the country for

19  now.

20              You also state your conditional status

21  has been extended, but the visa had expired and that a

22  new one will be issued no sooner than in two months.

CONFIDENTIAL

1   certain tale to prove your activity in the company.

2                 Why did you make that statement?

3                 MR. DUBOGRAEV:  Objection, translation.

4                 MR. SHAHTAKHTINSKI:  Go off the record to

5   correct.

6                 (Thereupon, a discussion was had off the

7                 record.)

8                 BY MR. DI GIACOMO:

9       Q.    Let me rephrase the question.  There's

10  been some discussion off the record that the

11  translation of this E-mail between Mr. Demcenko and

12  Mr. Masiutin was incorrect and I want to rephrase the

13  question based on the correct translation.

14                Mr. Demcenko, in Exhibit DEM12 in front

15  of you Mr. Masiutin asks you why you need to mention

16  2001.  And then in Exhibit DEM13 in front of you, you

17  state that the Department of Immigration requires a

18  certain story to prove your activity in the company.

19                Why did you state that the Department of

20  Immigration requires a certain story to prove your

21  activity in the company?

22      A.    Firstly, in the letter that I sent I

Page 97

1    **stated that I need a story to prove my activities.**

2    **The necessity of this particular document I was**

3    **advised by my immigration lawyer --**

4                    MR. GARDEN:  Mr. Demcenko, you don't want

5    to disclose any substantive communications between you

6    and your counsel.

7                    THE WITNESS:  Well, I was pressed.

8                    BY MR. DI GIACOMO:

9        **Q.    Mr. Demcenko, within your personal**

10   **opinion and within your personal knowledge and not any**

11   **advice that you received from your attorney, why did**

12   **you need to mention the date 2001 and why did you need**

13   **to provide the Department of Immigration with this**

14   **story?**

15                   MR. GARDEN:  Objection to form.

16                   THE WITNESS:  I did what I was advised by

17   immigration lawyer.  I did not take care of my

18   immigration matters myself.  I was -- I did what I was

19   told by my immigration lawyer.  I was told to collect

20   documents and I did.

21                   MR. GARDEN:  You can state that you did

22   something at the advice of counsel, but I would not

CONFIDENTIAL

Page 98

1    disclose what that advice was.

2              THE WITNESS:  I did it on advice of my

3    lawyer.

4              BY MR. DI GIACOMO:

5         Q.   **Mr. Demcenko, who is your immigration**

6    **attorney?**

7         A.   **Serge Bauer.**

8              **(Thereupon, DEM Deposition Exhibit Number**

9              **14 was marked for identification.)**

10             **BY MR. DI GIACOMO:**

11        Q.   **Mr. Demcenko, I'm handing you what's been**

12   **marked as Exhibit DEM14.  This is a subscription**

13   **agreement purported to be between RitLabs, Inc. and**

14   **RitLabs, SRL, wherein RitLabs, SRL is purported to be**

15   **granted 39 shares of RitLabs, Inc.**

16             **Have you seen this document before?**

17        A.   **Yes.**

18        Q.   **And for the record, I'd like to note that**

19   **it is also marked as Tanurkov Exhibit 11.**

20             THE INTERPRETER:  Interpreter request

21   clarification.  I do not know what a subscription

22   agreement in this particular context means.

CONFIDENTIAL

Page 118

1    course, sent documents on behalf of RitLabs, Inc. to

2    immigration department.

3         Q.    Did you apply for an L-1A visa?

4         A.    Yes, I did apply for LI-1 (sic) visa.

5         Q.    What position did you indicate being your

6    position as -- strike that.

7               What did you indicate as being your

8    position at RitLabs, Inc. when applying for L-1A?

9         A.    CEO.

10        Q.    And what percentage of ownership of

11   RitLabs, Inc. did you indicate in the immigration

12   papers when you applied for L1-A?

13        A.    I indicated 100 percent and also the

14   amount which was less than 100 percent.

15        Q.    Why did you indicate 100 percent if you

16   told us that you own about 80 percent of RitLabs?

17        A.    I said that currently I own 80 percent,

18   in the very beginning of our questioning.

19        Q.    What percentage of RitLabs, Inc. did you

20   own at the time when you first applied for L1-A visa?

21        A.    100 percent.

22        Q.    And when did that change from 100 percent

CONFIDENTIAL

Page 119

1   to about 80 percent?

2       A.    When we transferred actions -- when we

3   transferred shares to RitLabs, SRL and when I

4   transferred some shares to my wife.

5       Q.    Did you transfer those shares after you

6   obtained L1-A visa or before?

7       A.    I transferred them after I obtained it

8   first time, but before I obtained it the second time.

9             MR. DUBOGRAEV:  Objection.

10            MR. GARDEN:  Off the record.

11            (Thereupon, a discussion was had off the

12            record.)

13            BY MR. SHAHTAKHTINSKI:

14      Q.    When you first applied for L1-A were you

15   already in United States?

16            MR. GARDEN:  Objection, irrelevant

17   question.

18            THE WITNESS:  When we applied for L1-A we

19   were not in United States.

20            BY MR. SHAHTAKHTINSKI:

21      Q.    Did you -- did your first application for

22   L1-A visa get approved?

CONFIDENTIAL

Page 130

1    questions because all immigration issues were dealt by

2    with my attorney.  I was just following his advice.

3                (Thereupon, a brief recess was taken.)

4                BY MR. SHAHTAKHTINSKI:

5        **Q.    In the forms that you filed or your**

6    **attorney filed on your behalf with the Immigration**

7    **Services was there the name of RitLabs, SRL?**

8                MR. GARDEN:  Objection, calls for

9    speculation.

10                THE WITNESS:  I cannot tell you exactly

11   what -- what was in the form and what wasn't.  There

12   was a lot of information.

13                BY MR. SHAHTAKHTINSKI:

14       **Q.    Did you have to prove the relationship**

15   **between RitLabs, SRL and RitLabs, Inc. for purposes of**

16   **your L1-A visa?**

17                MR. GARDEN:  Objection, calls for a legal

18   conclusion and speculation and on the basis of lack of

19   foundation.

20                THE WITNESS:  Well, in my understanding,

21   I should have shown the connection between RitLabs,

22   SRL and RitLabs, Inc.

CONFIDENTIAL

1          BY MR. SHAHTAKHTINSKI:

2       **Q.    And what connection did you show at the**

3   **time of your first L1-A application?**

4               MR. GARDEN:  Objection, lack of

5   foundation.

6               THE WITNESS:  At the time of my -- of my

7   first application of L1-A, we showed dealership

8   agreement between RitLabs, Inc. and RitLabs, SRL and

9   also my involvement and connection with two companies.

10              BY MR. SHAHTAKHTINSKI:

11      **Q.    And which dealership agreement?  Do you**

12  **mean subscription agreement?**

13      **A.    License agreement.**

14              MR. SHAHTAKHTINSKI:  Let the record

15  reflect that the deponent is referring to Exhibit

16  DEM7.

17              BY MR. SHAHTAKHTINSKI:

18      **Q.    Was this licensing agreement one of the**

19  **documents which you requested to be backdated?**

20      **A.    I did not ask for any license agreement**

21  **that it should be backdated in our conversation.**

22      **Q.    Now, you previously stated that you did**

CONFIDENTIAL

1    **request some documents to be backdated for immigration**

2    **purposes, correct?**

3              MR. GARDEN:  Objection, misstates the

4    testimony.

5              THE WITNESS:  It's mistake of my

6    testimony.  I asked to prepare the general assembly

7    document in the following context, to give authority

8    to Serghei Demcenko to represent company abroad with

9    the right to have negotiations for the organization of

10   affiliates and branches and to search and attract

11   investors and finances.

12             BY MR. SHAHTAKHTINSKI:

13        **Q.    So the document which you requested to be**

14   **backdated is -- is the decision of the board of**

15   **directors?**

16        **A.    Yes.**

17        **Q.    And you asked to backdate this document**

18   **for immigration purposes, correct?**

19        **A.    I asked to provide this document for me**

20   **so then I could present it to the Immigration Service.**

21        **Q.    Does that mean yes to answering my**

22   **question?**

CONFIDENTIAL

1        A.    Yes.  Yes.  Which question one more time?

2        Q.    You asked to backdate this document, to

3   create this document for the purposes of using in your

4   L1-A application, correct?

5             MR. GARDEN:  Objection, vague.

6             THE WITNESS:  I did not ask to create.  I

7   asked to prepare.

8             BY MR. SHAHTAKHTINSKI:

9        Q.    What's the difference?

10       A.    The difference is when people create

11  document, they sign it.  When Maxim Masiutin and

12  Stefan Tanurkov --

13       Q.    You have to wait until the interpreter

14  finishes the translation.

15       A.    -- signed this document it became

16  document.  They created it.  They made it.  They made

17  this document.

18       Q.    And you requested them to create this

19  document so you can use it in your immigration

20  process, correct?

21       A.    You do not understand my response

22  correctly.  I asked to prepare given document.  They

1    could have not -- they could not have signed it, then

2    it would not have been created.

3         Q.    No, that's not an answer to my question.

4    That's not what I'm asking.  I'm asking -- you

5    asked -- is that true or not, you asked to prepare a

6    document, backdated document, which you intended to

7    use for your immigration process?  Correct or no?

8         A.    Yes.  Correct.

9         Q.    Thank you.

10              And this document was created, correct?

11        A.    This document was created.

12        Q.    Okay.  Do you assert that it is a valid

13   document giving you a right to represent RitLabs,

14   SRL -- to act -- strike that.

15              Do you represent that this document is a

16   valid document based on which you can -- you could act

17   on behalf of RitLabs, SRL in forming -- in formation

18   of RitLabs, Inc. in United States?

19              MR. GARDEN:  Objection, vague, calls for

20   a legal conclusion.

21              MR. DUBOGRAEV:  Objection based on

22   translation.

CONFIDENTIAL

Page 135

1             Off the record?

2             MR. DI GIACOMO:  That's fine.

3             (Thereupon, a discussion was had off the

4             record.)

5             THE WITNESS:  I can say that this

6     document provides me with the right to have

7     negotiations in organizations of branches and

8     affiliates, searches of investments and attractions of

9     finances and does not give me right to create

10    affiliates, branches and no other rights.

11            BY MR. SHAHTAKHTINSKI:

12        Q.    **How often do you use backdated documents**

13    **to establish a right to act on behalf of other**

14    **organizations?**

15            MR. GARDEN:  Objection, irrelevant,

16    intended to intimidate the witness and harassment.

17            THE WITNESS:  The meaning of how often

18    does not have a definition.  Yes, I do use sometimes.

19    I do not see it as violation if some -- some

20    requirements does not prevent documents from being

21    created.

22            BY MR. SHAHTAKHTINSKI:

Page 150

1    individual reasons to hide any information of RitLabs,

2    Inc. to RitLabs, SRL, except legal reasons and I never

3    had ones.

4                    BY MR. SHAHTAKHTINSKI:

5          **Q.    Now, when you applied -- there's**

6    **something going on here.  When you applied for L1-A**

7    **visa or extension, you had to demonstrate that**

8    **RitLabs, Inc. is a successful company, correct?**

9                    MR. GARDEN:  Objection, calls for a legal

10   conclusion.

11                   THE INTERPRETER:  I missed answer.

12                   MR. SHAHTAKHTINSKI:  It's okay.  You can

13   ask him to repeat.

14                   THE WITNESS:  Could you repeat the

15   question?

16                   (The record was read as requested.)

17                   THE WITNESS:  We have to show documents

18   proving activity of our company.  And if Immigration

19   Services recognize it as a success, it's their right.

20   We do not know the criteria.

21                   BY MR. SHAHTAKHTINSKI:

22         **Q.    Now, as part of the application you had**

CONFIDENTIAL

1    to also demonstrate -- indicate a salary written out

2    to you, correct?

3        A.    Yes, of course.

4        Q.    And what was that salary which you

5    indicated to the Immigration Services?

6        A.    I cannot recall, not big one.

7        Q.    You don't know your own salary?

8        A.    It's not --

9              MR. GARDEN:  Objection, argumentative.

10   That's not the question.  You asked -- the second

11   question you asked is different than the first

12   question.

13             MR. SHAHTAKHTINSKI:  That's why it's a

14   second question.

15             MR. GARDEN:  The way it was stated was

16   argumentative.

17             You can answer the second question.

18             THE WITNESS:  Approximately $50,000 per

19   year.

20             BY MR. SHAHTAKHTINSKI:

21        Q.    Is that what you are getting paid by

22   RitLabs, Inc. during the processing of your

CONFIDENTIAL

Page 164

1    in my head.

2              MR. DUBOGRAEV:  Objection based on

3    translation.

4              MR. DI GIACOMO:  Let's go off the record.

5              (Thereupon, a discussion was had off the

6              record.)

7              BY MR. DI GIACOMO:

8        Q.    Mr. Demcenko, you stated that you were

9    developing technology at this time.  How are you

10   developing technology?

11       A.    So I develop a totally new direction of

12   development of products with the objective to bring it

13   to totally different market.  We developed the product

14   MailVoyager.  There was also develop the strategy of

15   realization, of services, personal mail assistant with

16   the use of technology RitLabs, SRL as part of this

17   service.

18       Q.    Mr. Demcenko, is MailVoyager based on

19   code from The Bat!?

20             MR. GARDEN:  Objection, vague as to the

21   word based.

22             THE WITNESS:  MailVoyager uses code The

CONFIDENTIAL

Page 165

1  Bat!

2              BY MR. DI GIACOMO:

3      Q.    **Mr. Demcenko, how are you using code from**

4  **The Bat! when the license agreement is dated December**

5  **2009, the first of December 2009?**

6      A.    I do not understand question a little

7  bit.  MailVoyager appeared later.

8      Q.    **Are you stating that MailVoyager appeared**

9  **later than September 9, 2008?**

10     A.    Of course.

11             MR. DUBOGRAEV:  Objection.

12             MR. GARDEN:  Off the record.

13             (Thereupon, a discussion was had off the

14             record.)

15             BY MR. DI GIACOMO:

16     Q.    **You testified that you were developing**

17  **technology at this time and then you testified that**

18  **you were developing MailVoyager, but your most recent**

19  **testimony is that MailVoyager appeared later than**

20  **September 9, 2008; is this correct?**

21             MR. GARDEN:  Objection, vague as to this.

22             THE WITNESS:  I said in the first

CONFIDENTIAL

1          **Q.     Why have you --**

2          **A.     I did not show.**

3          **Q.     Why have you not produced these documents**

4   **showing the transfer of this money to your bank**

5   **account?**

6                MR. GARDEN:  Objection to the question to

7   the extent it calls for you to disclose communications

8   between your attorneys in this matter.  If you can

9   respond to the question without disclosing the

10  substance of any communications with your counsel, you

11  may do so.

12                THE WITNESS:  By the advice of my

13  attorney.

14                BY MR. DI GIACOMO:

15         **Q.     Mr. Demcenko, what is the source of these**

16  **funds?  Were they funds that RitLabs, SRL earned based**

17  **on sales by CIF/NET?**

18                MR. GARDEN:  Objection to form.

19                MR. DI GIACOMO:  Let me restate the

20  question.

21                BY MR. DI GIACOMO:

22         **Q.     Did these funds come from sales of**

CONFIDENTIAL

Page 171

1  RitLabs, SRL's software by CIF/NET?

2       A.    This question could be answered by

3  Yevgeniy Kruglov only.

4       Q.    You did not ask where the $70,000 payment

5  into your bank account came from?

6       A.    Why?  From Yevgeniy Kruglov?

7       Q.    Yes.

8       A.    I knew where it came from, from Yevgeniy

9  Kruglov, but I do not know what kind of money was sent

10  by Yevgeniy Kruglov.

11      Q.    Mr. Demcenko, you've testified that you

12  did not return the $70,000 sent to you by Yevgeniy

13  Kruglov.  Don't you find -- strike that.

14           Mr. Demcenko, you testified that you did

15  not -- or that you did not return this payment of

16  $70,000 received from Yevgeniy Kruglov.  Don't you

17  believe that you should know the source of this amount

18  of money?

19           MR. GARDEN:  Objection, vague and

20  argumentative.

21           THE WITNESS:  I know that the source of

22  this money is Yevgeniy Kruglov.

CONFIDENTIAL

1          BY MR. SHAHTAKHTINSKI:

2      Q.    **Was it a gift from Yevgeniy Kruglov?**

3      A.    **It could be asked only of Yevgeniy**

4  **Kruglov.**

5      Q.    **To your personal knowledge, was it a gift**

6  **from Yevgeniy Kruglov?**

7      A.    **I have no knowledge with regard to this**

8  **money.**

9      Q.    **My question to you is yes or no or I**

10  **don't know.**

11          **Was this a gift from Yevgeniy Kruglov?**

12          MR. GARDEN:  Okay.  He answered I don't

13  know.  He said I have no knowledge.  That means I

14  don't know.

15          MR. SHAHTAKHTINSKI:  He says he has no

16  knowledge of the source of the funds.  I'm talking

17  about whether it was a gift.

18          BY MR. SHAHTAKHTINSKI:

19      Q.    **What was the reason Yevgeniy Kruglov paid**

20  **you $70,000?  Was it money that he owed to you?**

21          MR. GARDEN:  Objection to form and calls

22  for speculation.

CONFIDENTIAL

1              THE WITNESS:  I said that Yevgeniy

2    Kruglov offered to put $70,000 on my account to show

3    them and then, as needed, will take what I wouldn't be

4    able to take on my own.

5              BY MR. SHAHTAKHTINSKI:

6         **Q.    And you never returned that money to**

7    **Yevgeniy Kruglov?**

8         **A.    No.**

9              MR. GARDEN:  Objection, asked and

10   answered.

11             THE WITNESS:  Not so far.

12             BY MR. SHAHTAKHTINSKI:

13        **Q.    Is this the only money that Yevgeniy**

14   **Kruglov transferred to your personal bank account?**

15        **A.    No.**

16        **Q.    To your knowledge, there was no basis why**

17   **Yevgeniy Kruglov owed you $70,000, correct?**

18             MR. DUBOGRAEV:  Objection.

19             MR. GARDEN:  Off the record.

20             (Thereupon, a discussion was had off the

21             record.)

22             THE WITNESS:  I said that I had no reason