# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

RITLABS, S.R.L.,

        Plaintiff/Counter-Defendant,

           v.

RITLABS, INC., and SERGHEI
DEMCENKO,

        Defendants/Counter-Claimants.

Case No.:  1:12CV215


Hon. Anthony J. Trenga

## BRIEF IN SUPPORT OF PLAINTIFF'S AMENDED

## MOTION FOR SUMMARY JUDGMENT

\* Exhibit EE to this Brief is hereby filed under seal pursuant to this Court's order of June 22, 2012.

\*\* Exhibit EEE to this Brief is hereby filed under seal pursuant to this Court's order of March 30, 2012.

## TABLE OF CONTENTS

I.    Introduction ...........................................................................................................1

II.   Undisputed Facts ...................................................................................................1

III.  Standard of Review................................................................................................6

IV.   Argument ...............................................................................................................7

      A.   Plaintiff's Claims

          i.     Defendant Demcenko is liable for a breach of his fiduciary duty of loyalty
              to Plaintiff SRL ...........................................................................................8

          ii.    Defendants INC and Demcenko are liable for cybersquatting under the
              Anticybersquatting Consumer Protection Act...................................................20

          iii.   Defendants are liable for false designation of origin under the Lanham Act ..27

          iv.    Defendant Demcenko is liable for a violation of the Computer Fraud
              and Abuse Act ...........................................................................................30

          v.     Defendants are liable for conversion .........................................................32

          vi.    Defendants are liable for tortious interference with contractual relations.......33

          vii.   Defendants are liable for tortious interference with prospective
              economic advantage ....................................................................................33

          viii.  Defendants are liable for unfair competition .................................................34

      B.   Defendant's Claims.................................................................................35

          i.     Defendant Demcenko is liable for a breach of his fiduciary duty of loyalty to
              Plaintiff SRL and, therefore, the License Agreement is void and Defendants'
              Counterclaims are unsupported by the facts or law .......................................36

          ii.    Defendants' Counterclaim for conversion is unsupported by
              the facts and law ........................................................................................36

V.    Conclusion............................................................................................................39

NOW COMES Plaintiff, RitLabs, SRL, by and through its attorneys Traverse Legal, PLC and I.S. Law Firm, P.C., and states the following in support of its Motion for Summary Judgment as To Plaintiff's Claims.

## I.  INTRODUCTION

Plaintiff submits this Brief in Support of its Motion for Summary Judgment because no genuine issues of material fact remain for trial and, as such, Plaintiff is entitled to summary judgment as a matter of law as to all of the counts listed in its Complaint. Defendant Demcenko, through his proxy Defendant INC, has breached his fiduciary duty to Plaintiff SRL, has cybersquatted upon and used SRL's trademarks for the purposes of unfair competition and false designation of origin, and has tortiously interfered with and converted Plaintiff's former dealers in an attempt to obtain additional revenue for himself and to obtain and extend his L-1A visa in the United States. Additionally, Defendant, without authorization, accessed or exceeded his access to protected computer systems for the purpose of converting company property and disrupting the business of Plaintiff SRL. Having previously examined all of these issues, this Court found it necessary to issue a preliminary injunction in this matter. In light of the fact that Defendant has breached his fiduciary duty to Plaintiff SRL, summary judgment is appropriate as to Defendants' Counterclaims I-VI. Additionally, Defendants' Counterclaim VII is unsupported by the facts and the law. For these reasons, summary judgment is appropriate as a matter of law.

## II.  UNDISPUTED FACTS

1.  Plaintiff RitLabs, SRL ("SRL") is a limited liability company organized under the laws of the Republic of Moldova with its principal place of business in Chisinau, Moldova.

1

Defendant RitLabs, Inc. ("INC") is a corporation organized under the laws of the State of Virginia with its principal place of business in Alexandria, VA. Defendant Serghei Demcenko ("Demcenko") is a citizen of the Republic of Moldova who is currently domiciled in Centreville, VA.

2.   SRL is an Internet technology and software provider located in Chisinau, Moldova that currently employs 18 full time employees. Since early 1998, SRL has sold several highly acclaimed software products throughout the world, including the United States. SRL's current software offerings include The Bat!, BatPost, The Bat Voyager, and MailVoyager. Plaintiff's predecessor in interest, RIT, SRL ("RIT"), offered its software goods through its primary website, http://www.ritlabs.com, since as early as December 16, 1996. Since succeeding RIT in 1998, SRL has offered the same software products through http://www.ritlabs.com.

3.   SRL's predecessor in interest, RIT, was incorporated on February 9, 1993 in the Republic of Moldova and was owned by two limited liability companies: IBIS, SRL, which held 50% of RIT's shares, and ALEX, SRL, which held 50% of RIT's shares. See Complaint Exhibit A, SRL Registration History. At the time of RIT's incorporation, Defendant Demcenko was the Director of RIT. See Complaint Exhibit A, SRL Registration History. In late 1996, RIT, which was selling e-mail products, sought to advertise and offer its products over the Internet and purchased the <ritlabs.com> domain name.

4.   In late 1997, ALEX, SRL was unable to renew the registration of its company due to a change in the law related to limited liability companies in Moldova. See **Exhibit A**, Deposition of Demcenko, Pg. 18; see also **Exhibit B**, Deposition of Tanurcov, Pgs. 31-32. Consequently, Defendant Demcenko, Mr. Tanurcov, and Mr. Masiutin resigned from RIT and, on February

2

1998, together formed SRL as a limited liability company. See Complaint Exhibit C, State

Registration of SRL. Prior to the recognition of SRL by Moldova, and on February 3, 1998,

Demcenko, Tanurcov, and Masiutin executed the Articles of Association of SRL, which serve

as the equivalent of a LLC operating agreement under US law. Under these Articles, Defendant

Demcenko received 40% ownership of SRL and Mr. Masiutin and Mr. Tanurcov each received

30% respectively. See Complaint Exhibit D, Articles of SRL. Defendant Demcenko was

appointed the Director of SRL, which is the equivalent of a manager under US law.

5.   Once SRL was formed, the property of RIT was transferred to SRL. The WHOIS

database entry associated with the <ritlabs.com> domain name was soon after changed to

reflect SRL as its owner, and The Bat! and other software products were transferred into the

ownership of SRL. See Complaint Exhibit AH, Printout of WHOIS History; see also **Exhibit

A,** Deposition of Demcenko Pgs. 29-30, 42. SRL continued to operate its business, contract

with distributors and sell its software until mid 2008.

6.   On July 14, 2008, Demcenko incorporated INC under the laws of Virginia, see

Complaint Exhibit E, Virginia Entity Search, without a vote of the General Assembly of SRL

or the approval, acquiescence, or prior knowledge of his business partners and, in doing so,

used the "RitLabs" name. Mr. Masiutin first discovered that Demcenko had diverted one of

SRL's distributors, STech Data, to INC. See Complaint Exhibit G, Printout of April 20, 2011

fax. Mr. Masiutin continued to collect evidence of Demcenko's diversion of corporate assets,

opportunities, and information for his own personal gain for several months before

approaching Mr. Tanurcov, his partner, with information regarding such diversion.

3

7.   On September 27, 2011, Defendant Demcenko sent an email to Mr. Tanurcov and Mr. Masiutin requesting that they backdate a corporate resolution stating that Mr. Demcenko was authorized to represent SRL "abroad, organize branches, and control the search and attraction of finance." See Complaint Exhibit N, Printout of Sept. 27, 2011 email. Also on Sept. 27, Demcenko sent an email to Tigor Talmatski, SRL's accountant, instructing him to prepare a resolution of the General Assembly, dated Jan. 2001, stating that Mr. Demcenko was authorized to create branches, create affiliated companies, and search for investments abroad. See Complaint Exhibit J, Printout of Second Sept. 27, 2011 Email. This email requested that Talmatski provide this resolution to Tanurcov and Masiutin for signing. Mr. Masiutin objected to the backdated resolution, which Demcenko characterized as necessary "to prove my activity in the company" to U.S. Citizenship and Immigration Services. See Complaint Exhibit Q, Printout of Sept. 27, 2011 return email from Demcenko.

8.   Tanurcov and Masiutin quickly became suspicious of Demcenko's motives and came to believe that Demcenko had created INC without authorization of the General Assembly or SRL's members to extend his visa in the United States. Tanurcov and Masiutin soon discovered that Demcenko had been diverting payments from SRL to INC without the authorization of the General Assembly or SRL's members. See Complaint Exhibit R, Printout of invoices.

9.   In response, Tanurcov and Masiutin held a meeting of the General Assembly on December 12, 2011 and voted to remove Defendant Demcenko from his position as Director of Plaintiff SRL. See Complaint Exhibit U, Printout of vote of members. Additionally, Tanurcov and Masiutin voted to elect Mr. Masiutin as the Director of SRL. See Complaint Exhibit V,

4

Election of Masiutin. Defendant Demcenko did not attend, though notice was provided to his last known address in Moldova. See **Exhibit C**, Moldovan State Recognition. On Dec. 13, 2011, the Moldova State Authority recognized Mr. Masiutin as the elected director of SRL. See Complainant Exhibit W, State authority recognition.

10. A day later, Demcenko, without authorization, accessed the domain registrant account associated with several of SRL's domain names, took control of those domain names, and changed the WHOIS entry associated with the domain name registrant from SRL to INC. See Complaint Exhibit Y, Dec. 14, 2011 WHOIS entry. On Dec. 20, 2011, SRL received a demand letter from Defendants' attorneys stating that SRL was in violation of a previously unknown license agreement between SRL and INC ("License Agreement"). See Complaint Exhibit Z, Printout of Dec. 20, 2011 letter to SRL. This License Agreement was executed by Demcenko as Director of SRL and by Yuri Bakay, purported to be the vice president of INC. See Complaint Exhibit AA, License Agreement. The License Agreement purports to provide INC with an exclusive license to sell and distribute SRL's software in the United States, as well as a non-exclusive license to sell software throughout the world. Further, this License Agreement provides INC with 60% of gross revenue from the sale of SRL's software. Thus, not only does Demcenko receive 40% of sales by virtue of his status as a member in SRL, but he also receives 60% of the sales price on the front end by virtue of his status as the owner of INC.

11. On Dec. 23, 2011, INC, without authorization, filed for registration of the RITLABS mark with the USPTO (IC 009). See Complaint Exhibit AB, USPTO entry for RITLABS (009). SRL then sent a demand letter to Defendants on Jan. 3, 2012. See Complaint Exhibit AC, Jan. 3, 2012 letter. The next day, INC filed for trademark registration of RITLABS with

5

the USPTO in International Class 042. See Complaint Exhibit Y. SRL's further investigation

found that INC had also filed for registration of MAILVOYAGER (IC 009) and THE BAT!

(IC 009). See Complaint Exhibit AD, USPTO entry for RITLABS (IC 042); see also

Complaint Exhibit AF.

12. SRL also soon discovered that Defendants had registered the <ritlabs.us> domain name

on March 8, 2010, see Complaint Exhibit AG, and had issued, without authorization of the

General Assembly, thirty-nine shares to SRL, the share certificate having been executed by

Demcenko on behalf of INC both as CEO and Secretary of INC. See Complaint Exhibit AK.

Then, on Jan. 21, 2012, Demcenko modified the MX records associated with the <ritlabs.com>

domain name, which controls the direction of electronic mail sent to any address containing the

@ritlabs.com suffix. As a result, Demcenko took control of the email accounts of SRL,

including the accounts associated with its 18 employees. See Complaint Exhibit AG.

Subsequently, Plaintiff filed this lawsuit on February 28, 2012 and this Court granted a

preliminary injunction in favor of Plaintiff on April 5, 2012, which required Defendants to

return the <ritlabs.com>, <ritlabs.net>, <thebat.net>, and <batpost.com> domain names to SRL

and to suspend Defendant's trademark registrations.

### III.   STANDARD OF REVIEW

Summary judgment is appropriate where the record shows that "there is no genuine

issue as to any material fact and that the movant is entitled to judgment as a matter of law."

See Fed. R. Civ. P. 56(c). "Once a motion for summary judgment is properly made and

supported, the opposing party has the burden of showing that a genuine dispute exists." *H. Jay*

*Spiegel & Associates, P.C. v. Spiegel*, 652 F. Supp. 2d 639, 643 (E.D. Va. 2009) aff'd 400 F.

App'x 757 (4th Cir. 2010). An opposing party cannot simply rely upon allegations or denials, but it must "set forth specific facts showing that there is a genuine issue for trial." Anderson at 248. A "mere scintilla" of evidence is not enough to overcome a properly supported motion. *Id.* at 248-52. In reviewing a motion for summary judgment, the Court must "draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

## IV.   ARGUMENT

### A.  Plaintiff's Claims

Summary judgment is proper as to Plaintiff's claims because no genuine issues of material fact remain for trial and, as such, Plaintiff is entitled to summary judgment as a matter of law. Defendant Demcenko has breached his fiduciary duty to Plaintiff SRL, has cybersquatted upon and used SRL's trademarks for the purposes of unfair competition and false designation of origin, and has tortiously interfered with and converted Plaintiff's former dealers in an attempt to obtain additional revenue for himself and to obtain and extend his L-1A visa in the United States. Additionally, Defendant, without authorization, accessed or exceeded his access to protected computer systems for the purpose of converting company property and disrupting the business of Plaintiff SRL. Accordingly, no genuine issues of material fact remain for trial and summary judgment is appropriate as a matter of law.

### i.  Defendant Demcenko is liable for a breach of his fiduciary duty of loyalty to Plaintiff SRL

In determining whether Defendant Demcenko has breached his fiduciary duty of loyalty to Plaintiff SRL, this Court should apply the Republic of Moldova's Law On Limited Liability Companies, which governs the duties of a Director of a Moldovan limited liability company. "Where foreign law is applicable, the parties have the burden of sufficiently proving foreign law in such a way that the court may apply it to the facts of the case." *Riffe v. Magushi*, 859 F. Supp. 220, 223-24 (S.D.W. Va. 1994). "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1.

Plaintiff has provided a translation of the Republic of Moldova's Law On Limited Liability Companies. See **Exhibit D**, Translation of Law On Limited Liability Companies.[1] Article 72(5) of that law states, "When exercising his (her) functions, the administrator shall show diligence and loyalty." See **Exhibit D**, Translation of Law On Limited Liability Companies. Article 73(1) states, "The administrator is responsible before the company for observance of the limits of his (her) powers established by the constitutive act or, if it does not provide otherwise, by the general assembly of associates." Article 73(2) states, "If the administrator violated the restrictions set in [Article 73(1)], the company or any associate may ask for reparation of damages incurred on the company on its behalf."

---

[1]     The Republic of Moldova is a civil law system and the Law On Limited Liability Companies is interpreted and applied on a case by case basis.

Where an associate of the company[2] has committed fraud or breached his duty of loyalty to the company, he may be removed from the company. Article 47(1) states, "The general assembly of associates, administrator, one or more associates may ask for exclusion of the company of an associate that... acting as a company's administrator, committed frauds to detriment of the company and used company's signature or property in his (her, its) favor or in the favor of the third parties." Where this has occurred, Article 47(2) states, "The associate shall be excluded from the company through a court decision."

Even presuming, *arguendo*, that the Court declines to apply Moldovan law, the Moldovan duty of loyalty corresponds to the common law duty of loyalty found under Virginia law. Under Virginia law, "It is a fundamental principle that a corporate officer or director is under a fiduciary obligation not to divert a corporate business opportunity for personal gain because the opportunity is considered the property of the corporation." *Today Homes, Inc. v. Williams*, 272 Va. 462, 471-72 (2006). Virginia law recognizes,

> He who is in such a fiduciary position cannot serve himself first and his cestuis second… He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters… He cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he would not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors… For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandisement,

---

[2]      An associated is the equivalent of an LLC member in the United States

9

preference, or advantage of the fiduciary to the exclusion or detriment of the cestuis.

*Pepper v. Litton*, 308 U.S. 295, 311 (1939). In usurping the corporate opportunity of SRL, misappropriating and diverting the corporate assets of SRL, and fraudulently diverting the dealers of SRL to INC, Defendant Demcenko has breached his fiduciary duties under both Moldova and Virginia law.

Defendant Demcenko may be held liable for a breach of his fiduciary duty of loyalty because he incorporated Defendant INC on July 14, 2008 to fraudulently extend his United States visa and misappropriate the funds and goodwill of Plaintiff SRL and did so without the vote, approval, or acquiescence of his business partners in SRL. See **Exhibit JJJ,** L1AVISA 2011 Filing and Determination. Pursuant to Article 58(1)(2)(e) of the Law on Limited Liability Companies of Moldova, the General Assembly of a limited liability company must authorize the creation of branch or affiliate offices through a ¾ vote of the members. See **Exhibit D**, Translation of Law On Limited Liability Companies. Despite his current protestations to the contrary, Defendant Demcenko characterized INC as a branch or representative company in September 2011.[3] See **Exhibit E**, Sept. 27, 2011 email from Demcenko to Tanurcov. Thus, Defendant Demcenko admitted, in 2011, that he sought to form a branch or representative office of SRL in the United States, and he did so without a 3/4 vote of the General Assembly of SRL. See **Exhibit F**, Def. Demcenko's Response to Pl's First Requests to Admit # 11.

---

[3]      "In order to extend my visa I need the protocol from the co-founders' meeting (with back date), in which I would be grated the right to represent the company abroad, organized branches, and control the search and attraction of finance."

10

Defendant Demcenko incorporated Defendant INC in July 2008 with funds that he misappropriated from SRL by paying his attorney, Mr. Dubograev, $8,432.40 from amounts owed to SRL under the terms of its agreement with its third party payment processor CIFNet. See **Exhibit G**, Sept. 9, 2008 email from Demcenko to Kruglov; see also **Exhibit H**, Jan. 6, 2009 email from Kruglov to Demcenko; **Exhibit I**, CIFNet financials; see also **Exhibit J**, Deposition of Yevgeniy Kruglov, Pg. 12:6-12, Pgs. 15-16. At the time of this payment, Defendant Demcenko made clear that he wanted "to continue the process of transferring clients to American RitLabs." See **Exhibit G**, Sept. 9, 2008 email from Demcenko to Kruglov. To do this, Defendant Demcenko, as Director of SRL, sent termination letters to SRL's dealers in a concerted effort to push those dealers into the newly formed INC. See **Exhibit K**, July 15, 2008 termination letter from Demcenko to CIFNet; see also **Exhibit L**, 2005 agreement between SRL and CIFNet. Defendant Demcenko terminated contracts with at least five of Plaintiff's dealers, SoftLogistic, Stech Data, Business IT, NILTA, CIFNet, and Skulski Enterprise and Defendant INC entered into its own agreements with those dealers. See **Exhibit M**, Deposition of Olga Somova, pg. 23-24; see also **Exhibit N**, Contracts between SRL and former dealers; **Exhibit O**, Contracts between INC and former SRL dealers.

Defendant Demcenko terminated a contract with one such dealer, CIFNet, as of December 31, 2008. See **Exhibit K**, July 15, 2008 termination ltr from Demcenko to CIFNet. When questioned as to whether CIFNet was concerned that its contract with SRL was terminated after a 12 years business relationship, Yevgeniy Kruglov, CEO of CIFNet, testified

11

that he was not concerned because INC was going to take SRL's place.[4] See **Exhibit J**,

Deposition of Yevgeniy Kruglov, pg. 45. Consequently, SRL's dealers were not concerned that

their contracts were being terminated by Defendant Demcenko because they were assured by

Defendant Demcenko that a replacement contract, one with INC, would follow shortly.

Instead of informing his business partners of his actions in the United States, Defendant

Demcenko instead misappropriated money owed to SRL to obtain a rental house. Specifically,

SRL's payment processor, CIFNet, transferred $70,000 to Defendant Demcenko's personal

bank account to aid him in obtaining a house. See **Exhibit P**, Nov. 20, 2009 email from

Kruglov to Demcenko. This $70,000 was taken from amounts owed to SRL from the sale of

SRL's software by CIFNet and was never returned to either SRL or CIFNet.[5] See **Exhibit J**,

Deposition of Yevgeniy Kruglov, pgs. 16-17. Plaintiff SRL has not received a single payment

from CIFNet since 2005, likely because the amounts due to SRL were transferred to Defendant

Demcenko's personal bank account.[6] See **Exhibit Q**, Affidavit of Maxim Masiutin.

Shortly after Defendant's termination of SRL's contract with CIFNet, Defendant began

selling SRL's software through INC without the approval his business partners. Despite not

being under a contract with either SRL or INC, CIFNet continued to sell and to collect

---

[4]     "When you received this letter, did it concern you that Ritlabs, S.R.L. was terminating
its contract with you?
        A.     Well, if Ritlabs, Inc. was going to take action on selling the software, then – and
we will report everything to Ritlabs, Inc., then it was making sense."
[5]     It is worth noting that, in his deposition, Defendant Demcenko unconvincingly stated that
he did not know where the $70,000 came from, and that he knew only that it came from
Yevgeniy Kruglov. See **Exhibit A**, Deposition of Demcenko, pgs. 170-173.
[6]      It is unclear what, exactly, has been transferred to Defendant's bank account, as
Defendant has refused to provide his bank records despite Plaintiff's discovery requests.

revenues from the sale of SRL's software between January 1, 2009 and December 31, 2009.[7]
See **Exhibit R**, Deposition of Basil Kruglov, pg. 54; see also **Exhibit J**, Deposition of
Yevgeniy Kruglov, pg. 26. Defendant also sold this software through INC in April and June of
2009, prior to the execution of any purported license agreement with SRL, which occurred on
December 31, 2009. See **Exhibit S**, February 24, 2011 email from Demcenko to Kruglov.

Then, on May 3, 2010, Defendant Demcenko, on behalf of SRL, and Yuri Bakay, vice
president of Defendant INC, entered into a license agreement between SRL and INC without
the knowledge or approval of Masiutin or Tanurcov, Defendant Demcenko's business partners
in SRL.[8] See **Exhibit T**, License Agreement; see also **Exhibit U**, May 3, 2010 email from
Demcenko to Bakay. This License Agreement purported to provide INC with an exclusive
license to sell SRL's software products in the United States as well as a non-exclusive license
to sell SRL's software products across the world. Additionally, not only would Defendant
Demcenko receive 60% of gross revenue of the sale of SRL's software as the sole shareholder
of INC, but he would also continue to receive 40% by virtue of his position as a shareholder in
SRL. See **Exhibit T**, License Agreement. As a result, on the sale of a $50 software product,
Defendant Demcenko would receive $38 and his business partners, Maxim Masiutin and
Stefan Tanurcov, would receive $6 each respectively.

In entering into this Agreement without the approval of his business partners,
Defendant Demcenko violated the Articles of Association of SRL, which states that the

---

[7]     Defendant INC then, on April 23, 2010, entered into a distribution agreement with
CIFNet, which was backdated to January 1, 2010. See **Exhibit V**, Agreement between INC and
CIFNet; see also **Exhibit J**, Deposition of Yevgeniy Kruglov, pgs. 23-24.
[8]     This License Agreement, like numerous other documents in this case, was backdated by
Defendant Demcenko to reflect December 31, 2009 as the date of signing.

General Assembly of the company must approve the "Adoption of contracts... signed between the Company and its members" by a simple majority. See **Exhibit W**, Articles of Association of SRL, § 6.1(7)-6.2. When questioned concerning this issue, Defendant Demcenko testified that he did not believe that there was a conflict of interest in signing this Agreement on behalf of SRL, even though he owned 100% of INC at the time, because he owns 100% of SRL, despite the fact that both Mr. Masiutin and Mr. Tanurcov have been his partners in SRL since its formation in 1998. See **Exhibit A**, Deposition of Demcenko, pgs. 79-85. In short, Defendant Demcenko justified this interested transaction by resort to a legal theory created subsequent to the execution of the Agreement, namely, that his business partners, Maxim Masiutin and Stefan Tanurcov, were not actually his business partners.

Defendant Demcenko then used this License Agreement to show a connection between SRL and INC in his L-1A visa application, which is a visa that is available to executives of an international company that have been sent to the United States to create a branch or representative office the company.[9] See **Exhibit X**, Printout of USCIS website. See **Exhibit A**, Deposition of Demcenko, pgs. 130-131.  At the time of the filing of his L-1A visa application, Defendant Demcenko indicated that he owned one hundred percent (100%) of INC. See **Exhibit A**, Deposition of Demcenko, pgs. 118-119 and **Exhibit JJJ,** L1AVISA 2011 Filing

---

[9]     The USCIS website states, "The L-1A nonimmigrant classification enables a U.S. Employer to transfer an executive or manager from one of its affiliated foreign offices to one of its offices in the United States. This classification also enables a foreign company which does not yet have an affiliated U.S. Office to send an executive or manager to the United States with the purpose of establishing one." Further, it states, "to qualify, the named employee must: (1) Generally have been working for a qualifying organization abroad for one continuous year within the three years immediately preceding his or her admission to the United States; and (2) Be seeking to enter the United States to render services in an executive or managerial capacity to a branch of the same employer or one of its qualifying organizations."

and Determination. After his L-1A visa was granted, Defendant Demcenko transferred 39

shares in INC to SRL to further show a connection between the two companies to the USCIS.

See **Exhibit A**, Deposition of Demcenko, pg. 119. Defendant Demcenko then deceived his

business partner, Stefan Tanurcov, into signing a subscription agreement on behalf of SRL,

which was intended to provide SRL with shares in INC in order to help Defendant Demcenko

obtain his US visa. See **Exhibit B**, Deposition of Tanurcov, pgs. 128-130.

   After the execution of the License Agreement, Defendant Demcenko issued invoices on

behalf of Defendant INC and sent them to CIFNet requesting payment for CIFNet's sale of

software in 2009, See **Exhibit Y**, April 23, 2010 email from Demcenko to Kruglov. Defendant

Demcenko issued these invoices to show income within his US bank account so that he could

obtain an extension of his L-1A visa. See **Exhibit Z**, April 19, 2011 email from Demcenko to

Kruglov. Defendant Demcenko needed to show not only income on his US account, but also

that INC had employees, in order to extend his L-1A visa[10], see **Exhibit AA**, Sept. 19, 2011

email from Demcenko to Kruglov), and he further needed to prove the purported relationship

between INC and SRL. See **Exhibit A**, Deposition of Demcenko, pg. 130.

   To further show a relationship between the two companies, Defendant Demcenko

directed Tigor Talmatski, SRL's accountant, to prepare a corporate resolution, backdated to

2001, which was to provide him with the authority incorporate INC in the United States, which

was to say the following:

---

[10]     "With visa they sent us for a second round, demanded a bunch of additional paperwork
and employees. I can't leave the country for now. My conditional status has been extended but
my visa had expired and the new one will be issued no sooner than in two months."

Give the right to Serghei Demcenko to represent the company abroad with the

right to hold negotiation talks for organization of branches, affiliated companies,

search for investments, and control upon attraction of finance.

See **Exhibit BB**, Sept. 27, 2011 email from Demcenko to Talmatski. Defendant Demcenko

also directed Mr. Talmatski to hand the resolution to Masiutin and Tanurcov for signing and

noted, "I need this not as a director, but as a co-founder of the company RITLABS SRL." See

**Exhibit BB**, Sept. 27, 2011 email from Demcenko to Talmatski. When questioned by Masiutin

as to why this resolution needed to be back-dated to 2001, Defendant Demcenko replied that

the "Department of Immigration requires a certain story to prove my activity in the company."

See **Exhibit CC**, Sept. 27, 2011 email from Demcenko with CC to Talmatski, Tanurcov, and

Masiutin; see also **Exhibit DD**, Sept. 27, 2011 email from Masiutin to Demcenko; **Exhibit A**,

Deposition of Demcenko, pgs. 96-98. Defendant later confirmed that he requested the

backdated document so that he could defraud the USCIS into believing that he had been

authorized to create INC in 2001. See **Exhibit A**, Deposition of Demcenko, pgs. 132-135.

Since the creation of INC, Defendants Demcenko and INC have misappropriated

approximately $371,684.05 in software license royalties rightfully due to SRL. See **Exhibit**

**EE**, Draft profit and loss of INC Jan. 2008-Feb. 2012. It is unclear, however, whether this is

the entire extent of Defendants' misappropriation, as Defendants have refused to provide their

bank statements in response to Plaintiff's discovery requests in this matter. Regardless of the

final tally of Plaintiff's damages, it is clear that Defendant INC's current customers are all

former customers of SRL, including SoftLogistic, STech Data, Business IT, NILTA, and

Skulski Enterprise, and that they were obtained by terminating preexisting contracts with SRL

16

in favor of new contracts with INC. See **Exhibit M**, Deposition of Somova, pgs. 23-24; see also **Exhibit Q**, Affidavit of Masiutin. Of this amount, Plaintiff SRL has received only $63,928.30, which was likely transferred to SRL to show income flow between SRL and INC for the purposes of Defendant Demcenko's L-1A visa. See **Exhibit Q**, Affidavit of Masiutin; see also **Exhibit FF**, Invoices issued from SRL to INC; **Exhibit A**, Deposition of Demcenko, pgs. 150-151.

Demcenko undertook these actions without the authorization of his business partners or a vote of the General Assembly of SRL. See **Exhibit A**, Deposition of Demcenko, pgs. 60-61 ("Before I formed the company RitLabs, I did not seek the word from – from the members of general assembly of RitLabs, SRL because there is no necessity for that."). When asked why he did not seek the approval of his business partners, Demcenko stated, "Because I was creating RitLabs, Inc. personally as Serghei Demcenko." See **Exhibit A**, Deposition of Demcenko, pgs. 61, 14-18; see also **Exhibit GG**, Def's Resp. to Pl's First Rogs #5. Demcenko was in a fiduciary position as the Director of SRL at the time of these actions, and, as CEO of INC, he served two masters to the detriment of SRL. He used his power as Director of SRL for his own personal advantage to defraud third party distributors, US government agencies, and his own business partners.

On April 20, 2011, Maxim Masiutin discovered the signature page of a contract between Stech Data, a former SRL dealer, and INC lying in the SRL office fax machine. See **Exhibit HH**, Deposition of Maxim Masiutin, pg. 128. This document contained the corporate stamp of INC and spurred Mr. Masiutin to investigate whether Demcenko had diverted funds from SRL to INC. See **Exhibit HH**, Deposition of Maxim Masiutin, pg. 128. In August, 2011,

Mr. Masiutin convinced his business partner, Mr. Tanurcov, to approach the company accountant, Tigor Talmatski, to obtain the accounting records of the company. See **Exhibit HH**, Deposition of Masiutin pgs., 129-30. Mr. Tanurcov received printouts of the company's financials from Mr. Talmatski, which showed that a large amount of money was missing from the company's coffers. See **Exhibit HH**, Deposition of Maxim Masiutin, pgs. 129-30.

Then, on August 5, 2011, Mr. Masiutin received an email press release from Defendant Demcenko's email address announcing the product MailVoyager, which was a software product based on The Bat! code and listed Defendant INC as its creator and owner. See **Exhibit II**, Aug. 6, 2011 email chain; see also **Exhibit A**, Deposition of Serghei Demcenko, pgs. 164-65. In response, Mr. Masiutin sent Defendant Demcenko a lengthy email stating that the partners of SRL had agreed that Defendant Demcenko could open a separate firm in the United States unrelated to SRL and that, in the event Defendant Demcenko wanted to open a related company in the United States, "the American firm should have the same participation shares as RitLabs SRL in order to carry through the money or to use the RitLabs SRL resources...." See **Exhibit II**, August 6, 2011 email chain. In response, Demcenko stated, "I suggest not putting all eggs into a basket and not biting the had that feeds you" and later noted that he had not decided whether he would allow Mr. Masiutin to have shares in INC because Mr. Masiutin had not yet provided Defendant with "what the new company will obtain personally from you. For instance, guarantees of attraction of investments for the project proposed by you; or, maybe, a patent that will help gain a part of the market." See **Exhibit II**, August 6, 2011 email chain. Mr. Masiutin responded by chastising Defendant's actions, "The decisions you write about were adopted by you with excess of your powers of director, you

18

proceed dishonestly and illegally," and, later, "the work you carry out... is your duty arising from your post and this is not a reason for increasing your piece of cake on the account of reduction of someone other's share." See **Exhibit II**, August 6, 2011 email chain.

Despite Mr. Masiutin's warnings, Defendant continued to sell SRL's software through INC. In response, Mr. Tanurcov and Mr. Masiutin called a meeting of the General Assembly of SRL on December 12, 2011 to remove Demcenko from his position as Director of SRL. See **Exhibit JJ**, Notice of Dec. 12, 2011 meeting. At this meeting, Mr. Tanurcov and Mr. Masiutin, having a combined 60% ownership of Plaintiff SRL, voted to remove Defendant Demcenko and elect Mr. Masiutin as the Director of Plaintiff SRL. See **Exhibit KK**, Election of Masiutin. On December 13, 2011, the Moldova State Authority recognized Mr. Masiutin as the elected director of SRL. See **Exhibit C**, Moldovan State Authority recognition.

A day later, on December 14, 2011, Defendant Demcenko took control of the <ritlabs.com> domain name and changed the WHOIS registrant information associated with that domain name from SRL to INC. See **Exhibit LL**, WHOIS history of <ritlabs.com>. Defendant also took control of the <ritlabs.net>, <thebat.net>, and <batpost.com> domain names and changed the WHOIS registrant information associated with those domains from SRL to INC. See **Exhibit MM**, WHOIS history of <ritlabs.net>, <thebat.net>, and <thebat.com>. Defendant also filed for registration of the RITLABS trademark (International Class 009) on December 23, 2011. See **Exhibit NN**, Printout of USPTO application for RITLABS (009). On January 3, 2012, SRL sent a threat letter to Defendants and, in turn, Defendant INC filed for trademark registration of RITLABS (International Class 042) on the very next day. See **Exhibit OO**, Demand letter; see also **Exhibit PP**, Printout of USPTO

application for RITLABS (042). Defendant also filed for trademark registration of MAILVOYAGER and THE BAT!. See **Exhibit QQ**, Printout of USPTO application for MAILVOYAGER; see also **Exhibit RR**, Printout of USPTO application for THE BAT!. Even assuming, *arguendo*, that the terms of the License Agreement between SRL and INC are valid, the License Agreement clearly states that "Licensee [INC] agrees that all right, title, and interest in and to Products, and all Intellectual Property Rights are the sole and exclusive property of Licensor [SRL]." See **Exhibit T**, License Agreement § 2.7. These "Intellectual Property Rights include "Internet domain names, trademarks, service marks, trade dress, trade names, logos, designs, slogans, product names, corporate names...." See **Exhibit T**, License Agreement Exhibit H § 1.14. Thus, even under Defendants' own interpretation of the facts, Defendants lacked the authority to misappropriate the domain names and trademarks of SRL.

In light of these actions, it is clear that Defendant Demcenko has breached his fiduciary duty to SRL. Defendant Demcenko has undertaken concerted efforts to usurp corporate opportunity by transferring SRL's clients to INC, and he did so with the intent and purpose to (1) obtain significantly more of the revenue of SRL than he otherwise could with his business partners and (2) to defraud the USCIS for the purposes of obtaining a L-1A visa. See **Exhibit JJJ**, L1AVISA 2011 Filing and Determination. Defendant has committed fraud to the detriment of SRL and has used his signature and SRL's property in his favor and in favor of INC. See **Exhibit D**, Moldova Law of Limited Liability Companies Article 47(1). Accordingly, no genuine issues of material fact remain for trial and summary judgment is appropriate as a matter of law as to Plaintiff's breach of fiduciary duty claim.

20

**ii.   Defendants INC and Demcenko are liable for cybersquatting under the**

**Anticybersquatting Consumer Protection Act (ACPA)**

Defendants may also be held liable for cybersquatting under the ACPA as a matter of

law. In order to prevail on a claim under the Anticybersquatting Consumer Protection Act, a

Plaintiff must establish the following:

> (1) it has a valid trademark entitled to protection;
>
> (2) its mark is distinctive or famous;
>
> (3) the defendant's domain name is identical or confusingly similar
>
> to... the owner's mark; and
>
> (4) the defendant used, registered, or trafficked in the domain name
>
> (5) with a bad faith intent to profit.

*See* 15 U.S.C. § 1125(d); *see also Virtual Works, Inc. v. Volkswagen of America*, Inc., 238 F.3d

264, 267 (4th Cir. 2001). Summary judgment under the ACPA is proper where the facts "lead

to the inescapable conclusion that defendant acted in bad faith and no reasonable factfinder

could conclude otherwise." *Nike, Inc. v. Circle Group Internet, Inc.*, 318 F. Supp. 2d 688, 692

(N.D. Ill. 2004). The Court has already found that Plaintiff is likely to succeed on the merits of

its cybersquatting claim, and the facts now confirm Defendants' bad faith.

Plaintiff SRL is the owner of common law trademark rights in and to the RITLABS,

BATPOST, and THE BAT! marks and Defendants have registered and used those marks in the

<ritlabs.com>, <ritlabs.net>, <ritlabs.us>, <thebat.net>, and <batpost.com> domain names

with a bad faith intent to profit. On December 13, 1996, Plaintiff's predecessor in interest, RIT,

registered the <ritlabs.com> domain name. See **Exhibit SS**, Printout of <ritlabs.com> WHOIS.

Upon the resignation of Defendant Demcenko, Maxim Masiutin, and Stefan Tanurcov from

RIT, SRL, see **Exhibit TT**, Workbooks of Demcenko, Masiutin, and Tanurcov, the property of

RIT, SRL was transferred to RitLabs, SRL, which was formed on February 16, 1998. See

**Exhibit UU**, State Register of Legal Entities Extract; see also **Exhibit A,** Deposition of

Demcenko, pgs. 29-30, 42 (Evidencing that the software of RIT, SRL, including THE BAT!,

was transferred to RitLabs, SRL). On or about October 15, 2003, SRL began using the

RITLABS mark on its website located at the <ritlabs.com> domain name in the sale of its

software goods and services. See **Exhibit VV**, Printout of Oct. 15, 2003 archive. Since this

time, SRL has continuously and exclusively used the RITLABS mark to sell its software

products and has purposely targeted citizens of the United States, which has resulted in

numerous sales since 2003. See **Exhibit Q**, Affidavit of Maxim Masiutin.

Prior to the dissolution of RIT, RIT used the THE BAT! mark in association with its

email client software as early as April 14, 1997. See **Exhibit WW**, Printout of April 14, 1997

archive. SRL also used the BATPOST trademark as early as August 2, 2002. See **Exhibit XX**,

Printout of Aug. 2, 2002 archive. Upon the resignation of Demcenko, Masiutin, and Tanurcov,

the The Bat! and BatPost software products were assigned to Plaintiff SRL. See **Exhibit A,**

Deposition of Demcenko, pgs. 29-30, 42. Since their assignment to SRL, Plaintiff SRL has

continuously and exclusively used THE BAT! and BATPOST marks in commerce in

association with its software goods and services. See **Exhibit YY,** Printout of current

<ritlabs.com> webpage. By virtue of its longstanding use of THE BAT!, BATPOST, and

RITLABS marks in United States commerce, Plaintiff has acquired common law trademark

rights in the THE BAT!, BATPOST, and RITLABS marks. *See Emergency One, Inc. v.*

*American Eagle Fire Engine Co., Inc.*, 332 F.3d 264, 268-70 (4th Cir. 2003) (discussing the acquisition of common law rights through use in commerce).

Furthermore, Defendants Demcenko and INC registered and used the <ritlabs.com>, <ritlabs.net>, <ritlabs.us>, <thebat.net>, and <batpost.com> domain names, which are identical or confusingly similar to Plaintiff's RITLABS, THE BAT!, and BATPOST marks. "In the cybersquatting context, 'confusing similarity' must simply mean that the plaintiff's mark and the defendant's domain name are so similar in sight, sound and meaning that they could be confused." *Venetian Casino Resort, LC v. Venetiangold.com*, 380 F.Supp.2d 737, 743 (E.D. Va. 2005) (citing J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 25:78 (4th ed. 2004)).

It is clear that the <ritlabs.com>, <ritlabs.net>, <ritlabs.us>, <batpost.com>, and <thebat.net> domain names are identical or confusingly similar to Plaintiff's marks. Specifically, <ritlabs.com>, <ritlabs.net>, and <ritlabs.us> are identical to Plaintiff's RITLABS mark and merely add a top-level domain name suffix to the end of that mark. Additionally, <thebat.net> is identical to Plaintiff's THE BAT! mark, and merely removes the "!" from the mark and adds the top-level domain name suffix of .net. The removal of the "!" does not militate against a finding of confusing similarity under the law. *See Super-Krete Int'l, Inc. v. Sadleir*, 712 F. Supp. 2d 1023, 1032 (C.D. Cal. 2010) ("Based on the case law, this minor variation makes Defendant's domain name confusingly similar to Plaintiff's mark."); *see also Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 382 (7th Cir. 1976) ("Courts have often held that small changes in words, such as adding or deleting a hyphen, are insufficient to

23

distinguish marks."); *In re Quik-Print Copy Shops*, 616 F.2d 523, 526 (C.C.P.A. 1980) (Finding that "[t]here is no legally significant difference here between 'quik' and 'quick.'"). Similarly, the <batpost.com> domain name merely adds the .com suffix to Plaintiff's BATPOST mark, which is removed in ACPA analysis.

Defendants INC and Demcenko registered and used the <ritlabs.com>, <ritlabs.net>, <ritlabs.us>, <thebat.net>, and <batpost.com> domain names with a bad faith intent to profit. Defendants Demcenko and INC registered the <ritlabs.us> domain name on March 8, 2010 without the acquiescence or approval of Mr. Tanurcov or Mr. Masiutin. See **Exhibit ZZ**, Printout of <ritlabs.us> WHOIS. Subsequently, and to this day, Defendants continue to use this domain name, without the approval of SRL, to sell SRL's products. See **Exhibit AAA**, Printout of current <ritlabs.us> domain name.

Defendant Demcenko, on December 14, 2011 (the day after he was removed as Director of SRL), accessed the registrant account associated with the <ritlabs.com>, <ritlabs.net>, <thebat.net>, and <batpost.com> domain names without authorization and re-registered those domain names in the name of Defendant INC by changing the information listed in the registrant field of the WHOIS database entry associated with those domain names from SRL to INC. See **Exhibit BBB**, Printout of WHOIS registration changes; see also **Exhibit F**, Def's Response to Pl's Request to Admit #13. For the purposes of cybersquatting, this hijacking of SRL's domain names constitutes a new "registration." *See Travant Solutions, Inc. v. Don Cole*, FA203177 (Nat. Arb. Forum Dec. 6, 2003) (finding that "where the domain name was transferred to a new registrant at a time when the new registrant's registration of the domain name would be in bad faith, the transfer is tantamount to a new registration and the

'bad faith' requirement of Policy ¶ 4(a)(iii) can be proven against the current registrant"); *see also America West Airlines v. domainchronicle*, FA222038 (Nat. Arb. Forum Feb. 11, 2004) ("The transfer of a domain name registration has been equated to "registration" for purposes of Policy ¶ 4(a)(iii).").

Once these domain names were in INC's possession and control, Defendants Demcenko and INC used and held the domain names to gain leverage in their negotiations with SRL under the theory that these domain names were originally "licensed by Mr. Demcenko to SRL." See **Exhibit CCC**, Jan. 4, 2012 letter from ILC to Traverse Legal; *see also DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1219-21 (9th Cir. 2010). Defendants continued to use the domain names to sell SRL's software products and to obtain revenues that were ultimately transferred to Defendant INC. See **Exhibit I**, List of CIFNet transfers to INC.

Defendants not only registered and used the <ritlabs.com>, <ritlabs.net>, <ritlabs.us>, <thebat.net>, and <batpost.com> domain names, but they did so with a bad faith intent to profit. In determining whether the Defendant acted with a bad faith intent to profit, courts are directed to examine nine non-exclusive factors.[11] 15 U.S.C. § 1125(d). Neither Defendant

1.  [11]  The trademark or other intellectual property rights of the person, if any, in the domain name;

2.  The extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

3.  The person's prior use, if any, of the domain name in connection with bona fide offering of any goods or services;

4.  The person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

5.  The person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the

Demcenko nor Defendant INC have intellectual property rights in the domain names at issue.

Defendant Demcenko has never used the terms "RitLabs," "The Bat!," or "BatPost" in

commerce in association with the sale of goods or services in his capacity as an individual. See

**Exhibit A**, Deposition of Demcenko, pg. 15 (wherein Defendant Demcenko admits he has

never owned shares in RIT, SRL). Moreover, Defendant INC expressly admitted that it did not

have intellectual property rights in and to the domain names and trademark through its

execution of the License Agreement, which stated that "Licensee [INC] agrees that all right,

title, and interest in and to Products, and all Intellectual Property Rights are the sole and

exclusive property of Licensor [SRL]." See **Exhibit T**, License Agreement § 2.7. These

"Intellectual Property Rights include "Internet domain names, trademarks, service marks, trade

dress, trade names, logos, designs, slogans, product names, corporate names...." See **Exhibit T**,

---

mark, by creating a likelihood of confusion at to the source, sponsorship, affiliation, or endorsement of the site;

6.     The person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use the domain name in a bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

7.     The person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

8.     The person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

9.     The extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

License Agreement Exhibit H § 1.14. Furthermore, Exhibit B of the License Agreement, which contains a list of "Licensee's Marks," expressly states that INC does not own any trademarks related to the software. See **Exhibit T**, License Agreement Exhibit B. Thus, it is clear that Defendants do not have intellectual property rights in the domain names.

Defendants have never used the terms reflected in the domain names as their personal names and have never used the domain names in connection with a bona fide offering of goods or services or a non-commercial use. As stated at length above, Defendant Demcenko misappropriated the domain names and used them in a concerted scheme wherein he breached his fiduciary duty to SRL in an attempt to usurp corporate property and opportunity for his own commercial and personal gain and to obtain a L-1A visa within the United States See **Exhibit JJJ,** L1AVISA 2011 Filing and Determination. Defendants' sole purpose in misappropriating the domain names was to hold those domain names for ransom in their negotiations with SRL over Defendant Demcenko's breach of fiduciary duty, to disrupt the business of Plaintiff SRL, and to divert revenue and customers of SRL to INC. See **Exhibit DDD**, Affidavit of Stefan Tanurcov (wherein Defendant Demcenko threatened to shut down the ritlabs.com website). These actions all evidence Defendants' bad faith intent to profit under the law. *See DSPT Int'l,* at 1213, 1219-21. Accordingly, no genuine issues of material fact remain for trial and Plaintiff's Motion for Summary Judgment must be granted.

### iii. Defendants are liable for false designation of origin under the Lanham Act

Defendants may also be held liable for false designation of origin as a matter of law pursuant to 15 U.S.C. § 1125. To prevail on a claim of false designation of origin, a plaintiff must establish five elements: "(1) that it possesses a mark; (2) that the [opposing party] used

the mark; (3) that the [opposing party's] use of the mark occurred 'in commerce'; (4) that the [opposing party] used the mark 'in connection with the sale, offering for sale, distribution, or advertising of goods or services; and (5) that the [opposing party used the mark in a manner likely to confuse consumers." *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005). Since Plaintiff has already addressed its ownership of the RITLABS, THE BAT!, and BATPOST marks, the only remaining mark to address is Plaintiff's ownership of the MAILVOYAGER mark.

Plaintiff has trademark rights in the MAILVOYAGER mark because it was the first to use that mark in commerce in association with the sale of software products. Specifically, Plaintiff began using the MAILVOYAGER mark in commerce as early as August 4, 2011 and at the <ritlabs.com> domain name. See **Exhibit Q**, Affidavit of Masiutin; see also **Exhibit A**, Deposition of Demcenko, pgs. 53-55. In contrast, Defendant INC did not begin using MAILVOYAGER as a trademark until September 27, 2011. See **Exhibit A**, Deposition of Demcenko, pgs. 50-51. Accordingly, Plaintiff has priority of rights in and to the MAILVOYAGER mark, which was based on Plaintiff's THE BAT! code, written, in part by Mr. Maxim Masiutin, and first used in commerce by SRL. See **Exhibit Q**, Affidavit of Maxim Masiutin.

Defendants have used the RITLABS, THE BAT!, BATPOST, and MAILVOYAGER marks in commerce in connection with the sale of software products. Specifically, Defendants have falsely represented that Defendant INC is a branch, affiliate, or representative office of SRL or that Defendant INC is otherwise endorsed or sponsored by SRL. Defendants have sold and offered for sale the THE BAT!, BATPOST, and MAILVOYAGER products under the

RITLABS mark and have done so under a fallacious License Agreement that was executed in violation of the SRL Articles of Association. See **Exhibit AAA**, Printout of current <ritlabs.us>; see also **Exhibit T**, License Agreement.

  Furthermore, Defendants have used SRL's mark in a manner likely to cause consumer confusion as to the source, sponsorship, or endorsement of Plaintiff's software products. Defendants have terminated distributor agreements with SRL's former distributors and have executed new agreements with those distributors through Defendant INC, which has resulted in actual consumer confusion, namely, the sale of SRL's software to third parties that believe that they were purchasing software from an authorized, endorsed, or affiliated entity of Plaintiff SRL. See **Exhibit K**, Termination letter to CIFNet; see also **Exhibit I**, Sales of SRL software by CIFNet; **Exhibit EEE**, Printout of registration server data showing INC's sale of SRL's software through SoftLogistic. This actual confusion serves as the best evidence of the likelihood of confusion resulting from Defendant's use of SRL's marks. *See Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 464 F. Supp. 2d 495, 502 (E.D. Va. 2006) *aff'd on other grounds*, 507 F.3d 252 (4th Cir. 2007) (holding that "'Actual confusion' means actual consumer confusion that allows the seller to pass off his goods as the goods of another" and that "evidence of actual confusion is the best evidence of likelihood of confusion."). Additionally, Defendants' unauthorized sale of SRL's products under the RITLABS, THE BAT!, BATPOST, and MAILVOYAGER marks has caused a likelihood of confusion because SRL's marks are distinctive, Defendants have used identical marks in the sale of SRL's software products within the same trade channels and to the same distributors as SRL, and because Defendant Demcenko did so in bad faith to misappropriate the funds of SRL and to

obtain and extend his L-1A visa. Consequently, no genuine issues of material fact remain for trial and summary judgment as to Plaintiff's false designation claim is appropriate as a matter of law.

### iv. Defendant Demcenko is liable for a violation of the Computer Fraud and Abuse Act

Defendant Demcenko may also be held liable for a violation of the Computer Fraud and Abuse Act, under which one may be held liable where one knowingly accesses a computer without authorization or exceeds authorized access and thereby obtains any thing of value. *See* 18 U.S.C. § 1030(a)(4); *see also Global Policy Partners, LLC v. Yessin*, 686 F. Supp. 2d 631, 635-36 (E.D. Va. 2009). As stated above, Defendant Demcenko admits that on December 14, 2011, after having been removed as Director of SRL on the previous day, he knowingly accessed the registrant account associated with the <ritlabs.com>, <ritlabs.net>, <thebat.net>, and <batpost.com> domain names. See **Exhibit F**, Def. Response to Pl's Request to Admit #13. After accessing that registrant account, Defendant Demcenko then, with an intent to defraud, changed the password associated with the registrant account to deprive SRL of access to the account and modified the WHOIS information associated with the domain names to convert those domain names into the possession of Defendant INC. See **Exhibit F**, Def. Response to Pl's Request to Admit #13; see also **Exhibit BBB**, WHOIS history of modification of domain names; *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1125-26 (W.D. Wash. 2000) (holding that "the CFAA's use of 'fraud' simply means wrongdoing and not proof of the common law elements of fraud."). These actions resulted in Defendants' receipt of things of value, namely the <ritlabs.com>,

<ritlabs.net>, <thebat.net>, and <batpost.com> domain names and the revenue appurtenant

thereto, and disrupted SRL's ability to renew its SSL certificate, the certificate that provides

purchasers with a secure connection to purchase SRL's software. See **Exhibit Q**, Affidavit of

Maxim Masiutin.

      Additionally, on January 20, 2012, Defendant Demcenko, with an intent to defraud,

changed the MX records associated with the <ritlabs.com> domain name to redirect email sent

to that domain name from <ritlabs.com>'s previous server provider to a virtual server created

by CIFNet on behalf of and at the direction of Defendant Demcenko. See **Exhibit FFF**,

Printout of name server history; see also **Exhibit J**, Deposition of Yevgeniy Kruglov, pgs. 36-

37. These actions were taken under the auspices that Defendant Demcenko needed to access

his <ritlabs.com> email account, access to which was revoked after his employment with SRL

was terminated. See **Exhibit Q**, Affidavit of Maxim Masiutin. Defendant then obtained

information from a protected computer, namely, emails sent to the <ritlabs.com> domain

name, so that he could continue to do business with dealers that he had misappropriated from

SRL. See **Exhibit R**, Deposition of Basil Kruglov, pgs. 57-62; see also **Exhibit K**,

Termination letter to CIFNet.

      These actions in total aggregated over $5,000 in damages to Plaintiff. Specifically,

Plaintiff's inability to change the DNS information association with <ritlabs.com> domain

name to modify its cart provider resulted in INC's receipt of revenue through the sale of

software through distributors CIFNet ($8,757.50 in 2012) and SoftLogistic ($8761.95 in Jan.

2012). See **Exhibit I**, CIFNet's sales of SRL's software; see also **Exhibit Q**, Affidavit of

Maxim Masiutin; **Exhibit GGG**, Emails from CIFNet re 2012 revenue; **Exhibit EEE**, January

2012 revenue of SoftLogistic. Since SRL was unable to modify its cart provider, it was also unable to enforce the previous contracts that were wrongfully terminated by Defendants. See **Exhibit Q**, Affidavit of Maxim Masiutin. Accordingly, summary judgment on Plaintiff's Computer Fraud and Abuse Act claim is proper as a matter of law and the only issue remaining for trial is the full amount of Plaintiff's damages.

### v. Defendants are liable for conversion

Defendants may also be held liable for conversion under Virginia law, which requires a plaintiff to prove that the defendant "wrongfully exercise[d] or assume[d] authority over another's goods, depriving him of their possession." *Hairston Motor Co. v. Newsome*, 253 Va. 129, 135 (1997). "Conversion includes any distinct act of dominion wrongfully exerted over property that is in denial of, or inconsistent with, the owner's rights." *Hartzell Fan, Inc. v. Waco, Inc.*, 256 Va. 294, 301-02 (1998). Like other forms of intangible property, such as negotiable instruments, *see Hartzell Fan* at 301-02, the cause of action of conversion has been held to apply to domain names. *See Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003).

As stated above, Defendants, through their unauthorized access to the registrant account associated with the <ritlabs.com>, <ritlabs.net>, <thebat.com>, and <batpost.com> domain names, and through their wrongful exercise of authority over those domain names, deprived Plaintiff of its possession of those domain names, which resulted in damages to Plaintiff. See **Exhibit BBB**, Printout of WHOIS registration changes; see also **Exhibit F**, Def's Response to Pl's Request to Admit #13. Accordingly, Defendants may be held liable for conversion as a matter of law, and the only matter remaining for trial is the amount of Plaintiff's damages.

32

### vi.  Defendants are liable for tortious interference with contractual relations

Under Virginia law, a plaintiff may establish tortious interference with contractual relations by establishing: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *See Chaves v. Johnson*, 230 Va. 112, 120-21 (1985). Defendant Demcenko, as Director of SRL, knew of the existence of valid contractual relationships between SRL and its distributors and intentionally interfered with those contractual relationships by sending termination letters to those distributors to terminate SRL's contracts and to enter into new contracts with those distributors as INC. See **Exhibit M**, Deposition of Olga Somova, pgs. 23-24; see also **Exhibit Q**, Affidavit of Maxim Masiutin; **Exhibit K**, July 15, 2008 termination letter from Demcenko to CIFNet; **Exhibit L**, 2005 agreement between SRL and CIFNet. Consequently, Defendant may be held liable for tortious interference with contractual relations as a matter of law and the only issue remaining for trial is the amount of Plaintiff's damages.

### vii. Defendants are liable for tortious interference with prospective economic advantage

Defendants may also be held liable for tortious interference with prospective economic advantage as a matter of law. To prove such a claim, a plaintiff must establish: (1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have

33

continued in the relationship or realized the expectancy; and (4) damage to plaintiff.

*Commercial Bus. Sys., Inc. v. Halifax Corp.*, 253 Va. 292, 300 (1997). Here, SRL had business

relationships and/or expectancies with its identified dealers SoftLogistic, Stech Data, Business

IT, NILTA, CIFNet, and Skulski Enterprise, of which Defendant Demcenko was aware. See

**Exhibit M**, Deposition of Olga Somova, pgs. 23-24; see also **Exhibit N**, Contracts between

SRL and former dealers. In the absence of Defendants' intentional misconduct and breach of

fiduciary duty, SRL would have continued in relationships or realized future expectancies with

these dealers. See **Exhibit O**, Contracts between INC and former SRL dealers. As a result of

this loss of relationships and expectancies, SRL has suffered damages of at least $371,684.05

in damages since 2008, the full amount to be determined at trial. See **Exhibit EE**, Draft profit

and loss of INC Jan. 2008-Feb. 2012. As a result, summary judgment is proper as a matter of

law.

      **viii.  Defendants are liable for unfair competition**

      Virginia has "adopted the general rule that in determining the exercise of unfair

competition in the use of trademarks or trade names, the test is whether the resemblance

between them is so close that it is likely to confuse a prospective buyer or customer exercising

ordinary care in his dealings." *Rosso & Mastracco, Inc. v. Giant Food Shopping Ctr. of Va.,*

*Inc.*, 200 Va. 159, 165 (1958). As stated above in regard to Plaintiff's false designation of

origin claim under the Lanham Act, Plaintiff SRL possesses valid and distinctive trademarks in

and to the RITLABS, THE BAT!, BATPOST, and MAILVOYAGER marks. These marks

have been continuously and exclusively used in commerce in association with SRL's software

products since as early as 1996. As a result, these marks have become distinctive identifiers of

the origin and source of SRL's software products. Defendants' sale and offering for sale of software products under the RITLABS, THE BAT!, BATPOST, and MAILVOYAGER marks have caused actual confusion with respect to Defendant's diversion of dealers and end users who have believed that they were receiving a product authorized by, endorsed by, or sponsored by SRL. Defendants' actions have also caused a likelihood of confusion because Defendants have used identical marks within the same trade channels and to the same distributors as SRL in bad faith to misappropriate the funds of SRL and to obtain and extend his L-1A visa. No genuine issues of material fact remain for trial and summary judgment as to Plaintiff's unfair is appropriate as a matter of law.

## B.  Defendants' Claims

Plaintiff is entitled to summary judgment as a matter of law as to all of the counts listed in Defendants' Counterclaims. Defendant Demcenko, through his proxy Defendant INC, has breached his fiduciary duty to Plaintiff SRL by creating a branch or affiliate office of SRL within the United States without the vote or approval of the General Assembly of SRL. Additionally, Defendant INC has entered into a fallacious and unauthorized license agreement between SRL and INC without the approval of the majority of the disinterested members of SRL to divert the majority of SRL's revenues to his personal bank account and to obtain and extend his L-1A visa within the United States. Accordingly, Defendants' Counterclaims are not supported by the law or the facts and, since no genuine issues of material fact remain for trial, summary judgment is appropriate as a matter of law.

35

### i. Defendant Demcenko is liable for a breach of his fiduciary duty of loyalty to Plaintiff SRL and, therefore, the License Agreement is void and Defendants' Counterclaims are unsupported by the facts or law.

Defendants' Counterclaims I-VI are contingent upon whether the License Agreement between SRL and INC is valid. Since Defendant Demcenko breached his fiduciary duty by unilaterally creating INC without the authorization or knowledge of his business partners, and because Defendant Demcenko executed the License Agreement in a self-interested transaction with a company in which he owned 100% of the shares, Defendant breached his fiduciary duty in executing the License Agreement and the License Agreement is void. *See Cohen v. Mayflower Corp.*, 196 Va. 1153, 1160 (1955) (holding that "[a]n agreement may be void and of no legal effect because public policy forbids that a contract be entered into with respect to the subject matter" and "an agreement may be void and of no legal effect because the statute forbids an agreement with respect to the subject matter with which the parties are undertaking to contract."). Accordingly, summary judgment is proper as to Defendants' counterclaims I-VI.

### ii. Defendants' Counterclaim for conversion is unsupported by the facts and law.

Defendants' Counterclaim for conversion is unsupported by the facts and the law. It is worth noting at the outset that Defendants' Counterclaim VII, Conversion, relies upon the fact that SRL "improperly and secretly directed CIFNet to transfer payments which CIFNet was supposed to make to INC to Mr. Masiutin." As stated above, Defendant Demcenko purposefully and deliberately terminated SRL's prior valid contract with CIFNet without the knowledge of his business partners, allowed CIFNet to continue selling software outside of a distributor agreement, and then, on April 23, 2010, entered into a backdated distributor

36

agreement between CIFNet and INC. See **Exhibit V**, Agreement between INC and CIFNet; see also **Exhibit J**, Deposition of Yevgeniy Kruglov, pgs. 23-24. Since Defendant Demcenko exceeded his authority as SRL's Director in violation of his fiduciary duties to SRL, and because Defendant Demcenko, in excess of his authority, caused INC to enter into a void License Agreement with SRL and a void distributor agreement with CIFNet, Defendants' claim for conversion must fail because INC was never rightfully entitled to receive payments from CIFNet from the sale of SRL's software.

Secondly, Defendants' claim for conversion must also fail because it mischaracterizes the facts and law. Conversion requires a counter-plaintiff to prove that the counter-defendant "wrongfully exercise[d] or assume[d] authority over another's goods, depriving him of their possession." *Hairston Motor Co. v. Newsome*, 253 Va. 129, 135 (1997). "Conversion includes any distinct act of dominion wrongfully exerted over property that is in denial of, or inconsistent with, the owner's rights." *Hartzell Fan, Inc. v. Waco, Inc.*, 256 Va. 294, 301-02 (1998). Defendants' cannot show, however, that Mr. Masiutin, acting on behalf of SRL, "improperly and secretly directed CIFNet to transfer payments which CIFNet was supposed to make to INC."

In reality, Mr. Masiutin, in his individual capacity, transferred $10,000 to Defendant Demcenko so that Defendant Demcenko would provide that money to Yevgeniy Kruglov, CEO of CIFNet, in his individual capacity, to aid Mr. Masiutin in investing in stock markets located in the United States. See **Exhibit HH**, Deposition of Maxim Masiutin pgs. 163-168. Mr. Masiutin, who has an avid interest in US stocks, first asked Mr. Basil Kruglov to investigate US-based brokerage houses that would allow foreign nationals to trade in US stocks. See

**Exhibit R**, Deposition of Basil Kruglov pgs. 31-32. In November 2007, Mr. Masiutin then registered an account with Zecco Trading company, a Glendale, California-based online broker, and requested that Mr. Yevgeniy Kruglov transfer funds to that account. See **Exhibit R**, Deposition of B. Kruglov pgs. 33-35.

Mr. Masiutin then asked Mr. Yevgeniy Kruglov to charge $300 to his credit card "in order to not confuse them with the companies affairs and to withdraw $3,000 more from the card and transfer them to the same place…." See **Exhibit HHH**, ICQ log between Kruglov and Masiutin. This same place was Mr. Masiutin's Zecco Trading account, which allowed Mr. Masiutin, a citizen of Moldova, to invest in US stock markets. See **Exhibit J**, Deposition of Yevgeniy Kruglov, pgs. 37-44. Mr. Masiutin then gave Defendant Demcenko $10,000 to transfer to Mr. Kruglov because Mr. Kruglov was located within the United States and because Mr. Masiutin could not directly send money from Moldova to his US brokerage account at Zecco Trading. See **Exhibit HH**, Deposition of Masiutin, pg. 163. Mr. Masiutin then, from time to time, gave Defendant Demcenko money in various installments to transfer to his brokerage account in the United States through Mr. Kruglov. *Id.*

Then, on March 19, 2008, Mr. Masiutin, in an ICQ chat conversation with Mr. Kruglov, asked Mr. Kruglov to transfer $1,000 monthly to his Zecco Trading account: "Hello. Could you transfer me a thousand monthly on the 21st through 24th day to Zecco?" See **Exhibit HHH**, ICQ log between Kruglov and Masiutin. When asked why Mr. Masiutin asked Mr. Kruglov to transfer these amounts, Mr. Kruglov stated, "Mr. Masiutin felt he could have funded the account from Moldova, but he would have to pay international wire fees, possibly some interest, and that was not economically feasible to do that." See **Exhibit J**, Deposition of

38

Yevgeniy Kruglov, pg. 44. On that same day, Defendant Demcenko sent an email to Mr.

Kruglov, which stated, "If there was a possibility to make transfers asked by Max, I have no

objections. The only request is to render a report from your part once a month." See **Exhibit**

**III**, March 19, 2008 email from Demcenko to Kruglov. Consequently, not only were these

transfers transparent, but they were also expressly approved by Defendant Demcenko.

Consequently, Defendants' conversion claim is unsupported by the evidence and the

law. Since Defendant Demcenko expressly approved these transfers, Mr. Masiutin cannot have

been said to have wrongfully exercised or assumed authority over another's goods depriving

him of their possession. Furthermore, even assuming, *arguendo*, that Defendants' claims were

true and Mr. Masiutin misappropriated these funds (which the evidence clearly establishes he

did not), the appropriate claimant would be SRL, not INC, because these amounts were offset

from amounts owed to SRL by CIFNet, not amounts properly owed to INC. Consequently,

Defendants' conversion claim must fail as a matter of law because the evidence in the record

clearly establishes that Mr. Masiutin, on behalf of SRL, did not wrongfully exercise authority

over goods rightfully due to INC.

## II. Conclusion

For the foregoing reasons, Plaintiff is entitled to summary judgment as to all counts of

its Complaint. No genuine issues of material fact remain for trial and, therefore, summary

judgment is appropriate. Additionally, no genuine issues of material fact as to Defendants'

Counterclaims remain and summary judgment is appropriate as a matter of law. Summary

judgment is proper as to Counts I-VI of Defendants' Counterclaims because Defendant

Demcenko is liable for a breach of fiduciary duty of loyalty to Plaintiff SRL and, therefore, the

License Agreement, which he unilaterally executed in an interested transaction, is void.

Additionally, Defendant's Count VII, Conversion, is unsupported by the law and the facts and,

therefore, summary judgment in favor of Plaintiff is justified.

        Respectfully submitted this 9th day of July, 2012.

                  **RITLABS, S.R.L.**

                  By:  /s/J. Andrew Baxter
                  J. Andrew Baxter
                  Virginia Bar No. 78275
                  *Counsel for Plaintiff* (Local)
                  I.S. Law Firm, PLLC
                  1199 N. Fairfax St., Suite 702
                  Alexandria, VA  22314
                  (703) 527-1779 Telephone
                  (703) 778-0369 Facsimile
                  jabaxter@islawfirm.com

                  By:/s/John Di Giacomo
                  Mark G. Clark
                  Michigan Bar No. P41652
                  John Di Giacomo
                  Michigan Bar No. P73056
                  *Counsel for Plaintiff* (Foreign)
                  Traverse Legal, PLC
                  810 Cottageview Drive, Unit G-20
                  Traverse City, MI  49684
                  (231) 932-0411 Telephone
                  (231) 932-0636 Facsimile
                  Mark@traverselegal.com
                  John@traverselegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of July, 2012, I electronically filed the foregoing **BRIEF IN SUPPORT OF PLAINTIFF'S AMENDED MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF System on:

Kevin Richard Garden
Filipp Kofman
International Legal Counsels, PC
*Attorney for Defendants*
901 North Pitt Street, Suite 325
Alexandria, VA 22314
Kevin@gardenlawfirm.com

                                        **RITLABS, S.R.L.**

                                        By:  /s/J Andrew Baxter
                                        J. Andrew Baxter
                                        Virginia Bar No. 78275
                                        *Counsel for Plaintiff* (Local)
                                        I.S. Law Firm, PLLC
                                        1199 N. Fairfax St., Suite 702
                                        Alexandria, VA  22314
                                        (703) 527-1779 Telephone
                                        (703) 778-0369 Facsimile
                                        jabaxter@islawfirm.com

41