# EXHIBIT J

Confidential

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

RITLABS, S.R.L.,                )
                                )
            Plaintiff,          )
                                )
    vs.                         )
                                ) Civil Action No.
RITLABS, INC., and SERGHEI      ) 1:12CV00215
DEMCENKO,                       )
                                )
            Defendants.         )
_____)

- CONFIDENTIAL -

DEPOSITION OF YEVGENIY KRUGLOV

Chicago, Illinois

Thursday, June 14, 2012

Reported by:  Janet L. Robbins
              CSR No. 84-002207
NDS Job No.:  149431

1          MR. HUFF:  Objection, foundation.
2          THE WITNESS:  He was being for the
3   registration -- for services in regards to
4   registration of Ritlabs, Inc.
5   BY MR. DI GIACOMO:
6       Q      Mr. Demcenko is sending money to
7   Mr. Dubograev to create Ritlabs, Inc., the business
8   entity, is that correct?
9       A      Yes.
10      Q      Did you, in fact, on behalf of
11  Mr. Demcenko, transfer that money to Mr. Dubograev?
12      A      Yes, I did.
13      Q      In this e-mail, Mr. Demcenko states that
14  he wanted to continue the process of transferring
15  clients to American Ritlabs.
16             To the best of your recollection, did
17  Mr. Demcenko transfer clients to the American Ritlabs
18  entity prior to September 9th, 2008?
19         MR. HUFF:  Objection, foundation.
20         THE WITNESS:  I'm not aware of that.
21  BY MR. DI GIACOMO:
22      Q      Did CIFNet receive payments on behalf of
23  Ritlabs, Inc. prior to September 9th, 2008?
24      A      No.
25      Q      When did CIFNet begin receiving payments

1         THE WITNESS:  Since 1997, we were selling
2    different software for different entities.
3    Ritlabs -- I don't even remember if Ritlabs, S.R.L.
4    was the first company, if there was anything before
5    Ritlabs, S.R.L.  And for every of those entities, the
6    president was Mr. Demcenko.  And we were dealing with
7    Mr. Demcenko.  I can't be certain if this was under
8    Ritlabs, S.R.L. or Ritlabs, Inc.
9         MR. DI GIACOMO:  Would you please mark this.
10                  (Y. Kruglov 2 was marked for
11                  identification.)
12    BY MR. DI GIACOMO:
13        Q    Mr. Kruglov, I'm handing you what has
14    been marked as Yevgeniy Kruglov Exhibit 2, which
15    purports to be a January 6th, 2009 e-mail from you to
16    Mr. Demcenko wherein you ask for the payment of legal
17    fees.
18             Are you familiar with this e-mail?
19        A    Yes, I am.
20        Q    Were these legal fees paid out of amounts
21    that CIFNet was holding on behalf of Ritlabs, whether
22    S.R.L. or Inc.?
23        A    Yes.
24        Q    And were these amounts paid out of
25    profits generated by either Ritlabs, S.R.L. or

1   Ritlabs, Inc. through the sale of The Bat! or any
2   other software?
3        A      Yes.
4        Q      Did you transfer this money to
5   Mr. Dubograev at the direction of Mr. Demcenko?
6        A      Yes, I did.
7                    (Y. Kruglov 3 was marked for
8                    identification.)
9   BY MR. DI GIACOMO:
10       Q      Mr. Kruglov, I'm handing you what has
11  been marked as Yevgeniy Kruglov Exhibit 3, which
12  purports to be a November 20th e-mail, November 20,
13  2009 e-mail, from you to Mr. Demcenko concerning the
14  transfer of $70,000.
15              Are you familiar with this e-mail?
16       MR. HUFF:  Can we go off the record for a
17  second?
18       MR. DI GIACOMO:  Sure.
19                   (A discussion was had off record.)
20       THE WITNESS:  Yes.
21  BY MR. DI GIACOMO:
22       Q      Mr. Kruglov, in this e-mail you state
23  that you will be depositing $70,000 into
24  Mr. Demcenko's account.  Mr. Demcenko will show that
25  amount and then he'll transfer it back to you when

1  necessary.
2           Is that an accurate statement?
3       MR. HUFF:  Objection to form.
4       THE WITNESS:  Yes.
5  BY MR. DI GIACOMO:
6       Q    Was this amount transferred to
7  Mr. Demcenko's personal bank account?
8       A    Yes.
9       Q    Did Mr. Demcenko ever return the $70,000
10 to CIFNet?
11      A    No, he did not.
12      Q    And was this $70,000 an offset against
13 amounts that CIFNet owed Ritlabs, S.R.L. or Ritlabs,
14 Inc. for the sale of software?
15      A    That's correct.
16      Q    Mr. Kruglov, has there been any other
17 transfers to Mr. Serghei Demcenko's personal bank
18 account between the years of 2008 and 2012 from
19 CIFNet?
20      A    All of the transfers that were made were
21 made at his direction, whether it was a personal
22 account or a business account.
23      Q    Understood.
24      A    I think there were transfers to personal
25 account.

1   agreement in this e-mail, is he, in fact, referencing
2   the agreement marked as Basil Kruglov Exhibit 5,
3   which purports to be a license agreement between
4   Ritlabs, Inc. and CIFNet?
5        A    Yes.
6        Q    Mr. Kruglov, this e-mail is dated April
7   23rd, 2010, but yet the exhibit there marked Basil
8   Kruglov Exhibit 5 is dated January 1st, 2010.
9             Is it accurate to state that you did not
10  sign that agreement on January 1st, 2010?
11       A    No, it was not signed on January 1st, but
12  the same thing happened to our previous agreements
13  with Ritlabs, S.R.L.
14       Q    When you say "the same thing happened,"
15  what do you mean?
16       A    The previous agreement that we had with
17  Ritlabs, S.R.L., it was not signed on January 1st of
18  2005 either.  I believe the date -- I believe the
19  date on that agreement was also January 1st.
20       Q    In this exhibit marked Yevgeniy Kruglov
21  5, is it accurate to state that Mr. Demcenko asked
22  you to backdate this document?
23       MR. HUFF:  Objection, form.
24       THE WITNESS:  Could you rephrase it?
25  BY MR. DI GIACOMO:

1      Q      Sure.  In this e-mail located within
2   Yevgeniy Kruglov Exhibit 5, Mr. Demcenko states, "My
3   understanding it would be better for you to sign this
4   agreement as of the first of this year," is that
5   correct?
6      A      It is.
7      Q      And based on your reading of that
8   language, do you believe that that was a statement
9   from Mr. Demcenko asking you to backdate that
10  document?
11     MR. HUFF:  Objection, form.
12     THE WITNESS:  I did not put any dates on the
13  document, just the signature.  And this was done to
14  simplify accounting.  That's all.
15  BY MR. DI GIACOMO:
16     Q      When you say you did not put dates on the
17  document, do you mean that that document was handed
18  to you -- the document referenced in Basil Kruglov
19  Exhibit 5 was handed to you with the date January 1st
20  already contained within the document?
21     A      This is right.
22     Q      This e-mail marked has Yevgeniy Kruglov
23  Exhibit 5 also states, "I tried to include as little
24  as possible from certain well known to you fellows."
25           Is that an accurate translation of what's

1  **Ritlabs, Inc.'s profits split to three invoices and**
2  **then paid to Ritlabs, Inc.?**
3      MR. HUFF:  Objection, form and foundation.
4      THE WITNESS:  I'm not sure.  I don't see a
5  reason from this.
6  BY MR. DI GIACOMO:
7      **Q      Your testimony has been that the license**
8  **agreement contained within Basil Kruglov Exhibit 5**
9  **dated January 1st, 2010 was executed after that date,**
10 **but yet the e-mail in front of you, which is marked**
11 **as Yevgeniy Kruglov Exhibit 6, shows that CIFNet was**
12 **selling Ritlabs' software in 2009.**
13          **Is that an accurate characterization?**
14     MR. HUFF:  Objection, form.
15          When you say "Ritlabs' software," it's
16 the same issue we've been talking about through the
17 morning.
18     THE WITNESS:  Could you repeat the question?
19 BY MR. DI GIACOMO:
20     **Q      Sure.  Is it accurate to state that**
21 **CIFNet was selling Ritlabs, Inc. or Ritlabs, S.R.L.'s**
22 **software in 2009?**
23     **A      Yes.**
24     **Q      And is it accurate to state that the**
25 **license agreement marked Basil Kruglov Exhibit 5 was**

1       MR. HUFF:  Objection to the form.

2       THE WITNESS:  CIFNet has created virtual server

3  and provided the standard set of software, like

4  e-mail server, DNS server.  And that give him ability

5  to access e-mail account, but he was in control of

6  his -- I should correct that.  He was in control of

7  ritlabs.com domain and DNS.  And any changes that

8  were done, this is something that Mr. Demcenko done

9  and not CIFNet.

10 BY MR. DI GIACOMO:

11      **Q      So just to clarify your testimony, is it**

12 **accurate to state that Mr. Demcenko changed the MX**

13 **records associated with the ritlabs.com domain name**

14 **to point to the virtual server that CIFNet created?**

15      MR. HUFF:  Objection, foundation.

16      THE WITNESS:  Could you restate this?

17 BY MR. DI GIACOMO:

18      **Q      Sure.  You've testified that CIFNet**

19 **created a virtual server on behalf of Mr. Demcenko.**

20 **And you've testified that any changes to the MX or**

21 **DNS records associated with the Ritlabs domain name**

22 **was made by Mr. Demcenko.**

23           **Is it accurate to state that Mr. Demcenko**

24 **changed the MX records to point to the virtual server**

25 **that CIFNet had created?**

 1          MR. HUFF:  Objection, foundation.
 2          THE WITNESS:  Mr. Demcenko was in the control
 3   of the name so he could point name servers to
 4   anywhere.  In this case, they were pointed to this
 5   new server.
 6   BY MR. DI GIACOMO:
 7      Q     So is it your testimony that you had
 8   personal knowledge that Mr. Demcenko pointed the
 9   ritlabs.com domain name to the virtual server created
10   by CIFNet?
11          MR. HUFF:  Objection, foundation.
12          THE WITNESS:  This is how I see it.  He was
13   only one in control of domain name.
14   BY MR. DI GIACOMO:
15      Q     Thank you.
16               (Y. Kruglov 10 was marked for
17               identification.)
18   BY MR. DI GIACOMO:
19      Q     Mr. Kruglov, I've handed you what has
20   been marked as Yevgeniy Kruglov Exhibit 10, which
21   purports to be an ICQ chat log between you and
22   Mr. Max Masiutin.
23               Are you familiar with this conversation?
24      A     Yes.
25          MR. HUFF:  Could we go off the record for a

 1   second?

 2        MR. DI GIACOMO:  Sure.

 3                 (A discussion was had off record.)

 4        THE WITNESS:  There is much more in English

 5   translation than Russian.

 6   BY MR. DI GIACOMO:

 7        Q    I agree.  I'm only going to draw your

 8   attention to the Russian page.

 9             Mr. Kruglov, I'm handing you what has

10   been marked as Exhibit 10, Yevgeniy Kruglov Exhibit

11   10, which purports to be an ICQ chain between you and

12   Maxim Masiutin.

13             Are you familiar with this conversation?

14        A    Yes.

15        Q    In this first line of this conversation,

16   Mr. Masiutin states, "Can you charge those $300 that

17   we transferred from my card in order to not confuse

18   them with the company's affairs and to withdraw

19   $3,000 more from the card and transfer them to the

20   same place and what transaction expenses will be in

21   such a case?"

22             Is this an accurate statement?

23        MR. HUFF:  You mean accurate translation?

24   BY MR. DI GIACOMO:

25        Q    Accurate translation, excuse me.

1     **A**    It is.

2     **Q**    **And in this conversation, what was**
3 **Mr. Maxim Masiutin asking you to transfer $300 for,**
4 **to the best of your personal recollection?**

5    MR. HUFF: Objection, foundation.

6    THE WITNESS: Mr. Maxim Masiutin was asking me
7 to transfer the money to his personal account at a
8 brokerage firm.

9 BY MR. DI GIACOMO:

10     **Q**    **And was he asking you to transfer this**
11 **money to make investments in the United States?**

12    MR. HUFF: Objection, foundation.

13    THE WITNESS: I would say so.

14 BY MR. DI GIACOMO:

15     **Q**    **To the best of your recollection, was**
16 **Mr. Demcenko aware of these transfers at the time**
17 **that this ICQ log was written?**

18    MR. HUFF: I'm going to object to the
19 foundation.

20    THE WITNESS: He should have been because
21 during this whole discussion -- and I do not see it
22 in this portion -- yes, it is here. It is in the
23 second page of English translation.

24    MR. HUFF: Just to make the record clear --
25 maybe you're going to do that. It's your

1   examination.

2           MR. DI GIACOMO:  Please.

3           MR. HUFF:  Counsel has provided me and
4   subsequently the witness with a three-page, it's not
5   Bates stamped, but a three-page English translation
6   of an ICQ log, a portion of which is Exhibit No. 10.

7               And I believe what the witness is right
8   now telling counsel, that there's a portion of the
9   English translation that is relevant to him answering
10  the question that's been posed with respect to
11  whether Mr. Demcenko was aware of the transfers at
12  the time that they were being made.

13  BY MR. DI GIACOMO:

14      **Q      Mr. Kruglov, is it your testimony that**
15  **Mr. Demcenko was aware of the transfers at the time**
16  **that this ICQ log was created?**

17      **A      The portion of the log goes from February**
18  **12th through February -- or even March 19th.  And,**
19  **yes, during this conversation he was aware of it.**

20                  **(Y. Kruglov 11 was marked for**
21                  **identification.)**

22          MR. HUFF:  For clarity of the record, I would
23  say that the ICQ log doesn't indicate what year we
24  are in.  The last number on the year appears to be
25  not logged.  Again, I understand that this is the way

1  it was produced to you, but it's unclear to me at
2  least what year we're in.
3         MR. DI GIACOMO:  Understood.
4  BY MR. DI GIACOMO:
5     Q     Mr. Kruglov, I'm handing you what has
6  been marked as Yevgeniy Kruglov No. 11, which
7  purports to be an e-mail chain between you and
8  Serghei Demcenko between the dates of March 19th,
9  2008 and March 20th, 2008.
10              Are you familiar with these e-mails?
11    A     Yes, they look like the messages I sent
12 and received.
13    Q     And in the e-mail dated Wednesday, March
14 19th, 2008, is it accurate that Mr. Demcenko states,
15 "If there was a possibility to make transfers asked
16 by Max, I have no objections.  The only request is to
17 render a report from your part once a month."
18              Is that an accurate translation?
19    A     Yes, of that paragraph.
20    Q     And based on your recollection, are the
21 transfers discussed in this e-mail within Exhibit 11
22 the same transfers that were discussed in the ICQ log
23 located within Exhibit 10?
24    A     To the best of my recollection, yes.
25    Q     And drawing your attention again to

1   **Exhibit 10, the last page of the English translation,**
2   **which I understand no Russian translation has been**
3   **provided, but drawing your attention to the English**
4   **translation of this ICQ log on Page 3, there is a**
5   **line dated March 19th, two-zero-zero, with the last**
6   **digit of that date cut off, wherein Mr. Maxim**
7   **Masiutin states to you, "Hello.  Can you transfer me**
8   **a thousand monthly on the 21st through the 24th day**
9   **to Zecco?"**
10                  **Do you recall this statement by**
11  **Mr. Masiutin?**
12          A       On the March 21st?
13          Q       On March 19th.
14          A       Yes, March 21st or March 24th, yes.
15          Q       Just to clarify the record, I'm pointing
16  to Page 3, this line dated March 19th,
17  two-thousand -- the date is cut off, the end date is
18  cut off.
19          MR. HUFF:  At 1:46 p.m.?
20          MR. DI GIACOMO:  At 1:46 p.m.
21          MR. HUFF:  I think the witness was talking
22  about at 3:47 p.m.
23          MR. DI GIACOMO:  Understood.
24          MR. HUFF:  For clarity of the record, I think
25  you should probably now mark the English translation

1   as a separate exhibit.
2           MR. DI GIACOMO:  Let's do that.
3                   (Y. Kruglov 12 was marked for
4                   identification.)
5   BY MR. DI GIACOMO:
6       Q   Mr. Kruglov, for clarity of the record,
7   we've marked the English translation of Exhibit 10 as
8   Exhibit 12.  And I'd like to draw your attention to
9   the last page of Exhibit 12 to the line dated
10  3/19/200, with the last digit cut off, at 1:46 p.m.
11  wherein Mr. Maxim Masiutin states, "Hello.  Could you
12  transfer me a thousand monthly on the 21st through
13  24th day to Zecco?"
14          Do you recall receiving this message from
15  Mr. Masiutin?
16      A   I recall about him asking me to transfer
17  monthly.  I do not recall the dates, but...
18      Q   And based on your recollection and your
19  review of what has been marked as Exhibit 11, which
20  was the e-mail chain on March 19th and March 20th, do
21  you believe that the ICQ log within Exhibit 12 dated
22  3/19 at 1:46 p.m. is the same request referenced in
23  Exhibit 11 dated March 19th, 2008?
24      A   Yes.
25      Q   And did you, in fact, transfer $1,000 to

1   Mr. Masiutin's bank account monthly?

2        A      Yes, on average.

3        Q      Thank you.

4               To the best of your personal knowledge, why did Mr. Masiutin ask you to transfer these amounts to his Zecco account?

7        MR. HUFF:  Objection, foundation.

8        THE WITNESS:  Mr. Masiutin felt he could have funded the account from Moldova, but he would have to pay international wire fees, possibly some interest, and that was not economically feasible to do that.

12  BY MR. DI GIACOMO:

13       Q      Mr. Kruglov, I'm handing you what has been marked as Basil Kruglov Exhibit No. 4, which purports to be the July 15, 2008 letter from Mr. Demcenko to you at CIFNet terminating an agreement signed on January 1st, 2005.

18              Are you familiar with that e-mail -- or with that letter?

20       A      Yes, I have seen this copy, document in the past few months.

22       Q      Do you recall receiving it in 2008?

23       A      I can't be absolutely sure.  I might have seen it then, too.

25       Q      Prior to the date on that letter, which

1  is July 15th, 2008, did Mr. Demcenko state that he
2  was going to form Ritlabs, Inc. to you?
3     A    I don't remember the chronological order,
4  but I think that he thought that sometime in the
5  summer of 2008.  I basically went through working
6  thousand e-mail messages in a short period of time,
7  so I'm a little bit time confused now.
8     Q    Understood.
9          Your testimony has been that you've been
10 working with Ritlabs since approximately 1996.  And
11 you received this letter dated July 15th, 2008
12 terminating the contract between CIFNet and Ritlabs,
13 S.R.L. on the date of December 31st of that year.
14         When you received this letter, did it
15 concern you that Ritlabs, S.R.L. was terminating its
16 contract with you?
17    A    Well, if Ritlabs, Inc. was going to take
18 action on selling the software, then -- and we will
19 report everything to Ritlabs, Inc., then it was
20 making sense.
21    Q    So in your estimation, did you know
22 Ritlabs, Inc. prior to the receipt of this letter in
23 2008?
24    A    Yes, I would say so.  It makes sense.
25              (Y. Kruglov 13 was marked for