# EXHIBIT R

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

RITLABS, S.R.L.,                    )
                                    )
            Plaintiff,              )
                                    )
    vs.                             )
                                    ) Civil Action No.
RITLABS, INC., and SERGHEI          ) 1:12CV00215
DEMCENKO,                           )
                                    )
            Defendants.             )
_____)


- CONFIDENTIAL -

DEPOSITION OF BASIL KRUGLOV

Chicago, Illinois

Wednesday, June 13, 2012


Reported by:  Janet L. Robbins
              CSR No. 84-002207
NDS Job No.:  149430

Page 31

1      **A      As I'm looking at -- just foreign**
2  **citizens.**
3      **Q      In this conversation with Mr. Masiutin,**
4  **did you discuss the transfer of money from**
5  **Mr. Masiutin to CIFNet to fund this potential bank**
6  **account -- excuse me, investment account?**
7          MR. HUFF:  I guess I'll object.  The document
8  is what the document is.  The conversation is there.
9          THE WITNESS:  I have to analyze the
10 conversation because it took place so long ago and to
11 understand who said what.
12 BY MR. DI GIACOMO:
13     **Q      Sure.  Take your time, please.**
14             **(A pause was had in the**
15                **proceedings.)**
16         THE WITNESS:  Could you restate the question
17 one more time?
18 BY MR. DI GIACOMO:
19     **Q      Sure.  In this conversation dated October**
20 **9th, 2007, is it accurate to state that you were**
21 **discussing the opening of an investment account on**
22 **behalf of Mr. Masiutin?**
23     **A      No.**
24     **Q      Could you please tell me what this**
25 **conversation was concerning?**

1       **A      On those first three pages of the**
2   **document -- first of all, I've given him list of**
3   **areas, books on investments.**
4           **Then on the second page of this document**
5   **at the very bottom, Mr. Masiutin is asking me to**
6   **provide him with information on brokerage houses that**
7   **may work with foreign -- with citizens of Moldova.**
8           **On the third -- at the very top of the**
9   **third page, I've listed Zecco Trading and Trade King.**
10  **Then Mr. Masiutin is asking me whether he could pay**
11  **using his card.**
12      **Q      When you say "card," do you mean credit**
13  **card?**
14          MR. HUFF:  Objection, foundation.  I think he
15      said that that was something that Mr. Masiutin said
16      to him.
17          THE WITNESS:  That was -- this is what
18      Mr. Masiutin is asking me.
19      BY MR. DI GIACOMO:
20      **Q      Is it your understanding that**
21  **Mr. Masiutin meant credit card when he asked you**
22  **about this payment?**
23          MR. HUFF:  Objection, foundation.
24          THE WITNESS:  I do not know whether it's the
25      debit card or the credit card.

```
 1   BY MR. DI GIACOMO:
 2       Q     I want to now draw your attention to this
 3   ICQ log again to the dates dated November 8th, 2007,
 4   and that is on Page 3 and 4 of this document.  Please
 5   take your time to review that and let me know when
 6   you are ready.
 7                  (A pause was had in the
 8                   proceedings.)
 9       THE WITNESS:  Okay.
10   BY MR. DI GIACOMO:
11       Q     Drawing your attention to this section
12   dated November 8th, 2007, in this does Mr. Masiutin
13   state that he sent documents to this Zecco company to
14   open an investment account?
15       A     Yes.
16       Q     Is it accurate to state that Mr. Masiutin
17   also says that Yevgeniy Kruglov transferred money to
18   that account?
19       MR. HUFF:  Can I have a continuing objection so
20   I don't need to interrupt you?
21       MR. DI GIACOMO:  Sure.
22       THE WITNESS:  Yes, it says so on Page 3 at the
23   bottom.
24   BY MR. DI GIACOMO:
25       Q     And is it accurate that Mr. Masiutin is
```

Page 34

1   asking you in this conversation where that money is
2   that was transferred to the Zecco account by
3   Mr. Yevgeniy Kruglov?
4        A    Could you repeat the question one more
5   time?
6        Q    Sure.  In this conversation dated
7   November 8th, 2007, is it accurate to state that
8   Mr. Masiutin asked you for help in finding amounts
9   that were supposed to be transferred to the Zecco
10  account?
11       A    Mr. Masiutin is referring to e-mail that
12  was sent by him to me.  And without that e-mail, I
13  cannot answer your question.
14       Q    Is it accurate that in this conversation
15  in this ICQ log, Mr. Masiutin asks you where money
16  that was supposed to be sent to the Zecco account is?
17       A    Yes, he's asking me where the money --
18  where the money might be.
19       Q    And is it fair to characterize this
20  conversation as evidencing the fact that CIFNet or
21  you in your personal capacity were transferring
22  monies or aiding Mr. Masiutin in transferring monies
23  to the Zecco Trading account?
24            MR. HUFF:  Objection to the form.
25            THE WITNESS:  Given that he's writing that

1   Yevgeniy had transferred amount, I would say that
2   CIFNet had transferred the amount to Mr. Masiutin.
3   BY MR. DI GIACOMO:
4        Q      To Mr. Masiutin or to the Zecco Trading
5   account?
6        A      Zecco Trading account of Mr. Masiutin.
7        Q      Thank you.
8               And I want to draw your attention to the
9   conversation dated within the same document marked as
10  Exhibit 3, the conversation dated November 12th,
11  2007, which is on Page 4 of this document.  Please
12  tell me when you're ready.
13       A      Go ahead.
14       Q      Based on this conversation, is it
15  accurate to state that Mr. Masiutin asked you how he
16  could deposit funds into his account at Zecco?
17       A      By looking at this, I think he's asking
18  me -- he's telling me that he sent Yevgeniy
19  information on -- he's sending Yevgeniy instructions
20  related to JPMorgan Chase, but -- I apologize, could
21  you restate the question one more time?
22       Q      Sure.  The question is:  Based on this
23  conversation on November 12th, 2007, is it fair to
24  characterize Mr. Masiutin's statements to you as
25  asking you to transfer money to his account at Zecco?

1   at the direction of Mr. Demcenko?

2        A     Correct.

3        Q     And did you sell the software of Ritlabs,

4   S.R.L. between January 1st, 2009 and December 31st,

5   2009, to the best of your personal knowledge?

6        A     Could you repeat the dates one more time?

7        Q     Sure.  Did you sell the software of

8   Ritlabs, S.R.L. on behalf of Ritlabs, S.R.L. between

9   the dates of January 1st, 2009 and December 31st,

10  2009?

11       A     Yes.

12       MR. HUFF:  Objection to the form.

13       THE WITNESS:  Yes.

14  BY MR. DI GIACOMO:

15       Q     So to repeat your testimony, for sake of

16  clarity, during the year in which CIFNet was not in a

17  license agreement with either Ritlabs, S.R.L. or

18  Ritlabs, Inc., you continued to sell Ritlabs,

19  S.R.L.'s software, is that correct?

20       A     That is correct.

21       Q     Are you familiar with the ritlabs.net

22  domain name?

23       A     I have a vague recollection of that name.

24       Q     Based on your recollection, was

25  ritlabs.net registered with CIFNet?

1      MR. HUFF:  Can we go off the record?

2          (A recess was had.)

3      MR. DI GIACOMO:  We'd like to clarify the

4  record.  At the break, Mr. Kruglov indicated that he

5  may have been confused by my question concerning MX

6  records, so we'd like to revisit that at this time.

7  BY MR. DI GIACOMO:

8      **Q    Mr. Kruglov, between December of 2011 and**

9  **February of 2012, did you ever have a conversation**

10 **with Mr. Serghei Demcenko concerning the modification**

11 **or change of the DNS records associated with the**

12 **ritlabs.com domain name?**

13     **A    Yes.**

14     MR. HUFF:  Just for the record, I would object

15 to the characterization of the need for the

16 clarification.  I think the question -- the answers

17 to the questions as posed were proper.  But to

18 provide a full record on what I think you're trying

19 to get at, we made you aware of the fact that

20 Mr. Kruglov could provide some testimony about that

21 subject matter.

22 BY MR. DI GIACOMO:

23     **Q    Mr. Kruglov, what was the content of this**

24 **conversation with Mr. Demcenko?  Let me back up.**

25 **Strike that.**

1         When did this conversation with
2    Mr. Demcenko occur?
3         A    I assume somewhere in February 2012.
4         Q    What was the content of that
5    conversation?
6         MR. HUFF: Objection, foundation as to who was
7    involved in the conversation.
8    BY MR. DI GIACOMO:
9         Q    Who was involved in the conversation?
10        A    Myself, Yevgeniy and Mr. Demcenko.
11        Q    Was this conversation had via telephone?
12        A    Yes.
13        Q    What was said in this conversation?
14        A    I cannot tell you the exact words because
15   I cannot remember.
16        Q    To the best of your recollection.
17        A    Mr. Demcenko wanted to have access to his
18   e-mail accounts, his personal e-mail accounts that
19   were -- and that of his family, also employees of --
20   or former at the time employees of Ritlabs, S.R.L.
21        Q    When you say personal -- and I don't mean
22   to interrupt you, but when you say "personal e-mail
23   accounts," do you mean e-mail accounts on the
24   ritlabs.com domain name?
25        A    Correct.

```
 1      Q      Please continue.
 2      A      So he wanted to have access to those
 3   accounts.  And he asked us to -- as to how this can
 4   be done.
 5      Q      What was your response?
 6      A      To the best of my recollection, in my
 7   words, I would say that to do that, we would need to
 8   set up another machine computer system to -- and
 9   modify DNS records for that domain name, ritlabs.com.
10      Q      And did you set up a separate computer
11   system and modify the DNS records?
12      A      Set up computer system, yes.  Modify DNS
13   records, I will specify that only the MX -- could I
14   pause for a second?
15      Q      Sure.
16      MR. DI GIACOMO:  Can we go off the record?
17              (A pause was had in the
18                 proceedings.)
19      THE WITNESS:  We can go on the record.
20   BY MR. DI GIACOMO:
21      Q      Please continue.
22      A      The machine was set up, but I was not
23   personally involved in a configuration of DNS -- of
24   any changes to the DNS system made by CIFNet on
25   behalf of Mr. Demcenko.
```

```
 1       Q      Who was involved in the changes to the
 2   DNS records?
 3       A      Yevgeniy.
 4       Q      And when you say a machine was set up, do
 5   you mean a machine that the DNS record would point
 6   to?
 7       A      Yes.
 8       Q      And what was the purpose of this machine?
 9       A      A mail server and a DNS server.
10       Q      And did this mail server capture any
11   e-mails intended to go to the ritlabs.com domain
12   name?
13       A      Only those e-mails provided by Mr. --
14   only to those e-mail accounts provided by
15   Mr. Demcenko.
16       Q      Do you know what e-mail accounts
17   Mr. Demcenko provided?
18       A      Not off the top of my head, but to my
19   recollection, Serg, Olga, and two or three other
20   accounts associated with his family members, former
21   employees at the time of Ritlabs, S.R.L.
22       Q      Just for clarity of the record, when you
23   say Serg, you mean serg@ritlabs.com --
24       A      Correct.
25       Q      -- olgal@ritlabs.com?
```

1   **A**   Correct.

2   **Q**   And just for, again, for clarity of the record, when you state that he was providing e-mail addresses for former employees, do you mean former employees that were family members or do you mean former employees who were not family members?

7   **A**   That were family members.

8   **Q**   Did he provide e-mail addresses of any other employees other than family members?

10  **A**   No. And they were very clear that at no point in time he would set up any other accounts due to attorney-client information that could be passing, given the lawsuit that was initiated by the plaintiffs.

15          I will also add that he concurred that this is not his intention. His intention is to get access to his e-mail account to communicate with various dealers with whom he had done business or was doing business at the time.

20  **Q**   Does this server still exist?

21  **A**   Yes.

22  **Q**   Has the hard drive been modified in any way?

24  **A**   It is a virtual server. And, no, the substance of the machine is intact.

1  **Q    Did you provide e-mails sent to the**
2  **server in response to plaintiff's subpoena in this**
3  **matter?**
4  **A    No, we did not provide -- those -- those**
5  **are not our e-mail -- those are not our e-mails.**
6  **Q    When you say that they're not your**
7  **e-mails, are they not under your control?**
8  **A    We have access to the system, but**
9  **those -- the content belongs to Mr. Demcenko, his**
10 **wife and other family members who are or were**
11 **receiving e-mails to those addresses during the time**
12 **before the judge ordered to -- before the judge**
13 **ordered the domain name to be transferred into**
14 **plaintiff's possession.**
15 **Q    But you do have control over the server?**
16 **This is not Mr. Demcenko's server?**
17 **A    Correct.**
18      MR. HUFF:  Objection.  Objection to the form of
19 the question.  And with respect to any concerns that
20 you have with respect to the production of records in
21 the response to subpoena, I would ask that you direct
22 that to counsel as opposed to the witness.
23      MR. DI GIACOMO:  Understood.
24 BY MR. DI GIACOMO:
25 **Q    Mr. Kruglov, it appears that CIFNet has**