IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| RITLABS, S.R.L., ) | |
| ) | |
| Plaintiff/Counter-Defendant, ) | |
| ) | No. 1:12-cv-215 (AJT/IDD) |
| v. ) | |
| ) | |
| RITLABS, Inc., ) | |
| ) | |
| and ) | |
| ) | |
| SERGHEI DEMCENKO, ) | |
| ) | |
| Defendants/Counter-Claimants. ) | |
| _____ ) | |

## MEMORANDUM OPINION

Plaintiff RitLabs, S.R.L. (or "SRL") is an Internet technology and software provider that was formed in 1998 as a limited liability company under the laws of the Republic of Moldova, with its principal place of business in Chisinau, Moldova. *See* Compl. at ¶ 8-9; *see generally* Articles of Association of "RitLabs" LLC [Doc. No. 1-4]. It has developed, sold, and distributed several software products throughout the world, including in the United States, and currently employs 18 full time employees, all located in Moldova. SRL's original organizers were Maxim Masiutin, Stefan Tanurcov, and Defendant Serghei Demcenko, who pursuant to SRL's Articles of Association, were to be the sole members of the company, with Masiutin and Tanurcov each holding a 30% share in the company and Demcenko holding a 40% share. *Id.* at ¶ 3.2. Pursuant to SRL's Articles of Association, each member was to contribute a percentage of the initial capital investment of 5400 lei (the currency of Moldova; singular, "leu"), equivalent to that member's percentage share in the company. *Id.* From SRL's inception in 1998 until his disputed removal by Masiutin and Tanurcov on December 12, 2011, Demcenko served as

"director" of SRL, a position equivalent to a chief executive officer. *See* Ex. JJ to Pl.'s Mem.

On July 14, 2008, while the director of SRL, Defendant Demcenko incorporated RitLabs, Inc. ("INC") under the laws of the Commonwealth of Virginia. *See* Ex. K to Compl. Initially, Demcenko, together with his wife, were the sole owners and shareholders of INC.[1] On May 3, 2010, Demcenko, on behalf of SRL, entered into a License Agreement with INC, which purported to provide INC with an exclusive license to sell SRL's software products in the United States, as well as a non-exclusive license to sell SRL's software products around the world. *See* Ex. T to Pl.'s Mem. (License Agreement). Under the License Agreement, INC would receive 60% and SRL, 40% of the gross revenue generated from the sale of SRL's software. Demcenko did not seek the authorization or approval of Masiutin and Tanurcov, SRL's other members, before either creating INC or entering into the License Agreement on behalf of SRL with INC. Ex. A to Pl.'s Mem. at 60:10-61:13. Nor did Demcenko advise Masiutin or Tanurcov of his 100% ownership interest in INC. *See* Defs.' Mem. at 7-8 (arguing that Masiutin and Tanurcov knew of the existence of INC but never asserting that either knew of Demcenko's ownership stake in INC). In addition, Demcenko, acting on behalf of SRL, cancelled a software distributorship agreement between SRL and a company known as CIFNet, which acted as SRL's U.S. based distributor, and then, on behalf of INC, entered into distributorship agreements with CIFNet and other companies for the distribution SRL's software products. *See* Ex. K to Pl.'s Mem. (Letter from Serghei Demcenko, Director, RITLABS SRL, to Yevgeniy Kruglov, CIFNet, Inc., July 15, 2008); Ex. V to Pl.'s Mem. (Licensing Agreement between INC and CIFNet, Inc.); Ex. O to Pl.'s Mem. (Licensing Agreements between INC and Soft Logistic LLC, Business IT

---

[1] On May 1, 2011, Demcenko transferred to SRL 11% of the shares in INC. *See* Ex. JJJ to Pl.'s Mem. (Letter from U.S. Citizenship and Immigration Services to Serghei Demcenko, Sept. 7, 2011), at 4.

LLC, NILTA Corp., and S-Tech Data e.K.).

On February 28, 2012, Plaintiff SRL filed a Complaint against Defendants Demcenko and INC, alleging eight claims: (1) a violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); (2) breach of the fiduciary duty of loyalty; (3) false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1); (4) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4); (5) conversion; (6) tortious interference with contractual relations; (7) tortious interference with prospective economic advantage; and (8) unfair competition under Virginia common law. On March 23, 2012, Defendants answered, and asserted six counterclaims: (1) breach of contract; (2) breach of covenant of good faith and fair dealing; (3) tortious interference with contract; (4) intentional interference with prospective economic advantage; (5) negligent interference with prospective economic advantage; and (6) commercial disparagement.

On March 6, 2012, Plaintiff moved for a preliminary injunction, and the Court held a hearing on that motion on March 30, 2012, following which the Court granted in part and denied in part the motion. The Court ordered the parties to submit agreed upon language for the preliminary injunction order, which the parties did and which the Court modified slightly, and then entered an order with the following provisions:

> "ORDERED that Defendants, RitLabs, Inc. and Serghei Demcenko, immediately suspend the applications for registration of the following marks, and notify such offices and agencies as are necessary for such purposes, until further order of the Court: RITLABS (USPTO Serial No. 85508804), RITLABS (USPTO Serial No. 85503367), THE BAT! (USPTO Serial No. 85496559), and MAILVOYAGER (USPTO Serial No. 85450930); and it is further
> ORDERED that Defendants RitLabs, Inc. and Serghei Demcenko, immediately transfer the registration of <ritlabs.com>, <ritlabs.net>, <batpost.com>, and <thebat.net> domain names to Plaintiff, provide Plaintiff with the username(s) and password(s) needed to access and obtain possession and control over the registrant account associated with the

3

> domain names and undertake any and all actions necessary to transfer those domain names into the possession of Plaintiff until further order of the Court; and it is further
> ORDERED that Plaintiff RitLabs, S.R.L. will not transfer possession or control of <ritlabs.com>, <ritlabs.net>, <batpost.com>, and <thebat.net> to any party until further order of the Court; and it is further
> ORDERED that Plaintiff, RitLabs, S.R.L.'s request to restrain and prohibit Defendants RitLabs, Inc. and Serghei Demcenko, from soliciting or receiving payments from customers or distributors of Plaintiff during the pendency of this lawsuit be, and the same hereby is, DENIED; and it is further
> ORDERED that Plaintiff RitLabs, S.R.L.'s request to restrain and prohibit Defendants RitLabs, Inc. and Serghei Demcenko, from offering goods or services under the names and/or trademarks of RitLabs, Inc., RITLABS, MAILVOYAGER, and THE BAT! during the pendency of this lawsuit be, and the same hereby is, DENIED . . . ."

*See* Doc. No. 39.

Following entry of the preliminary injunction order, the parties engaged in discovery and, on June 28, 2012, Defendants filed a Motion for Partial Summary Judgment [Doc. No. 78], seeking judgment as a matter of law on Counts I, III, IV, and VIII of the Complaint. On July 9, 2012, Plaintiff filed an Amended Motion for Summary Judgment [Doc. No. 103], in which it seeks summary judgment as to all of its claims and all of Defendants' counterclaims. These cross-motions have been fully briefed and the Court held a hearing on the motions on August 6, 2012, following which the Court took the matter under advisement. For the reasons stated herein, the Court concludes as a matter of law, based on undisputed facts, that Defendant Demcenko breached his fiduciary duty to SRL and for that reason Plaintiff is entitled to summary judgment as to liability on Counts I (breach of contract), II (breach of the fiduciary duty of loyalty), IV (violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4)), VI (tortious interference with contractual relations), and VII (tortious interference with prospective economic advantage). The Court also concludes that Defendants are entitled to summary judgment as to Counts III (false designation of origin in violation of the Lanham Act,

4

15 U.S.C. § 1125(a)(1)), V (conversion), and VIII (unfair competition under Virginia common law). Finally, the Court concludes that Plaintiff is entitled to summary judgment on all of Defendants' Counterclaims. Based on these rulings, the Court will impose constructive trusts, restraining orders, and accountings as required for the identification and disgorgement of property wrongfully diverted away from SRL as a result of Defendant Demcenko's breach of fiduciary duty. The case will also proceed to trial on Plaintiff's damages as to Counts I, II, IV, VI, and VII of the Complaint.

## FACTUAL FINDINGS

Although the parties' voluminous filings would suggest otherwise, only relatively few facts are material to the Court's determination of the central and mostly dispositive issue in this case: whether Demcenko breached his fiduciary duty to SRL. Those facts are as follows:

(1) In 1998, Maxim Masiutin, Stefan Tanurcov, and Defendant Serghei Demcenko formed RitLabs, S.R.L., a limited liability company, under the laws of the Republic of Moldova, with its principal place of business in Chisinau, Moldova. *See generally* Articles of Association of "RitLabs" LLC [Doc. No. 1-4].

(2) Pursuant to SRL's Articles of Association, Masiutin, Tanurcov, and Demcenko were to be the sole members of the company, with Masiutin and Tanurcov each holding a 30% share in the company and Demcenko holding a 40% share. *Id.* at ¶ 3.2.

(3) Moldovan Law No. 135 of the 14th of June, 2007 on Limited Liability Companies, at Chapter 4, Section 1, Article 47(1)-(2), provides: "[At t]he general assembly of associates, administrator, one or more associates may ask for exclusion from the company of an associate that did not pay in the contribution subscribed . . . . The associate shall be excluded from the company through a court decision." *See* Ex. D

to Pl.'s Mem. at 11.[2] Moldovan Law further provides that until excluded by a court, a shareholder is liable for losses and may continue to receive the profits from the company in which he is a shareholder. *Id.* (Article 47(2)).

(4) Moldovan Law No. 135 of the 14th of June, 2007 on Limited Liability Companies, at Chapter 4, Section 4, Article 72(5), provides: "When exercising his (her) functions, the administrator shall show diligence and loyalty."[3] *Id.* at 17. Demcenko served as the "administrator" under Moldovan law, referred to within SRL as the "director," from 1998 until December 12, 2011, when he was purportedly removed at a shareholder's meeting called by Masuitin and Tanurcov. *See* Ex. KK to Pl.'s Mem. In his capacity as the Director of SRL, Demcenko acted as SRL's sole decision-maker. Ex. A to Defs.' Reply (Declaration of Sergei Demcenko), at ¶ 13.

(5) Demcenko has not obtained a court decision to exclude either Masiutin or Tanurcov as associates of SRL. Demcenko first initiated a lawsuit in Moldova to obtain such a decision in April 2012. *See* Ex. D. to Defs.' Opp'n at ¶ 7; Ex. H to Defs.' Opp'n.

(6) On July 14, 2008, Defendant Demcenko incorporated RitLabs, Inc. ("INC") under the laws of the Commonwealth of Virginia. *See* Ex. K to Compl. At the time of INC's incorporation, Demcenko held no less than 95.3% of the stock of INC and at times claimed that he was the sole shareholder in INC. Ex. JJJ to Pl.'s Mem. (Letter from U.S. Citizenship and Immigration Services to Serghei Demcenko, Sept. 7, 2011), at 4.

(7) On July 15, 2008, Defendant Demcenko, on behalf of SRL, sent a letter to CIFNet, one of SRL's dealers, advising that SRL was terminating its Agreement with CIFNet

---

[2] An "associate" under Moldovan corporate law is the equivalent of a member or shareholder of a corporation in the United States.

[3] An "administrator" under Moldovan corporate law is the equivalent of a corporate director in the United States.

as of December 31, 2008. Ex. K to Pl.'s Mem. (Letter from Serghei Demcenko, Director, RITLABS SRL, to Yevgeniy Kruglov, CIFNet, Inc., July 15, 2008).

(8) On December 1, 2009, Demcenko, on behalf of SRL, entered into a License Agreement with INC, which granted INC an exclusive license to sell SRL's software products in the United States, as well as a non-exclusive license to sell SRL's products elsewhere in the world. Ex. T to Pl.'s Mem. (License Agreement).

(9) At all material times herein, the United States' software market was considered by SRL and Demcenko as a critically important component of SRL's present and future business. *See infra*, note 8.

(10) Before entering into the License Agreement with INC on behalf of SRL, Demcenko did not disclose his ownership interest in INC to Masiutin or Tanurcov, or obtain Masiutin or Tanurcov's approval of the License Agreement. Ex. A to Pl.'s Mem. at 60:10-61:13; Defs.' Mem. at 7-8 (arguing that Masiutin and Tanurcov knew of the existence of INC but never asserting that either knew of Demcenko's ownership stake in INC).

(11) At the time the License Agreement was entered into, Demcenko owned 95.3% of INC, and his wife owned the remaining 4.7% of INC. Ex. JJJ to Pl.'s Mem. (Letter from U.S. Citizenship and Immigration Services to Serghei Demcenko, Sept. 7, 2011), at 4. Demcenko transferred 11% of the shares in INC to SRL no earlier than May 1, 2011. *See id.* at 5.

(12) On December 12, 2011, Masiutin and Tanurcov held a meeting of the General Assembly and voted to remove Defendant Demcenko from his position as Director of SRL. Ex. KK to Pl.'s Mem.

(13) On December 13, 2011, after having been removed as Director of SRL, and with that knowledge,[4] Defendant Demcenko accessed the domain registrant account associated with several of SRL's domain names and changed the name of the registrant of those domain names from SRL to INC. Ex. AH (registrant for <ritlabs.net> changed from SRL to INC on December 13, 2011) and AJ (registrant for <thebat.net> changed from SRL to INC on December 13, 2011) to Pl.'s Mem.

## STANDARD OF REVIEW

Summary judgment is appropriate only if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). The party seeking summary judgment has the initial burden to show the absence of a material factual issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247-48 ("[T]he mere

---

[4] Although Demcenko did not receive formal notice that he had been removed as Director of SRL until he received Masiutin's letter dated December 14, 2011, Demcenko had been told informally by SRL's chief accountant that Masiutin and Tanurcov had voted to remove him on December 12, 2011. Demcenko therefore admits that his actions on December 13, 2011 to reregister the domain names were taken with his knowledge of, and because of the fact that Masiutin and Tanurcov had terminated him as Director. Ex. A to Defs.' Opp'n (Demcenko Decl.), at ¶ 103, 111; Ex. B to Defs.' Opp'n (Declaration of Igor Talmatski), at ¶ 22.

existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." (emphasis in original)). Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

The nonmoving party may rebut the motion for summary judgment "by any of the kinds of evidentiary materials listed in Rule 56(c)." *Celotex*, 477 U.S. at 324. To overcome a motion for summary judgment, the nonmoving party "'may not rely merely on allegations or denials in its own pleadings' but must 'set out specific facts showing a genuine issue for trial.'" For cross-motions for summary judgment, "the Court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## ANALYSIS

The parties agree that Moldovan law applies to the duties that Demcenko owes to SRL in his capacity as Director.[5] Under Moldovan Law on Limited Liability Companies, "[w]hen exercising his (her) functions, the administrator shall show diligence and loyalty." Ex. D to Pl.'s Mem. at 17.[6] There is nothing in the summary judgment record that further elaborates on this legal obligation under Moldovan law. However, the parties do not dispute that this duty under Moldovan law imposes on Demcenko the same types of fiduciary duties and obligations owed by

---

[5] The parties do not dispute the translation of the Moldovan Law on Limited Liability Companies that has been provided to the Court.

[6] There is no dispute that what SRL referred to as a "Director" constitutes a position referred to under Moldovan law as an "administrator" of a company.

corporate officers and directors under American law. Accordingly, the Court will apply generally accepted principles of corporate law in analyzing Demcenko's conduct in this case.

Under Virginia law, as in most, if not all, American jurisdictions, corporate directors and officers are considered to stand in a fiduciary relationship to the members of the corporation. *See United States v. Bynum*, 408 U.S. 125, 138 n.11 (1972) (recognizing that corporate director's fiduciary duty to promote the interests of the corporation is a relationship that "would exist in almost every, if not every, State"). In Virginia, it is well-settled that a "corporation's directors and officers owe a duty of loyalty both to the corporation and to the corporation's shareholders." *WLR Foods v. Tyson Foods, Inc.*, 869 F. Supp. 419, 421 (W.D. Va. 1994); *Glass v. Glass*, 228 Va. 39 (1984); *Adelman v. Conotti Corp.*, 215 Va. 782 (1975). Embedded within this duty is the notion that "a director of a private corporation cannot directly or indirectly, in any transaction in which he is under a duty to guard the interests of the corporation, acquire any personal advantage, or make any profit for himself, and if he does so, he may be compelled to account therefor to the corporation." *Rowland v. Kable*, 174 Va. 343, 366 (1940). *See also WLR Foods*, 869 F. Supp. at 421 ("A Virginia corporation's directors and officers owe a duty of loyalty both to the corporation and to the corporation's shareholders."); *Adelman*, 215 Va. at 790 (affirming that same sort of duty "applies to the conduct of the officers and directors of a corporation in their dealings with the corporation's stockholders"). "It is a fundamental principle that a corporate officer or director is under a fiduciary obligation not to divert a corporate business opportunity for personal gain because the opportunity is considered the property of the corporation. Underlying this concept is the expectation that officers, as corporate fiduciaries, exercise the 'utmost good faith' and loyalty in their dealings with, and on behalf of, the corporation." *See Today Homes, Inc. v. Willliams*, 272 Va. 462, 471 (2006) (citing *Feddeman &*

*Co. v. Langan Assocs., P.C.*, 260 Va. 35, 46 n. 1 (2000)). Furthermore, "this good faith forbids [a corporate officer from] placing himself in a position where his individual interest clashes with his duty to his corporation. . . . As long as [an individual remains a corporate officer, he] owes an undivided duty to [the corporation], and cannot place himself in any other position which would subject him to conflicting duties, or expose him to the temptation of acting contrary to [its] best interests." *Rowland*, 174 Va. at 366-67 (internal quotation and citation omitted). This prohibition on an officer's diverting a business opportunity of the corporation to himself is "unbending" unless the fiduciary obtains the consent of the other members of the corporation after "full disclosure." *Id.* at 366, 369.[7]

Based on the undisputed facts, there is no question that Demcenko breached his duty of loyalty to SRL in connection with his activities pertaining to INC. At the time Demcenko formed INC, SRL was already selling its software in the United States, which Demcenko recognized as a major, if not the most important, market for SRL products; and he formed INC precisely for the purpose of exploiting the U.S. market for SRL software. See *infra*, note 8. Taking a personal stake in INC, he then engaged in a series of transactions that had the effect, if not the purpose, of personally benefitting himself through INC at the expense of SRL. He, on behalf of SRL, entered into the License Agreement with INC to facilitate INC's activities, and cancelled SRL's distribution agreement with a U.S.-based distributor, CIFNet. Then, acting on behalf of INC, he entered into virtually the same distribution agreement with CIFNet and other

---

[7] There is nothing in the Moldovan law provided to the Court that allows through full disclosure and disinterested approval what would otherwise be a fiduciary breach. Nevertheless, the Court assumes, without finding, that approval by the disinterested shareholders of SRL, after full disclosure by Demcenko, would permit him to escape liability that would otherwise accrue. Here, however, there is no evidence that would allow a factfinder to conclude that Demcenko either made full disclosure of his interest in or activities on behalf of INC or that Masuitin and Tanurcov approved Demcenko's actions after full disclosure.

companies for the distribution of SRL software authorized under the License Agreement. In effect, Demcenko diverted SRL's corporate opportunities to himself, through INC, a company he controlled and substantially owned.

Demcenko defends against the claim that he breached his duty of loyalty to SRL on the grounds that the creation of INC and the License Agreement between SRL and INC were fair and in SRL's best interests.[8] In that regard, he claims that by restructuring SRL's business

---

[8] Demcenko more specifically identifies the following as leading to his decision to form INC:

> (1) "As SRL's sole decision-maker, I realized in 2001 that there was a need to establish a company in the U.S. to promote SRL's products in the U.S. I realized that the U.S. market provided a tremendous growth opportunity for SRL and SRL needed to have a physical presence in the U.S. to fully take advantage of these opportunities." Ex. A to Defs.' Reply (Demcenko Decl.) at ¶ 13.
>
> (2) ". . . [I]n order to promote SRL's products in the U.S., it was critical for SRL to have a physical presence in the U.S. because U.S. companies did not like to work with foreign entities. Also, many customers and distributors preferred to deal with [a] U.S. company rather than a Moldovan company because they felt more comfortable and secure dealing with a U.S. company." *Id.* at ¶ 16.
>
> (3) "Between 2003 and 2008, I continued to periodically discuss with Mr. Masuitin and Mr. Tanurkov the critical need to establish an entity in the U.S. to expand SRL's business in the U.S." *Id.* at ¶ 23.
>
> (4) "I established INC in 2008, to the benefit of SRL." *Id.* at ¶ 25.
>
> (5) "I established INC because, at the time, SRL's product development growth had stagnated and I believe that SRL's future success depending [sic] on having a presence in the U.S." *Id.* at ¶ 26.
>
> (6) "SRL also needed INC in order to establish an English-speaking technical support group in the U.S. because SRL's technical support was quite poor and U.S. customers did not like dealing with foreign-accented support staff. Furthermore, because of the time difference between Moldova and U.S., the Moldovan support staff would be forced to work at night." *Id.* at ¶ 28.
>
> (7) "It was also very beneficial for SRL to have an independent corporate entity, as opposed to a branch, operate in the U.S." *Id.* at ¶ 29.
>
> (8) ". . . [T]he License Agreement between INC was hugely beneficial and eminently fair to SRL, but would not have been possible if I had not set up a

12

through INC, SRL was benefitted because sales and revenue to SRL increased over what they would have been without INC, the License Agreement, and the new distributor arrangements. He also contends that there is no liability because he did not actually receive any financial benefit in his capacity as a shareholder of INC, but only received salary and compensation for expenses in connection with his efforts on behalf of INC. Even assuming all that Demcenko claims is true, none of these contentions would justify or excuse as a matter of law Demcenko's conduct for the simple reason that there is no doubt that INC was exploiting SRL's business opportunities and, as Demcenko's counsel conceded during oral argument, SRL would have been better off with a 100% interest in INC rather than no interest or the 11% interest that Demcenko ultimately transferred to it in 2011.

Demcenko also contends that he did not engage in any actionable breach of fiduciary duty since he is and at all material times was the only shareholder of SRL. He bases this claim on his contention that Masiutin and Tanurcov never paid into SRL their statutorily required capital contribution of 1620 liu (which converts to approximately $131), even though this alleged failure occurred over 14 years ago, the statute of limitation on a claim for those funds under Moldovan law is three years, and SRL's financial statements have reflected that all such payments had been made as of the early 2000s. In any event, under Moldovan law, on the grounds that Demcenko asserts, a shareholder can be removed only by a court decision; and until such a decision, a shareholder is entitled to receive the profits attributable to his shares. *See* Moldovan Law No. 135 of the 14th of June, 2007 on Limited Liability Companies, at Chapter 4, Section 1, Article 47(2). Here, there is no dispute that a court never issued a decision removing

---

separate U.S. company." *Id.* at ¶ 31.
(9) "Through the License Agreement, INC provided a U.S. face for SRL which was necessary to increase SRL's sales in the U.S. market." *Id.* at ¶ 32.

Masuitin or Tanurcov as shareholders.[9] For the above reasons, the Court will enter summary judgment in favor of SRL on Count II.

For the same reasons that the Court has determined that Defendant Demcenko breached his fiduciary duty to SRL, the Court also concludes as a matter of law based on undisputed facts that Defendants Demcenko and INC tortiously interfered with both SRL's existing contracts[10] and prospective economic advantage[11] by terminating at least one contract that inured only to the benefit of SRL, the CIFNet contract, and then entering into distribution agreements with certain companies, including CIFNet, on behalf of INC, rather than SRL. SRL clearly had existing contracts and business expectancies, which were known to Demcenko, who through his breaches of his duty of loyalty, intentionally used improper means to interfere with those contracts and expectancies, as a result of which these contracts and expectancies were diverted away from SRL and to INC and Demcenko. Accordingly, the Court will enter summary judgment for Plaintiff as to liability on Counts VI and VII of the Complaint.

The Court further finds that Plaintiff is entitled to summary judgment as to liability on

---

[9] In April 2012, Demcenko filed an action seeking to remove Masuitin and Tanurcov on the basis of their alleged non-contribution, but has not yet obtained a decision. *See* Ex. D. to Defs.' Opp'n at ¶ 7; Ex. H to Defs.' Opp'n.

[10] The elements of a cause of action for tortious interference with contract are: "(i) the existence of a valid contractual relationship or business expectancy; (ii) knowledge of the relationship or expectancy on the part of the interferor; (iii) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (iv) resultant damage to the party whose relationship or expectancy has been disrupted." *DurretteBradshaw, P.C. v. MRC Consulting, L.C.*, 277 Va. 140, 145 (2009).

[11] To state a claim for tortious interference with prospective economic advantage, a party must: "(1) demonstrate the existence of a business relationship or expectancy, with a probability of future economic benefit; (2) prove knowledge of the relationship or expectancy; (3) show that it was reasonably certain that absent intentional misconduct, the claimant would have continued in the relationship or realized the expectancy; and (4) show that it suffered damages from the interference." *Commerce Funding Corp. v. Worldwide Sec. Serv. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001) (citing *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 254 Va. 408, 414 (1997)).

Counts I and IV of the Complaint in light of the Court's determination that Demcenko breached his fiduciary duty to SRL. Because Demcenko breached his duty of loyalty when he used, trafficked in, and reregistered SRL's domain names and associated marks, he violated the Anticybersquatting Consumer Protection Act, alleged in Count I.[12] He also accessed SRL's computers and changed access codes and other features of SRL's computer system after he had been removed as Director by Masuitin and Tanurcov at a shareholders' meeting held on December 12, 2011. He therefore engaged in unauthorized computer access in violation of the Computer Fraud and Abuse Act, as alleged in Count IV.[13] In that regard, the Court concludes that it is irrelevant whether Demcenko's removal was proper under Moldovan law since there is no dispute that he knew at the time he accessed SRL's computers that he had been removed as Director and his access was for the purpose of continuing his control over SRL's computer system for the benefit of INC and himself.

However, with respect to Count III, false designation of origin under the Lanham Act, and Count VIII, common law unfair competition,[14] the Court finds that summary judgment

---

[12] To establish a violation of the Anticybersquatting Consumer Protection Act, under 15 U.S.C. § 1125(d), the plaintiff is required to prove that the defendant had a bad faith intent to profit from using the domain name and that the domain name is identical or confusingly similar to, or dilutive of, the distinctive and famous mark. *Graduate Mgmt. Admission Council v. Raju*, 267 F. Supp. 2d 505, 511 (E.D. Va. 2003).

[13] The Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4), imposes civil liability on any person who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." The record demonstrates that Plaintiff has shown more than $5,000 loss this year as a result of Demcenko's actions. *See* Exs. A, F, BB, and CC to Pl.'s Opp'n (showing losses of at least $17,000 in 2012).

[14] The test for unfair competition under Virginia common law is essentially the same as that under the Lanham Act because "both address the likelihood of confusion as to the source of the goods or services involved." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922 (4th Cir. 1995).

15

should be denied to Plaintiff and entered for Defendants. Defendants' use in commerce of the Plaintiff's marks and names were not actually confusing or deceptive, because the marks and names were used in connection with products that were, in fact, Plaintiff's products. *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104 (4th Cir. 1991) ("As a general rule, trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent.") (citing *NEC Elecs. v. CAL Circuit Abco*, 810 F.2d 1506 (9th Cir. 1987)); *see also Sunsport Inc. v. Barclay Leisure Ltd.*, 984 F. Supp. 418, 421 (E.D. Va. 1997) (quoting *Shell Oil*).

Additionally, the Court finds that summary judgment should be denied to Plaintiff, and entered for Defendants, as to Count V, because Virginia law does not recognize causes of action for conversion of intangible property that does not arise from and is not merged with a document. *See, e.g., United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (1994) ("In general, a cause of action for conversion applies only to tangible property."); *but see E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, No. 3:09-cv-58, 2011 WL 4625760, at *5 (E.D. Va. Oct. 3, 2011) (Payne, J.) ("In this technology-driven world, the value of intangible property cannot be disputed, and a decision to limit conversion to tangible property or intangible property merged in a document symbolizing ownership would leave domain name users . . . unable to use an action for conversion for substantial interference with their rights. . . . The Seventh Circuit, the Ninth Circuit, and the D.C. Circuit have recognized actions for conversion of intangible property, and this Court concludes that, if confronted with the issue, the Supreme Court of Virginia also would permit a conversion action for converted intangible property of th[is] sort . . . .").

Finally, because the Court has concluded as a matter of law that Demcenko breached his

duty of loyalty by entering into the License Agreement on behalf of SRL, the Court will enter summary judgment in Plaintiff's favor as to Counts I, III, and IV, and VI of the Counterclaim, all of which are premised on the validity of the License Agreement. The Court will also grant summary judgment for Plaintiff on Counts II and V of the Counterclaim because neither Count states a claim that is recognized under Virginia law. *See Eplus Tech., Inc. v. Nat'l R.R. Passenger Corp.*, 407 F. Supp. 2d 758, 762 (E.D. Va. 2005) ("While Virginia law recognizes a contractual duty of good faith and fair dealing, a breach of that duty only creates a claim for a breach of contract.") (citing *Va. Vermiculite, Ltd. v. W.R. Grace & Co. – Conn.*, 156 F.3d 535, 542 (4th Cir. 1998); *Joyce v. Lincoln Nat'l Life Ins. Co.*, 845 F. Supp. 353, 355 (E.D. Va. 1993)); *Philip Morris, Inc. v. Emerson*, 235 Va. 380, 406 (1988) (to state a claim for "negligent interference with contract" under Virginia law, a claimant must allege facts supporting a finding that physical harm resulted from negligent interference).

For the above reasons, the Court will enter summary judgment in Plaintiff's favor as to liability on Counts I, II, IV, VI, and VII of the Complaint and all counts of the Counterclaim. It will enter summary judgment in Defendants' favor as to Counts III, V, and VIII of the Complaint. The case will therefore proceed to trial as to damages against the Defendants under Counts I, II, IV, VI, and VII.

The Court will issue an appropriate order.

The Clerk is directed to forward copies of this Memorandum Opinion to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
August 9, 2012