IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| RITLABS, S.R.L., | |
| Plaintiff/Counter-Defendant, | Case No.:  1:12CV215 |
| v. | Hon. Anthony J. Trenga |
| RITLABS, INC. and SERGHEI DEMCENKO, | |
| Defendants/Counter-Plaintiffs. | |

## DEFENDANTS' PROPOSED FACTS

Following damages trial held on September 25, 2012 and pursuant to this Court's Order of the same date, Defendants Ritlabs, Inc. ("INC") and Serghei Demcenko ("Demcenko"), by and through their attorneys, hereby submit the following proposed factual recitation and scope of damages.

**I.     Proposed Facts**

1.      Plaintiff Ritlabs, S.R.L. ("SRL)" is an Internet technology and software provider formed in 1998 as a limited liability company under the laws of the Republic of Moldova, with its principal place of business in Chisinau, Moldova.  August 8, 2012 Memorandum Opinion ("Mem. Op.") at 1 (Doc 135).

2.      SRL has developed, sold, and distributed several software products throughout the world, including in the United States.  SRL was founded by Defendant Serghei Demcenko, Maxim Masiutin and Stefan Tanurcov, who remain the sole members of the company, with Demcenko holding a 40% share in the company and Masiutin and Tanurcov each holding a 30% share in the company.  *Id.*

3.      From SRL's inception in 1998 until his disputed removal on December 12, 2011, Demcenko served as "Director" of SRL, a position equivalent to a chief executive officer.  *Id.*, *see* Transcript of Trial from September 25, 2012 ("Tr.") 28:13-14.

**A.      Purpose of INC**

4.      Since as early as 2002 the members of SRL had discussed the possibility and potential benefit of establishing a company in the United States to sell SRL's products.  *See* Tr. 31:20-23.

5.      SRL's shareholders recognized that these benefits, including an expanded presence in the United States market for SRL's products and financial gains from avoiding double taxation when selling SRL's products in the Russian Federation, would have a substantial positive impact on SRL's business.  *See* Tr. at 88:7-93:25; *see also* Exh. A to Def.'s Resp. to Pl.'s Am. Mot. for Summ. J. ("Exh. A to Defs.' Mot. for Summ. J.") at ¶¶ 13-18, 25-29 (Doc 113).

6.      It was based on these discussions and with these goals in mind that Demcenko, as the Director of Plaintiff, established INC.  *Id.*

7.      On July 14, 2008, Defendant Demcenko incorporated INC under the laws of the Commonwealth of Virginia.  *See* Tr. at 30:10-11; Exh. A to Defs.' Mot. for Summ. J. at ¶ 25.

8.      Demcenko established INC (1) in order to sell SRL's products in the United States and around the world, seeking to thereby increase the sales of SRL's products outside Moldova, (2) as a means of avoiding certain double-taxation issues associated with selling SRL's products in the Russian Federation, and (3) to develop and distribute new products through INC. *See* Tr. at 88:7-93:25; Exh. A to Defs.' Mot. for Summ. J. at ¶¶ 13-18, 25-29.

9.      In 2010, Demcenko came to the United States to run INC as its chief effective officer, while simultaneously retaining his position as SRL's Director.  *See* Tr. at 28:6-8; 29:21-24; Exh. A to Defs.' Mot. for Summ. J. at ¶ 47.

10.      On May 3, 2010, Demcenko, on behalf of SRL, entered into a License Agreement with INC, which provided INC with an exclusive license to sell SRL's software products in the United States, as well as a non-exclusive license to sell SRL's software products around the world.  Mem. Op. at 7.

11.      Subsequently, INC entered into distribution agreements with a variety of distributors to sell SRL's products, including Chicago Interflash Networking, Inc. ("CIFNet"), SoftLogisitic LLC, Business IT LLC, NILTA Corp., S-Tech Data e.K., and Skulski.  *See* Tr. at 33:16-35:12.

12.      The distributors remitted a portion of the monies received from the sale of SRL's products to INC, which, in turn, remitted a portion of the monies received from the distributors to SRL pursuant to the License Agreement.  *See* Tr. 35:14-18.

13.      Through April 2012, INC received $376,649.36 from the distributors' sale of SRL products and remitted $63,928.30 thereof to SRL.  *See* Defs.' Trial Exh. D3 at 3-6, 51.

14.      Although Demcenko established INC without the explicit consent of Masiutin and Tanurcov, he did so for the benefit of Plaintiff SRL.  *See* Tr. at 88:7-93:25; Exh. A to Defs.' Mot. for Summ. J. at ¶ 25.

15.      Even after the dispute in this matter arose, Masiutin's primary grievance with Demcenko's conduct was not that Demcenko established INC, but rather that Masiutin and Tanurcov were not given an ownership stake in INC.  *See* Defs.' Trial Exh. D6 at 30; Tr. at 154:8-12 ("Q:  Mr. Masiutin, isn't it true that you agreed with the establishment of a United

States entity selling SRL's products as long as you and Mr. Tanurcov each received 30 percent of that entity?  A: Yes.").

16.      Even after Maisutin admitted that he was aware of INC's existence, in an August 6, 2011 email to Demcenko, Maisutin proposed a way to resolve the dispute by ensuring that INC had "the same participation shares as [SRL] had . . . ."  Defs.' Trial Exh. D6 at 30.

17.      Essentially, by Masiutin's own admission, Demcenko could have resolved Masiutin and Tanurcov's objections by providing them with an ownership stake in INC equivalent to that in SRL.  *See* Defs.' Trial Exh. D6 at 30 (August 6, 2011 email from Masiutin to Demcenko) ("It is yet possible to mend your way and make the same participation shares in "Ritlabs" Inc, as they in "Ritlabs" Ltd are."); *see* Tr. at 154:8-12 ("Q:  Mr. Masiutin, isn't it true that you agreed with the establishment of a United States entity selling SRL's products as long as you and Mr. Tanurcov each received 30 percent of that entity?  A: Yes."), 156:6-13.

18.      Masiutin's willingness to resolve the dispute in exchange for an ownership stake in INC demonstrates that Plaintiff's fundamental grievance is not with the existence of INC, but rather with INC's ownership distribution.  *Id.*

19.      These statements also demonstrate that, had INC's efforts resulted in substantial profits, Masiutin and Tanurcov would clearly now be seeking their share of those profits.  *Id.*

**B.      Reasonable Expenses**

20.      In order to establish a physical presence in the United States for Plaintiff, INC incurred certain reasonable and expected operating expenses of the type which would typically be associated with any active entity located in the United States with United States-based employees.  *See* Defs.' Trial Exh. 3; Tr. at 178:3-182:2.

21.     All of these expenses, with the exception of Demcenko's salary and pension, were paid to third parties.  *Id.*

22.     These expenses totaled $362,787.69 and are broken out by category below:

| INC EXPENSES | |
|---|---|
| Paypal Fees | $1,520.35 |
| Advertising and Promotion | $889.40 |
| Bank Fees | $2,151.90 |
| Communication | $3,531.18 |
| Computer and Internet Expenses | $7,097.42 |
| Consultation | $1,323.00 |
| Dues and Subscriptions | $1,171.65 |
| Management Fee | $5,750.00 |
| Medical Insurance | $20,520.97 |
| Merchant Fee | $2,017.72 |
| Office Software | $1,984.72 |
| Office Supplies | $1,890.53 |
| Outsourcing | $520.00 |
| Payroll Expenses | $147,389.21 |
| Payroll Taxes | $13,740.92 |
| Pension Expense | $4,166.70 |
| Postage and Delivery | $962.26 |
| Accounting Fee | $11,427.31 |
| Legal | $34,862.99 |
| Payroll Processing | $921.50 |
| Professional Fees - Other | $106.50 |
| Rent Expense | $25,521.23 |
| Royalties Paid | $63,928.30 |
| Small tools and Equipment | $5,661.36 |
| State Estimated Tax | $900.00 |
| Travel Expense | $19.99 |
| Website admin & maintenance | $560.58 |
| Federal Estimated tax | $2,250.00 |
| | |
| Total Expenses | $362,787.69 |

23.     INC's salary costs totaling $147,389.21 were reasonable in light of the fact that these costs were incurred over the course of three years for INC's four employees, three of whom are located in the United States.  *See* Defs.' Trial Exh. D3 at 38-39; Defs.' Trial Exh. D1 at 58.

24.     Demcenko's salary as the CEO of INC is in-line or below the industry standards.

25.     Demcenko's annual salary from Plaintiff SRL, which he was receiving at the same time he was drawing a salary from INC, totaled only approximately $11,500.  *See* Tr. at 162:21-23.

26.     It would have been impossible for Demcenko to live in the Washington, D.C. area on this salary alone.

27.     Notably, as soon as Masiutin took over the position of Director of Plaintiff from Demcenko, Masiutin nearly doubled his own salary as Director.  *See* Tr. at 162:7-163:1.

28.     For the period January 2010-July 2012, a period of 31 months, Demcenko received a total salary of $87,750.07 from INC.  *See* Defs.' Trial Exh. D3 at 38-39; Defs.' Trial Exh. D1 at 58.

29.     This salary averaged $2,830 per month or $33,967 per year, which is a modest amount given the cost of living in the Washington, D.C. area.  *Id.*

30.     In addition, Demcenko received payments to a pension fund during this same period totaling $3,333.36.  These payments averaged $107 per month or $1,290 per year.  *See* Defs.' Trial Exh. D1 at 58.

31.     Demcenko's wife, Olga Somova, also received a salary during this period totaling $30,250, which was $975 per month or $11,809 per year.  *See* Defs.' Trial Exh. D3 at 38-39; Defs.' Trial Exh. D1 at 58.

32.    During the period at issue, Demcenko had a visa which allowed him to live in the United States.  *See* Exh. A to Defs.' Mot. for Summ. J. at ¶ 63.

33.    However, in order to continue working at INC, Demcenko needed a certain type of visa.  *Id*. at ¶ 47

34.    INC incurred $19,124 in legal costs in an effort to obtain this visa for Demcenko for the purpose of continuing INC in the United States.  *See* Defs.' Trial Exh. D3 at 48-49.

35.    INC's expenditures on photography ($243.23) and model helicopter equipment ($186.95) were incurred in the course of INC's business and in furtherance of INC's projects—namely, development of a radiation detection project related to a business proposal made to Polimaster, Inc.—as well as marketing efforts for SRL's product.  *See* Tr. at 75:3-10-24, 74:18-22, 75:3-18, 170:18-171:2; Defs.' Trial Exh. D3 at 52-54.

36.    Therefore, these minor costs, totaling $3,225.77, are reasonable.  *See* Defs.' Trial Exh. D3 at 52-54.

37.    To the extent INC made a net profit, Demcenko is entitled to 40% of this net profit as a 40% shareholder in Plaintiff.

## C.    Payment of $70,000 to Demcenko by CIFNet

38.    In 2009, Demcenko required a substantial balance in his United States bank account in order to be eligible to rent living accommodations for himself and his wife.  Because of the difficulties associated with transferring money out of Moldova, Yevgeniy Kruglov, the co-founder of CIFNet and Demcenko's close friend residing in Chicago, suggested to Demcenko that CIFNet would transfer $70,000 into Demcenko's personal bank account in the United States. *See* Tr. at 53:25-54:3, 83:15-84:7, 123:14-22 (Mr. Masiutin admitting that it is difficult to transfer money from Moldova to the United States).

39.     CIFNet transferred the money on November 20, 2009.  *See* Tr. at 53:22-24.

40.     Although the terms of this transaction were never set between Demcenko and Kruglov, Demcenko reasonably believed that this money was given to him as a personal loan. *See* Tr. at 54:9-23, 55:10-55:23.

41.     The $70,000 transfer was unrelated to the establishment or operation of INC.  *See* Tr. at 83:15-84:7.

42.     Demcenko's request for money from CIFNet was consistent with the practice of Plaintiff SRL's shareholders.  *See* Tr. at 76:4-13, 77:6-15; Exh. A to Defs.' Mot. for Summ. J. at ¶ 134.

43.     Because of the difficulties associated with transferring money to the United States from Moldova, each shareholder of SRL routinely had CIFNet transfer money directly to the shareholder's account for his personal U.S.-related expenses and purchases. *See* Tr. at 76:4-13, 77:6-15, 123:16-124:2, 148:22-149:5.

44.     For instance, between 2008 and 2011, CIFNet transferred $46,300 to Maxim Masiutin's personal stock trading account in the United States, counting these transfers against amounts owed to SRL and INC.  *See* Defs.' Trial Exh. D2; Pl.'s Trial Exh. P37; Tr. at 152:20-153:7.

45.     Similarly, it appears that CIFNet transferred certain amounts to Stefan Tanurcov under the same arrangement.  *See* Tr. at 167:3-22.

46.     While there was no evidence that CIFNet considered the loan to Demcenko as an offset against monies owed by CIFNet to Plaintiff or INC, the evidence does show that the monies paid to Masiutin were offset against monies owed by CIFNet to Plaintiff and INC.  *See* Defs.' Trial Exh. D2

47.      There is no evidence that the members of SRL viewed this arrangement of obtaining money from CIFNet for their personal benefit as problematic until after a dispute arose as to the proper ownership of INC.

**D.      Dividend Distribution**

48.      Demcenko owns 40% of the stock in Plaintiff.  Mem. Op. at 1.

49.      Since 2002, SRL had distributed dividends to each of its members for the preceding calendar on a quarterly basis.  *See* Tr. at 165:25-166:17.

50.      In 2012, however, after Plaintiff discharged Demcenko as Director, Plaintiff suddenly stopped making dividend distributions to Demcenko.  *See* Tr. at 165:7-13.

51.      Instead, SRL apparently used that money for purposes such as increasing Masiutin's monthly salary.  *See* Tr. at 162:7-15, 162:24-163:1 (Q: Why did you give yourself more money than Mr. Demcenko was getting [as director of SRL]? A: I don't know.").

52.      In light of this, and the ongoing litigation in Moldova pursuant to which SRL seeks to strip Demcenko of his member status, it is apparent that SRL does not intend to remit dividends owed to Demcenko.

**E.      Emails and Domain Name Registration Issues**

53.      On March 8, 2010, while director of SRL, Demcenko registered the www.ritlabs.us domain name.  Exh. A to Defs.' Mot. for Summ. J. at ¶ 71.

54.      Although INC used the www.ritlabs.us domain name to advertise SRL's product, INC did not sell any products, SRL or otherwise, directly through www.ritlabs.us.  *See Id.* at ¶ 76-82.

55.      On December 13, 2012, after being notified by SRL's accountant that Demcenko had been removed as director and that Masiutin had taken over SRL, Demcenko, fearing that

Masiutin would cause damage to SRL and in order to protect SRL's assets, accessed the domain registrant accounts associated with www.ritlabs.com, www.ritlabs.net, www.thebat.net, and www.batpost.com and changed the registrant information associated with the domains from SRL to INC.  *See* Tr. at 43:12-44:14;  Exh. A to Defs.' Mot. for Summ. J. at ¶ 102-115.

56.     Demcenko believed that Masiutin, once he took over the company, would shut down SRL's sale of its products.  *See* Tr. at 46:23-47:7; Exh. A to Defs.' Mot. for Summ. J. at ¶ 113-114.

57.     Demcenko did not intend or attempt to alter, sell, or profit off, or hold these domains for ransom.  *See* Tr. at 45:13-46:12; Exh. A to Defs.' Mot. for Summ. J. at ¶ 127.

58.     Both www.ritlabs.net and www.batpost.com domains were purchased by SRL as placeholders and have never hosted functional websites for either SRL or INC.  *See* Tr. at 82:13-21.

59.     The www.thebat.net website is a portal that allows users to remotely access their @thebat.net e-mail accounts.  Exh. A to Defs.' Mot. for Summ. J. at ¶ 74.

60.     Demcenko made no other changes to the domains, to any information associated with the domain accounts, nor to the content of any of the websites associated with the domains. *See* Tr. at 81:13-82:12, 158:1-6 ("Q: Now, isn't it true, though, that when Mr. Demcenko changed the information on the registration control panel about who was identified as a registrant, that that change by itself had no effect on the activity of the Web site, correct? A: Yes.").

61.     Neither did Demcenko ever interfere with the operation of the websites.  Tr. at 164:3-9.

62.     SRL had at all times full control over the websites associated with www.ritlabs.com, www.ritlabs.net, www.thebat.net, and www.batpost.com domain names. *See* Tr. at 47:10-15, 48:4-10, 108:13-17, 157:20-160:14.

63.     After Demcenko was removed as director, SRL blocked his access to several @ritlabs.com e-mail accounts used by Demcenko and members of his family.  Exh. A to Defs.' Mot. for Summ. J. at ¶ 122.

64.     These email accounts had been used by Demcenko and his family since prior to the formation of SRL and were used for personal and business purposes. *Id*. at ¶ 123.

65.     Consequently, Demcenko altered the MX record associated with www.ritlabs.com to forward emails addressed to Demcenko's and his family members' accounts to separate email accounts not associated with SRL. *See* Tr. at 176:15-22.

66.     In doing so, Demcenko did not redirect any of the emails addressed to any other @ritlabs.com account nor did he access or take control of any emails addressed to anyone but himself or his family members. *See* Tr. at 176:15-22; Exh. A to Defs.' Mot. for Summ. J. at ¶ 125.

67.     Plaintiff has presented no evidence that these actions caused any harm to Plaintiff. *See* Tr. at 163:2-15.

**F.     S-Tech Data**

68.     After Mr. Masiutin took control of SRL, he threatened and blackmailed Anna Kock, S-Tech Data's principal. *See* Tr. at 64:15-64:10, 109:16-110:19.

69.     Mr. Masiutin told Ms. Kock that unless S-Tech Data paid to Plaintiff all the money that S-Tech Data had remitted to INC, SRL would cease working with S-Tech Data. *See* Tr. at 64:15-64:10, 109:16-110:19.

70.     It is as a result of these action by Mr. Masiutin that S-Tech Data ceased working with Plaintiff.  *See* Tr. at 64:15-64:10, 109:16-110:19.

## II.     Scope of Damages

Defendants contend that the scope of damages is properly based on any personal benefit which Demcenko received pursuant to his ownership of 100% of INC.   The general formula for determining damages is therefore based on calculating any funds received by INC, deducting all reasonable and appropriate expenses associated with INC's operations here in the United States and requiring Demcenko to compensate Plaintiff with the balance, less Demcenko's 40% to which he is entitled based on his 40% ownership share in Plaintiff.  As the Court previously held, Demcenko's lack of notice in creating INC and entering into the License Agreement was not excused

> for the simple reason that there is no doubt that INC was exploiting SRL's business opportunities and, as Demcenko's counsel conceded during oral argument, SRL would have been better off with a 100% interest in INC rather than no interest or the 11% interest that Demcenko ultimately transferred to it in 2011.

Mem. Op. at 13.  As found in *Trayer v. Bristol Parking, Inc.*, 198 Va. 595, 603 (1956), *quoting Rowland v. Kable*, 174 Va. 343, 366 (1940), when an officer breaches his duty of loyalty by taking a business opportunity for himself, he in effect takes such opportunity in "constructive trust" for the corporation.  If in fact Plaintiff had been issued 100% interest in INC, which is the primary reason why the Court concluded that Demcenko had violated his duties and in fact the basis for this lawsuit by Plaintiff, Plaintiff would have received all of the net revenues of INC.

As the Court held:

> Embedded within this duty [of loyalty] is the notion that "a director of a private corporation cannot directly or indirectly, in any transaction in which he is under a duty to guard the interests of the corporation, *acquire any personal advantage, or*

*make any profit himself, and if he does so, he may be compelled to account therefore to the corporation.*"

Mem. Op. at 10, *quoting Rowland*, 174 Va. at 366 (1940)(emphasis added).

Any personal advantage or profit by Demcenko should not include the reasonable business expenses incurred by INC, especially given that all of Plaintiff's shareholders agreed that establishing a United States presence was a good idea. For this reason, all reasonable expenses incurred by INC during the course of its operation should be deducted from any compensatory damages due to Plaintiff. As shown at trial, Plaintiff's primary grievance was not that INC existed in the first place, but that the members of Plaintiff SRL did not each have an ownership interest in INC in the same proportions as they had in SRL. Essentially, Plaintiff would have found INC's conduct acceptable so long INC was a full subsidiary of SRL or if it had been owned by Demcenko, Masiutin and Tanurcov based on a 40/30/30% share division. Accordingly, the Court should treat INC as SRL's subsidiary and subtract all reasonable expenses that INC incurred during its operations from compensatory damages due to Plaintiff, in addition to Demcenko's 40% share. The evidence shows that all of INC's expenses were reasonable, including the salaries paid to Demcenko and his wife.

CIFNet's transfer of $70,000 and the other alleged transfers from CIFNet to Demcenko should not be included in Plaintiff's damages either. As shown at trial, the $70,000 transfer from CIFNet to Demcenko was a personal loan from Yevgeniy Kruglov, CIFNet co-founder, to Demcenko in order to assist Demcenko is finding housing in the United States. The money was not related to the founding of INC or Demcenko's breach of fiduciary duty. In fact, Demcenko received the $70,000 in accordance with the same arrangement under which Maxim Masiutin received $46,300 from CIFNet and Stefan Tanurcov apparently received funds as well. None of the members of SRL had any problems with this arrangement prior to this lawsuit.

13

Plaintiff has also failed to show that it reasonably incurred damages as a result of Defendants' violation of the Computer Fraud and Abuse Act and that it is entitled to receive anything more than statutory minimal damages under the Anticybersquatting Consumer Protection Act ("ACPA"). Additionally, Plaintiff's totally speculative claim that it should be awarded $33,605.28 in compensatory damages for revenue that it allegedly would have received from S-Tech Data should also fall by the wayside. As the trial record clearly show, S-Tech Data declined to sell SRL's software because of Mr. Masiutin's heavy-handed tactics and not as a result of Demcenko's actions.

This Court should also deny Plaintiff's request for its costs and attorneys' fees and punitive damages for defendants' tortious interference and under the Lanham Act. Demcenko has at all times acted in the best interests of Plaintiff SRL and his actions were not malicious, fraudulent, willful, deliberate in nature, or in bad faith.

Additionally, any amount due to Plaintiff SRL in damages should be reduced by 40% because Demcenko is a 40% owner of Plaintiff, and, in light of this dispute, it is virtually certain that Plaintiff will not remit profits from this litigation to Demcenko as dividends.

## A.    INC's Expenses

Plaintiff has alleged that INC acted as an unauthorized branch or affiliate of Plaintiff without proper authorization. *See* Complaint at ¶ 42 ("Defendant Demcenko incorporated Defendant INC, and operated it as an apparent branch or affiliate office of Plaintiff SRL, without the authorization of the General Assembly or SRL members Mr. Masiutin or Mr. Tanurkov") (Doc. 1). Notwithstanding this allegation, Plaintiff is apparently seeking only the gross revenues

obtained by INC.[1]  *See* Trial Br. at 1.  Accordingly, the Court should view Demcenko as operating INC for the constructive benefit of Plaintiff and grant Plaintiff 100% ownership in INC.  Consequently, any damage calculation to assess any personal benefit received by Demcenko must take into account any reasonable and appropriate expenditures in operating INC because these expenses would have been incurred even if INC had been properly authorized as a branch or affiliate of Plaintiff.

INC's operating expenses, including salary paid to Demcenko and his wife, should be deducted from compensatory damages owed by Defendants to Plaintiff.  INC received $377,766.35 for the sale of SRL and non-SRL products.  *See* Defs.' Trial Exh. D3 at 3-9.  As shown in Defendants' Exhibit 3, during its operation, however, INC spent $362,787.69 in expenses, including $63,928.30 remitted to SRL pursuant to the License Agreement.  *Id.* at 9-56.  These expenses were reasonable and should be deducted from damages owed to SRL.

The expenses should be deducted from Plaintiff's damages because SRL's primary grievance with Demcenko's conduct was not that Demcenko established INC, but rather that Masiutin and Tanurcov were not given an ownership stake in INC.   Even after Maisutin admitted that he was aware of INC's existence, in an August 6, 2011 email to Demcenko, Maisutin proposed a way to resolve the dispute by ensuring that INC had "the same participation shares as [SRL] had . . . ."  *See* Defs.' Trial Exh. D6 at 30.  Essentially, by Masiutin's own admission, Demcenko could have resolved Masiutin and Tanurcov's objections by providing

---

[1] Plaintiff is seeking $404,223.16 in compensatory damages for Defendants' breach of fiduciary duty and that same amount for Defendants' tortious interference with contractual relations.  *See* Trial Br. at 7, 12.  The Court should consider these damages as redundant and refuse to double compensatory damages for the same activities, which would result in a windfall for Plaintiff.

them with an ownership stake in INC equivalent to that in SRL. *See* Defs.' Trial Exh. D6 at 30 (August 6, 2011 email from Masiutin to Demcenko) ("It is yet possible to mend your way and make the same participation shares in "Ritlabs" Inc, as they in "Ritlabs" Ltd are."); *see* Tr. at 154:8-12 ("Q: Now, Mr. Masiutin, isn't it true that you agreed with the establishment of a United States entity selling SRL's products as long as you and Mr. Tanurcov each received 30 percent of that entity? A: Yes."), 156:6-13. Masiutin's willingness to resolve the dispute in exchange for an ownership stake in INC demonstrates that Plaintiff's fundamental grievance is not with the existence of INC, but rather with INC's ownership distribution. These statements also demonstrate that, had INC's efforts resulted in substantial profits, Masiutin and Tanurcov would clearly be seeking their share of those profits. However, it would be unfair to provide Masiutin and Tanurcov with profits if they did not also account for the expenditures necessary to obtain those profits. Accordingly, for the purpose of calculating damages, INC should be deemed a subsidiary of INC and its reasonable expenses deducted from damages owed to SRL.

In addition, Plaintiff cannot claim in hindsight that it would not have approved of INC's operating expenses. As the evidence demonstrated, Plaintiff consistently authorized Demcenko to make all of the day-to-day business decisions as to Plaintiff's expenditures. *See* Exh. A to Defs.' Mot. for Summ. J. at ¶ 8. Therefore, if Plaintiff held 100% of INC's shares or if Masiutin and Tanurcov held shares in INC, they still would have deferred to Demcenko to decide the appropriate expenses for INC to incur. Moreover, none of INC's expenses are inappropriate or unreasonable for establishing a physical presence in the United States.

The expenses incurred by INC, as set forth in Defendants' Exhibit D3, were reasonable. For instance, the payroll paid to INC's employees was a reasonable business expense. During its operation, INC paid $147,389.21 in payroll expenses for four employees. *See* Defs.' Trial Exh.

D3 at 39.  INC's payroll expenses included $84,416.71[2] paid to Demcenko between 2010 and

2012 (average annual salary of $$33,967), $30,250 paid his wife, Olga Somova, who was

employed INC as administrative manager, between 2011 and 2012 (average annual salary of

$11,809), $30,000 received by Sergei Dubograev, INC's sales and marketing consultant,

between 2011 and 2012 (average annual compensation of $15,000), and $2,722 received by

Dmitry Kantor, INC software developer, in 2011.  *See* Defs.'s Trial Exh. D1 at 58.  None of

these salaries are unreasonable.  Both Mr. Dubograev and Mr. Kantor performed substantial

services for INC and received reasonable compensation from INC.  Although Demcenko and

Somova were drawing a salary concurrently from both SRL and INC, this was reasonable

because 1) Demcenko and Somova were performing substantial business responsibilities for SRL

and INC while they were in the United States, 2) salaries paid to Demcenko and Somova were

inline with the industry standard for their positions and responsibilities, and 3) Demcenko's and

Somova's SRL salaries (approximately $11,500 for Demcenko and $10,229 for Somova per

year) were insufficient to allow them to live in the United States, especially in Washington,

D.C.-area.  *See* Tr. at 162:21-23.  The pension and medical insurance benefits received by

Demcenko and Somova are also normal parts of any employer compensation.

     INC's legal expenses are likewise reasonable.  For instance, INC paid $15,588.99 to

International Legal Counsels PC in 2010.  *See* Defs.' Trial Exh. D3 at 48.  These expenses were

incurred in connection with INC's incorporation in Virginia and drafting various contracts within

the scope of INC's business.  SRL also seeks as damages $8,432.40 which were paid by CIFNet

---

[2] Although Defs.' Trial Exh. D3 at 58 lists Demcenko total compensation between 2010 and

2012 as $87,750.07, this figure includes $3,333.36 paid to Demcenko by INC in pension

benefits.

directly to INC's lawyers for INC's legal fees.  However, because this amount is also an ordinary cost of doing business, even if it had been included in INC's total revenues, it would have been offset by an additional deduction set out in INC's costs.  Therefore, this amount should not be added to INC's revenues or SRL's damages.

INC also paid $19,124 to an immigration attorney so as to allow Demcenko and his wife to stay in the United States on a business visa specifically for the purpose of operating INC.  *See* Exh. A to Defs.' Mot. for Summ. J. at ¶¶ 47-49, 63.  Therefore, these expenses are attributable to the need to operate INC because without Demcenko and Somova's presence in the United States, INC could not have been established and operated.  For that reason, these expenses should be borne by INC and thus should be deducted from revenues received by INC.

Despite Plaintiff's suggestions to the contrary, INC's very minor expenses related to model helicopter and photography equipment were reasonable and incurred through INC's course of business.  *See* Tr. at 72:21-76:3.  In 2011, INC spent $1,822.56 as part of a project for Polimaster, Inc. to develop a remote controlled mechanism for gauging pollution and $1,576.81 in costs associated with research and development of a dust detector project.  *See* Defs.' Exh. D3 at 53-54, Tr. at 73:6-10.  INC also spent $1,403.21 on media material in order to promote its products, including MailVoyager.  See Defs.' Exh. D3 at 54.  These expenses were each reasonable and incurred through INC's ordinary course of business.

In light of the foregoing, INC's expenses--$362,787.69—should be deducted from INC's total sales—$377,776.35—to result in Defendants being liable to Plaintiff for $14,988.66, before any deduction is made for Demcenko's 40% ownership share in Plaintiff.

**B.    CIFNet Transfers**

In its Trial Brief, Plaintiff seeks from Defendants payments allegedly made by CIFNet to Demcenko's personal bank which "were offset from amounts CIFNet owed to Plaintiff SRL". Pl.'s Trial Br. at 7.  Plaintiff alleges that CIFNet transferred $10,000 to Demcenko on November 11, 2009, $70,000 on November 20, 2009, and $1,000 on November 30, 2009.  However, Defendants should not be held responsible for paying these amounts to Plaintiff.

First, Demcenko never received, and CIFNet never transferred, the alleged $10,000 on November 11, 2009 nor $1,000 on November 30, 2009.  In fact, shockingly, Mr. Masiutin himself admitted at trial that it was he who received the $1,000 on November 30, 2009, not Demcenko.  *See* Tr. at 153:11-154:7 ("Q: Doesn't that demonstrate that the $1,000 payment to RIT was really made to you? A: This is probable."), 57:11-58:2 ("Q: Mr. Demcenko, is it accurate that on November 30, 2009, CIFNet transferred $1,000 to your personal bank account? A: No, that's not correct because there has been no transfer into my account on that date. Because according to what I know, that money was transferred to Maxim Masiutin, and the CIFNet report would confirm that.").  Given this admission, Plaintiff's attempt to obtain this $1,000 as damages owed by Demcencko was entirely meritless (as well as being in violation of Rule 11).

In addition, Plaintiff has presented no evidence that CIFNet sent or Demcenko received the alleged November 11, 2009 $10,000 transfer.  Demcenko denied ever receiving this money and this amount does not even appear in CIFNet's accounting of payments made to and on behalf of INC and SRL.  *See* Pl.'s Trial Exh. P37; Tr. 56:2-4 ("Q: Mr. Demcenko, did CIFNet transfer $10,000 to your personal bank account on November 11, 2009? A: No, it did not.").  Plaintiff's entire basis for seeking this $10,000 amount appears to be based on an e-mail sent by Demcenko to Yevgeniy Kruglov asking Mr. Kruglov to transfer $10,000 to Demcenko's account.  *See* Pl.'s

19

Exh. 36, Tr. at 56:5-22.  This transfer never occurred because Mr. Kruglov transferred $70,000 to Demcenko's account less than two weeks after that email.  *See* Tr. at 84:12-85:3.

Demcenko did receive a $70,000 transfer from CIFNet on November 20, 2009.  *See* Tr. at 53:22-24.  However, this money was unrelated to INC and transferred to Demcenko as part of an arrangement between CIFNet and all the members SRL.

In 2009, Demcenko required a substantial balance in his United States bank account in order to be eligible to rent living accommodations for himself and his wife.  *See* Tr. at 84:24-3. Because of the difficulties associated with transferring money out of Moldova, Yevgeniy Kruglov, the co-founder of CIFNet and Demcenko's close friend residing in Chicago, suggested to Demcenko that CIFNet would transfer $70,000 into Demcenko's personal bank account in the United States.  *See* Tr. at 53:25-54:3, 83:15-84:7, 123:14-22 (Mr. Masiutin admitting that it is difficult to transfer money from Moldova to the United States).  Although the terms of this transaction were never set between Demcenko and Kruglov, Demcenko reasonably believed that this money was given to him as a personal loan.  *See* Tr. at 54:9-23, 55:10-55:23.  The $70,000 transfer was unrelated to the establishment or operation of INC.  Moreover, Demcenko's request for money from CIFNet was consistent with the practice of Plaintiff SRL's shareholders.  *See* Tr. at 76:4-13, 77:6-15. Because of the difficulties associated with transferring money to the United States from Moldova, CIFNet routinely transferred money to or made purchases on behalf SRL's members for their U.S.-related expenses and purchases. *See* Tr. at 76:4-13, 77:6-15, 123:16-124:2, 148:22-149:5.  For instance, between 2008 and 2011, CIFNet transferred $46,300 to Maxim Masiutin's personal stock trading account in the United States, counting these transfers against amounts owed to SRL and INC.  *See* Defs.' Trial Exh. D2.   As with Demcenko, Mr. Kruglov transferred this money to Masiutin's personal account based on his friendship with

Masiutin.  Tr. at 144:13-145:25.   Similarly, it appears that CIFNet transferred certain amounts to Stefan Tanurcov under the same arrangement.  *See* Tr. at 167:3-22.   There is no evidence that the members of SRL viewed this arrangement as problematic until this dispute arose.  Thus, there is no basis for Plaintiff to allege that this transfer of funds was a violation of Demenko's duty of loyalty to Plaintiff, especially when Plaintiff's other shareholders were doing the exact same thing.

Given that the $70,000 transfer from CIFNet to Demcenko was unrelated to the establishment and operation of INC, and part of an arrangement between CIFNet and the members of SRL in which both Mr. Masiutin and Mr. Tanurcov participated, the amount should not be included in Plaintiff's damages.

## C.    Computer Fraud and Abuse Act

Plaintiff also claims that it incurred $10,827.20 in losses as a result of Defendant's violation of the Computer Fraud and Abuse Act ("CFAA").   In order to qualify under the CFAA, these loses must be the reasonably foreseeable and reasonably necessary under the circumstances.  *See Global Policy Ptnrs, LLC v. Yessin*, 686 F. Supp. 2d 642, 647 (E.D. Va. 2010) ("It follows, therefore, that plaintiffs in this case must show that the losses they claim were the reasonably foreseeable result of the alleged CFAA violations, and that any costs incurred as a result of measures undertaken to restore and resecure the e-mail system were reasonably necessary in the circumstances.").   The losses Plaintiff claims are neither.

Plaintiff argues that Demcenko "took control of the registrant account associated with the <ritlabs.com>, <ritlabs.net>, <batpost.com>, and <thebat.net> domain names" and changed the MX records associated with the <ritlabs.com> domain name.  Pl.'s Trial Br. at 11.  Plaintiff then suffered $8,757.50 in damages because "while <ritlabs.com> was under Defendant Demcenko's

control, Plaintiff SRL was unable to change its US cart provider from CIFNet, CIFNet obtained revenues in the amount of $8,757.50 from the unlawful sale of Plaintiff SRL's software." *Id*.  Mr. Masiutin's own testimony does not support this contention.

Mr. Masiutin admitted that Plaintiff SRL could have changed the cart provider at any time after Demcenko "took control" of the <ritlabs.com> domain.  Tr. at 108:13-17 (Q: Could you have changed the cart provider? A: Yes.").  Mr. Masiutin willingly chose not to do so.  *See* Tr. at 108:18-25.  SRL could have, at any time, prevented CIFNet from acting as the cart provider for <ritlabs.com>, but chose not to do so.  *See* Tr. at 157:20-158:6 ("Q: Now, Mr. Masiutin, regarding the issue of the cart provider or CIFNet serving as a vehicle through which people bought plaintiff's product, we talked about the fact that you wanted to change -- you wanted to prevent CIFNet from being -- serving that purpose, correct? A: Yes.").  Furthermore, CIFNet has not remitted to INC the $8,757.50 that SRL now seeks from INC.  *See* Tr. at 6:3-7 ("THE COURT: Has that money been transferred out of CIFNet? MR. DI GIACOMO: That money is still with CIFNet.").  Should SRL receive this money from INC, it could immediately turn around and demand the same $8,757.50 from CIFNet, resulting in windfall for SRL.  Therefore, this $8,757.50 should not be added to INC's damages calculation.

Plaintiff also seeks $979.68 in expenses for transferring the website content associated with the <ritlabs.com> domain name from CIFNet to a new web host, $169.18 in taxes associated with the transfer of the website, $313.76 to transfer the domain names at issue in this case to new registrar, and $607.08 in UPS expenses to ship numerous letters to the United States and Canada in an attempt to return the <ritlabs.com> domain.  Pl.'s Trial Br. at 11-12.  These expenses were not reasonable in light of the fact that Demcenko's change in registrant information did not cause any damage to SRL.  *See* Tr. at 81:13-82:12, 158:1-6 ("Q: Now, isn't it

true, though, that when Mr. Demcenko changed the information on the registration control panel about who was identified as a registrant, that that change by itself had no effect on the activity of the Web site, correct? A: Yes.").  Neither did Demcenko ever interfere with the operation of the websites.  Tr. at 164:3-9.  In fact, Mr. Masiutin admitted that the reason for SRL incurred expenses to switch from CIFNet's as host was because CIFNet was not remitting money to SRL and was cooperating with Demcenko.  See Tr. at 135:22-136:1 ("Technically, CIFNet did very well in hosting, but we couldn't keep for other reasons. We couldn't keep our server at CIFNet any longer for the reasons that they didn't pay money and they are cooperating with Mr. Demcenko.").  SRL incurred these expenses not as a result of Demcenko's actions, but because they were no longer happy with CIFNet as their host.  Therefore, these expenses were neither reasonably foreseeable and a reasonably necessary result of Demcenko's activities and should not be made part of the damages in this case.

**D.     ACPA**

In an effort to milk this case for all it can, Plaintiff seeks maximum statutory damages of $100,000 per each of the five domains whose registrant information Demcenko altered.  Plaintiff contends "that Defendant's actions were both willful and blatant."  Pl.'s Trial Br. at 4.  Moreover, Plaintiff seeks costs and attorneys' fees for what Plaintiff deems "malicious, fraudulent, willful, or deliberate" conduct under the Lanham Act.  *Id*. at 14.  This Court should not indulge Plaintiff's totally unsupported notions of Demcenko's supposed malicious conduct.  Instead, because Demcenko acted at all times for the benefit of SRL, damages should limited to the statutory minimum for the three operative websites only (<ritlabs.com>, <ritlabs.us>, and <thebat.net>) for total damages of $3,000.

23

On March 8, 2010, while director of SRL, Demcenko registered the www.ritlabs.us domain name.  Although INC used the www.ritlabs.us domain name to advertise SRL's product, INC did not sell any products, SRL or otherwise, directly through www.ritlabs.us. On December 13, 2012, after being notified by SRL's accountant that Demcenko had been removed as director and that Masiutin had taken over the SRL, Demcenko, fearing that Masiutin would cause damage to SRL and in order to protect SRL's assets, accessed the domain registrant accounts associated with www.ritlabs.com, www.ritlabs.net, www.thebat.net, and www.batpost.com and changed the registrant information associated with the domains from SRL to INC.  *See* Tr. at 43:12-44:14.

Demcenko believed that Masiutin, once he took over the company, would shut down SRL's sale of its products.  *See* Tr. at 46:23-47:7. Demcenko made no other changes to the domains, to any information associated with the domain accounts, nor to the content of any of the websites associated with the domains.  *See* Tr. at 81:13-82:12, 158:1-6 ("Q: Now, isn't it true, though, that when Mr. Demcenko changed the information on the registration control panel about who was identified as a registrant, that that change by itself had no effect on the activity of the Web site, correct? A: Yes.").  Neither did Demcenko ever interfere with the operation of the websites.  Tr. at 164:3-9.  SRL had at all times full control over the websites associated with www.ritlabs.com, www.ritlabs.net, www.thebat.net, and www.batpost.com domain names.  *See* Tr. at 47:10-15, 48:4-10, 108:13-17, 157:20-160:14.

Defendants did not intend or attempt to alter, sell, or profit off, or hold these domains for ransom.  *See* Tr. at 45:13-46:12.  And Plaintiff has presented no credible evidence that these actions caused any harm to Plaintiff.  *See* Tr. at 163:2-15.

Although courts have not articulated concrete factors for determining statutory damages, "courts reserve the high-end of the $ 1,000 to $ 100,000 range for the most egregious offenders"

*See Int'l Bancorp, L.L.C. v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco*, 192

F. Supp. 2d 467, 490 (E.D. Va. 2002).  "Such cases are generally deemed 'exceptional'[3] under

Section 1117(a) and therefore also result in an award of attorneys' fees." *Id*. (citing *Aztar Corp.*,

2001 U.S. Dist. LEXIS 13118, *6; *Electronics Boutique Holdings*, 2000 U.S. Dist. LEXIS

15719, *8).  "Finally, when an infringer's conduct is not deemed "exceptional," attorneys' fees

are not awarded and lower statutory damages are the norm."  *Id*. at 491.

     In its Trial Brief, Plaintiff appears to imply that Demcenko's change as to the registrant

information of the domains at issue somehow allowed Defendants to "continue[] to unlawfully

redirect consumers, who sought Plaintiff's software products, to CIFNet and other third parties . .

."  Pl.'s Trial Br. 4.  Plaintiff is blatantly attempting to mislead this Court.  Plaintiff's assertion is

explicitly contrary to Mr. Masiutin's own trial testimony, which stated that Demcenko's change

of the registrant information had no effect on the activity of the www.ritlabs.com website.  *See*

Tr. at 158:1-6 ("Q: Now, isn't it true, though, that when Mr. Demcenko changed the information

on the registration control panel about who was identified as a registrant, that that change by

itself had no effect on the activity of the Web site, correct? A: Yes."); *see also* Tr. at 81:17-25

(Demcenko testified that "When I changed the data in the main control panel, it didn't impact the

---

[3] It is well established in the Fourth Circuit that:

> . . . a case is exceptional where the infringer's conduct was "malicious, fraudulent, willful or deliberate in nature." *Doughney*, 263 F.3d at 370 (*quoting* Scotch Whisky Ass'n, 958 F.2d at 599). Thus, a prevailing trademark holder must "show that the defendant acted in bad faith." *Doughney*, 263 F.3d at 370. Yet, "a bad faith finding under the ACPA does not compel a finding of malicious, fraudulent, willful or deliberate behavior under § 1117." Id. Thus, it is within the discretion of the district court to find that even if a party violates the ACPA (and has, by definition, acted in bad faith), that party might not have acted "with the level of malicious, fraudulent, willful or deliberate behavior necessary for an award of attorney fees." Id.

*Int'l Bancorp, L.L.C.*, 192 F. Supp. 2d at 491 n.53.

plaintiff's business in any extent. . . . So I wasn't able to impact the company business in any

manner."). SRL had, at all times, full control over the websites associated with the

www.ritlabs.com, www.ritlabs.net, www.thebat.net, and www.batpost.com domain names. *See*

Tr. at 47:10-15, 48:4-10, 108:13-17, 157:20-160:14.

 Plaintiff also baldly asserts that Demcenko "obtained control over the domain names"

and "blocked Plaintiff SRL from changing the cart provider listed on the <ritlabs.com> website".

Pl.'s Trial Br. at 5. Once again, Mr. Masiutin's trial testimony contradicts Plaintiff's own Trial

Brief. Mr. Masiutin admitted that SRL could have changed the cart provider at any time after

Demcenko "took control" of the <ritlabs.com> domain. Tr. at 108:13-17 ("Q: Could you have

changed the cart provider? A: Yes."). Instead, Mr. Masiutin willingly chose not to do so. *See*

Tr. at 108:18-25. SRL could have, at any time, prevented CIFNet from acting as the cart

provider for <ritlabs.com>, but chose not to do so. *See* Tr. at 157:20-158:6 ("Q: Now, Mr.

Masiutin, regarding the issue of the cart provider or CIFNet serving as a vehicle through which

people bought plaintiff's product, we talked about the fact that you wanted to change -- you

wanted to prevent CIFNet from being -- serving that purpose, correct? A: Yes.").

 Plaintiff's assertions with regard to the Demcenko change of the MX records are

similarly unavailing. First, Demcenko's action with regard to the MX record are not relevant to

ACPA considerations given that the ACPA is, essentially, a trademark issue. However, Plaintiff

also mischaracterizes Demcenko's actions. After Demcenko was removed as director, SRL

blocked his access to several @ritlabs.com e-mail accounts used by Demcenko and members of

his family. These email accounts had been used by Demcenko and his family prior to the

formation of SRL and were used for personal and business purposes. Consequently, Demcenko

altered the MX record associated with www.ritlabs.com to forward emails addressed to

Demcenko's and his family members' accounts to his separate email accounts not associated

with SRL. *See* Tr. at 176:15-22. In doing so, Demcenko did not redirect any of the emails

addressed to any other @ritlabs.com account nor did he access or take control of any emails

addressed to anyone but himself or his family members. *See* Tr. at 175:21-176:22. There is no

evidence that Demcenko "captured" Plaintiff's emails, as Plaintiff asserts in its Trial Brief. *Id.*

Finally, with regard to the ritlabs.us domain name, Defendant did not sell any products

through the www.ritlabs.us domain names. Rather, this website was used to direct users to the

www.ritlabs.com website and to the benefit of SRL.

Like in *Int'l Bancorp, L.L.C.*, although the Court found bad faith for the purposes for the

ACPA, Demcenko's conduct "is neither malicious nor fraudulent, as required to obtain attorneys'

fees." *Id.* "Moreover, nothing in the record demonstrates a finding of actual economic harm" for

Plaintiff SRL as a result of Demcenko violation of the ACPA. *Id.* Demcenko did not change the

www.ritlabs.com website, did not sell any products through www.ritlabs.us, and, at all times,

acted for the benefit of SRL. Furthermore, both www.ritlabs.net and www.batpost.com domains

were purchased by SRL as placeholders and have never hosted functional websites for either

SRL or INC and the www.thebat.net website is a portal that allows users to remotely access their

@thebat.net e-mail accounts. *See* Tr. at 82:13-21. In light of these facts, it is appropriate to

award statutory minimum for the three operative websites only (<ritlabs.com>, <ritlabs.us>, and

<thebat.net>) for total damages of $3,000. *See Mattel, Inc. v. Adventure Apparel*, 2001 U.S. Dist.

LEXIS 13885 (S.D.N.Y. Sept. 6, 2001) ("The need for deterrence is not exceptional in this case

since little if any actual harm has been done to Mattel . . . Damages in the amount of $ 2000,

$1000 for each violative domain name - the minimum under the statute - is sufficient to achieve

the ends of the ACPA."); *see also Multisorb Techs., Inc. v. Impak Corp.*, 2008 U.S. Dist. LEXIS

65088 (W.D.N.Y. Aug. 14, 2008) (awarding statutory damages in the amount of $1,000).

Plaintiff attempts to present Demcenko's actions as "exceptional" under the Lanham Act

and thus warranting an award of attorneys' fees is similarly unavailing. Because Plaintiff is

unable to showing that Demcenko's ACPA-related actions (altering the domain registrant

information) was exceptional conduct, Plaintiff attempts to confuse the Court by presenting **all** of

Demcenko's actions in this case as relevant to the ACPA "exceptional" determination. This is

akin to a plaintiff seeking punitive tort damages for a defendant's breach of contract and should

not be considered by the Court.

Furthermore, Plaintiff's contention that Defendants failed to suspend the

MAILVOYAGER mark in violation of this Court's Preliminary Injunction Order is misleading.

As Plaintiff can easily glean from publicly available documents, Defendants requested for the

United States Patent and Trademark Office to suspend the MAILVOYAGER trademark

application after this Court issued its Preliminary Injunction Order. *See* Exh. L to Pl.'s Resp. to

Defs.' Mot. for Partial Summ. J. However, suspension was refused by the Examining Attorney

because an Office Action had already been issued by the USPTO denying registration of the

MAILVOYAGER trademark. *Id.* ("Before an application is suspended, the applicant must

respond to all outstanding issues raised in the examining attorney's Office action that are not

related to the proceeding. The application will not be suspended unless all matters not related to

the proceeding are resolved or in condition for final action. TMEP § 716.02(d) . . . If applicant

does not respond within six month of the mailing date of this final Office action, the application

will be abandoned."). Unless Defendants provide a substantive response to the outstanding

Office Action—which Defendants cannot do in light of the Court's Preliminary Injunction

Order—the MAILVOYAGER trademark application will be automatically abandoned.  In light of the above, Plaintiff's request for costs and attorneys' fees under the Lanham Act should be denied.

**E.     Defendants' Alleged Tortious Interference With Prospective Economic Advantage**

Plaintiff also seeks $33,605.28 in compensatory damages stemming from S-Tech Data declining to sell Plaintiff's software as a result of "this lawsuit."  Pl.'s Trial Br. at 13.  First, Plaintiff failed to show with any reliability that, had S-Tech Data continued selling Plaintiff's software, Plaintiff would have received $33,605.28 from such sale.  More importantly, however, is the fact that trial testimony demonstrates that the reason S-Tech Data refused to continue working with Plaintiff was not a result of Demcenko's conduct, but because of Mr. Masiutin's heavy-handed and blackmailing tactics.  Mr. Masiutin himself explained that S-Tech Data did not renew its contract with Plaintiff because

> . . .  she didn't like the situation because we asked her to provide the sales report to -- to let us know whether she had paid the money for our software. If she would reply that she had paid to INC, we would have been able to claim the money from INC. But if she didn't pay to anything, we would have been arguing that our contract is -- is in power still, and we could claim money from her if she didn't pay to INC anything. And she probably didn't like the situation, and he declined to work for either SRL or INC.

Tr. at 110:10-19.  Demcenko bolstered Mr. Masiutin's testimony.  *See* Tr. 64:12-65:10 ("Q:  And do you have any personal knowledge as to why S-tech Data no longer operates or provides services to Ritlabs, S.R.L.? . . . A: Because Maxim Masiutin did threaten Anna Kock and did blackmail Anna Kock. Also, they attempted to make her work in improvable conditions, and she just indicated that she wouldn't be able to work with people who were using such methods.").  Accordingly, Plaintiff cannot now claim that this $33,605.28 in speculative damages is attributable to Demcenko's conduct.  Rather, it is Plaintiff's own heavy-handed tactics which resulted in S-Tech Data not renewing its contract with SRL.

29

## F.     Punitive Damages

In its Trial Brief, Plaintiff seeks punitive damages for Demcenko's breach of fiduciary duty and Defendants' tortious interference.  *See* Pl's Trial Br. at 8-10, 13.  However, Plaintiff did not include a prayer for punitive damages in its Complaint and this Court should not deign to grant such an extraordinary measure in light of Plaintiff's failure to seek this remedy from the outset.  *See, e.g., Aniero Concrete Co. v. New York City Constr. Auth.*, 2000 WL 863208, at *26 (S.D.N.Y. June 27, 2000) (holding that party "does not . . . have permission" to pursue punitive damages when not pleaded); *Cappillino v. Hyde Park Cent. School Dist.*, 40 F. Supp. 2d 513, 516 (S.D.N.Y. 1999) (rejecting assertion of punitive damages because "there [was] no prayer for punitive damages in the Complaint).  Furthermore, Defendants actions do not warrant granting punitive damages to the Plaintiff.  As indicated herein, Demcenko at all times acted for the benefit of Plaintif SRL.  SRL's shareholders recognized that these benefits, including an expanded presence in the United States market for SRL's products and financial gains from avoiding double taxation when selling SRL's products in the Russian Federation, would have a substantial positive impact on SRL's business.  It was based on these discussions and with these goals in mind that Demcenko, as the Director of Plaintiff, established INC.  *See* Tr. at 88:7-93:25.  Demcenko established INC (1) in order to sell SRL's products in the United States and around the world, seeking to thereby increase the sales of SRL's products outside Moldova, (2) as a means of avoiding certain double-taxation issues associated with selling SRL's products in the Russian Federation, and (3) to develop and distribute new products through INC.  *See* Tr. at 88:7-93:25.  Demcenko's conduct was not malicious, egregious, or fraudulent and Defendants should not be subject to punitive damages.

## G.     Damages Should Be Reduced By 40%

All damages for which Defendants will be deemed liable should be reduced by 40% to account for Demcenko's status as 40% owner of Plaintiff.  Mem. Op. at 1.  Since 2002, SRL had distributed dividends to each of its members for the preceding calendar on a quarterly basis.  *See* Tr. at 165:25-166:17.  In 2012, however, after Plaintiff discharged Demcenko as Director, Plaintiff suddenly stopped making dividend distributions to its members.  *See* Tr. at 165:7-13. Instead, SRL apparently used its resources for purposes such as increasing Masiutin's monthly salary as the new Director.  *See* Tr. at 162:7-15, 162:24-163:1 (Q: Why did you give yourself more money than Mr. Demcenko was getting [as director of SRL]? A: I don't know.").  In light of this, it is apparent that SRL does not intend to remit dividends owed to Demcenko. Accordingly, this Court should reduce Defendants' damages by 40% to reflect Demcenko's undisputed ownership of 40% of Plaintiff.

**III.    Conclusion**

In light of the above, Defendants' damages should consist of $14,988.66 (INC's expenses--$362,787.69—should be deducted from INC's total sales—$377,776.35) and $3,000 for statutory damages for the three operative domains, which should then be reduced by 40% for a total damages amount of $10,793.20.  The Parties should each bear their own costs and attorneys' fees.

Dated: October 5, 2012

/s/
_____
Kevin R. Garden
Virginia Bar No. 30244
Attorney for Defendants
Ritlabs, Inc. and Serghei Demcenko
International Legal Counsels, PC
901 N. Pitt St., Suite 325
Alexandria, VA22314
Telephone: (703) 535-5565
Fax: (202) 318-0723
kg@legal-counsels.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of October, 2012, I will electronically file the foregoing **DEFENDANTS' PROPOSED FACTS** with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

**John Andrew Baxter**
**I.S. Law Firm PLLC**
**1199 N Fairfax St**
**Suite 702**
**Alexandria, VA 22314**

_____/s/_____
Kevin R. Garden
Virginia Bar No. 30244
Attorney for Defendants
Ritlabs, Inc. and Serghei Demcenko
International Legal Counsels, PC
901 N. Pitt St., Suite 325
Alexandria, VA 22314
Telephone: (703) 535-5565
Fax: (202) 318-0723
kg@legal-counsels.com